Jonathan K. Thorne (Utah Bar No. 12694)
Lauren I. Scholnick (Utah Bar No. 7776)
**SCHOLNICK THORNE HOLLAND**
40 South 600 East
Salt Lake City, Utah 84102
Telephone:(801) 359-4169
Facsimile:  (801) 359-4313
email:     jonathan@utahjobjustice.com
           lauren@utahjobjustice.com

*Attorneys for Defendant Daniel Moussaron*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

# SOUTHERN DIVISION

| | |
|---|---|
| SKYWEST AIRLINES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DANIEL MOUSSARON, and VIKAAS KRITHIVAS, <br><br> Defendants. | **DEFENDANT MOUSSARON'S MOTION TO DISMISS FOR LACK OF JURIDICTION** <br><br> Civil No. 4:26-cv-00015-DN <br><br> Judge David O. Nuffer |

Defendant Daniel Moussaron ("Defendant Moussaron" or "Moussaron"), by and through his undersigned counsel, hereby moves to dismiss Plaintiff SkyWest Airlines, Inc. ("SkyWest") Ex Parte Motions for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") (Dkt. No. 5).

**INTRODUCTION AND BACKGROUND**

Plaintiff-Employer SkyWest seeks to weaponize the federal court system to suppress its

employees' right to organize their fellow employees into a labor union. By seeking an injunction against a former employee for using non-confidential, public contact information to communicate with his coworkers about forming a union, SkyWest asks this Court to disregard nearly a century of settled federal law. Because this case arises directly out of a "labor dispute," the Norris-LaGuardia Act denies this Court jurisdiction to grant the requested injunctive relief.

## SKYWEST PILOTS' 2025 UNION ORGANIZING DRIVE

In April 2025, nearly three years after being hired as a pilot at SkyWest, Defendant Moussaron and other SkyWest pilots began organizing to form a labor union.[1] Mr. Moussaron was a member of the Organizing Committee ("OC") working with the Air Line Pilots Association ("ALPA") to organize SkyWest pilots. In May 2025, the OC launched a website providing information about its intent to unionize and affiliate with ALPA to negotiate a collective bargaining agreement with SkyWest that would provide pilots with job security, enforceable grievance procedures through arbitration, legal representation, industry-leading safety/security resources, etc. *See* https://skw.alpa.org/  Over the following months, the OC communicated with SkyWest pilots, using email, the website, social media, and pilot-to-pilot conversation off-duty, receiving positive feedback to both the OC's efforts and its intent to affiliate with ALPA. The OC began creating a database of pilots' contact information so it could provide periodic updates concerning unionization efforts, assess interest, uncover current working condition issues, and reach ALPA's required threshold of interest for a card drive.

The database was initially created by obtaining contact information from a variety of sources through multiple phases. In phase 1, the OC gathered contact information using a Google Form. In phase 2, the OC created a campaign website, https://skywestalpa.org, showing the

---

[1] SkyWest organized, finances and controls its own in-house organization, SAPA, to discourage employees from exercising their rights to organize. By doing so, SkyWest violates the Railway Labor Act. 45 U.S.C. § 152

benefits ALPA would bring to the pilots that included a self-registration form. Notably, this same domain name had been used in past pilot organizing drives at SkyWest in 2008 and 2019-23, before being revived in 2025. In this phase, the ALPA organizer also provided a pilot contact list from these previous drives. These contacts were all merged into the 2025 database. Then in phase 3, Mr. Moussaron built a Data Management System ("DMS") for the OC members and pilots to share pilot-to-pilot contact information (phone, email, address) for any pilots they might have in their devices. Every pilot that had registered and for whom the OC had an email address received a login to the initial iteration of DMS, and the DMS was used to share contact information for other pilots they might have been flying with or otherwise knew. Then, in phase 4, the OC used automated tools and manual lookups on public data, like the FAA's Airman Registry (a database maintained by the Federal Aviation Administration), White Pages, etc., to pull additional pilot contact information. With all this contact information, it was able to send a postcard about the union efforts in late July or early August 2025 to approximately 97% of the pilots. ALPA then took over the website, by publishing a new version at https://skw.alpa.org, to help legitimize the campaign, as some pilots were concerned that SkyWest might be behind the OC's site. During the months-long drive wherein the OC obtained more contact information from pilots, Mr. Moussaron also obtained contact information through SkyWest's employee directory.

SkyWest maintains an employee directory that is accessible to all SkyWest employees, including its pilots, known as SWOL. Complaint, Dkt. No. 1 ("Compl."), ¶12. SkyWest admits that this directory stores each SkyWest employee's name, phone number, home address, among other data. Compl. ¶13. SkyWest also claims that the directory applies a role-based permission that limits what information is available in this directory to employees. Compl. ¶14. While

SkyWest insists that 99% of pilots, including the Defendants, only had access to view the names, base/location, and supervisor but not phone numbers or addresses, prior to January 2026, SWOL did not limit the data that pilots could view. Compl. ¶¶14-15. This is because all the data was available to every employee, including pilots using a browser's web development tools even if it was not provided on a user-friendly interface.

Specifically, the directory was a standard web application, which will load an employee's profile details after a search of the directory. Although SkyWest displayed only certain information to employees in a user-friendly format, the complete employee profile data could be viewed, without any additional authorization or without exceeding authorized access, by using standard browser developer tools on the profile page.

In August 2025, for the sole purpose of union organizing, Mr. Moussaron accessed SWOL to obtain pilots' phone numbers and addresses to contact them and determine their interest in joining ALPA. Using his authorized access and credentials to SWOL, he pulled up pilots' profiles. While the phone numbers and addresses did not populate in the User Interface, SkyWest's server readily provided that information through the browser's development tools. These development tools are standard, built-in features that provide any user of any default browser the ability to view the webpage in a different way, providing him the sought-after information clearly laid out and identified with field labels and values. Importantly, these Chrome browser's developer tools do not create any additional access, do not defeat authentication, and do not retrieve any additional, unauthorized data. It is just another way to view the data and network traffic that is already provided by the responding server.[2] In short,

---

[2] Defendant Moussaron has an exhibit ready that shows an example of what the data looked like when Mr. Moussaron accessed the data vs. an example of what it looks like now but out of an abundance of caution – because it contains computer coding of SkyWest website – the exhibit has not been filed. If helpful to the Court we can either file the exhibit under seal or provide a

SkyWest's directory in 2025 provided phone numbers and addresses to its employees. SkyWest could have limited access to that data, as it did after discovering that the data was being used for a union drive, but at the time of Mr. Moussaron's actions, it had not.

Although Mr. Moussaron understood he had a legal right to access the information for contacting his coworkers about their interest in unionizing, he instead decided that the OC should collect the contact information as described in the phases above, as opposed to relying solely on SkyWest's directory. This is why it took the OC months after Mr. Moussaron's SWOL directory access to get the contact information necessary to send out its one text message to the pilots. The only information used from the SWOL directory was that of pilots hired between September and early December, because it was the fastest way to get those pilots' contact information to ensure that they were included in the drive.

On December 9, 2025, Mr. Moussaron, as an OC executive member and on its behalf, sent a mass text message to a large subset, but not all, of SkyWest pilots inquiring about their interest in joining ALPA, which read:

> SKW Pilots: SkyWest ALPA Organizing Committee poll re ALPA representation.
> Reply 1=yes 2=unsure 3=no.
> ALPA Confidential Study
> skw.alpa.org – STOP=opt out

See text message Ex. 1.

Within 24 hours of this text message, approximately 1,500 pilots had responded with overwhelming support with 87% of those pilots who received it responding favorably to ALPA representation. Almost simultaneously, SkyWest posted on SWOL an urgent notice titled "SPAM TEXT NOTICE" stating:

> We have received reports that pilots have received text messages on personal devices from groups claiming to be connected to SkyWest. SkyWest does not

---

copy to chambers and the Parties.

>provide contact information to outside third parties and we are investigating if any company policies have been violated. Employees are under no obligation to respond to the message and may report it to their mobile carrier as spam. Remember, you should never provide your contact or personal information to anyone not acting in an official SkyWest capacity (e.g., Crew Support, Travel Center, Employee Relations, etc.), even if they claim to be fellow employees.

See Ex. 2.

This was nothing more than SkyWest's attempt to defeat a legitimate union organization drive initiated by its pilots and protected by the Railway Labor Act.

Since this December 9th text message, the OC has not sent out any other text messages to the pilots. Currently, the OC does not have access to the list of pilot contact information that Mr. Moussaron created. Only Mr. Moussaron has access to that data along with an ALPA organizer. On January 8, 2026, Mr. Moussaron provided the data in an excel spreadsheet to one organizer with ALPA, as part of organizing efforts. However, that ALPA organizer has not used or otherwise distributed the data. Mr. Moussaron has not otherwise distributed or sold any information he obtained from the SkyWest directory and since his termination on January 26, 2026, which was in retaliation for his active and open involvement in organizing a labor union, has not contacted or solicited any SkyWest employee using that information.

## THE NORRIS-LAGUARDIA ACT

Congress enacted the Norris-LaGuardia Act ("the Act") to limit the jurisdiction of federal courts in issuing injunctions in labor disputes and to promote the rights of workers to organize and engage in collective bargaining.[3] The Act takes "the federal courts out of the labor injunction business except in the very limited circumstances left open for federal jurisdiction."[4] Congress

---

[3] *Bhd. Of R.R. Trainmen v. Chicago River & Ind. R.R. Co.,* 353 U.S. 30, 40 (1957); *Firebird Structures, LCC v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1505*, 252 F. Supp. 3d 1132, 1139 (D.N.M. 2017).
[4] *Burlington Northern*, 481 U.S. at 441 (citing Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 369 (1960)).

took this "extraordinary step" because "divesting federal courts of equitable jurisdiction was necessary to remedy [the] extraordinary problem" of judicial intervention in labor disputes.[5] Indeed, "Congress described federal labor injunctions unequivocally as abuses of judicial power."[6] Thus, Congress wrote the Act in "unmistakable language" to ensure that courts did not apply an unduly limited construction of its prohibition on labor injunctions.[7] Following Congress's unequivocal command, federal courts have generally recognized that they lack jurisdiction to enjoin a wide range of labor disputes. In Section 102, Congress explicitly declared the public policy of the Act:

> The individual unorganized worker is commonly helpful to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, . . . it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; THEREFORE, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are enacted.[8]

To facilitate this public policy, the Act defines a "labor dispute" in the broadest possible terms as:

> any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.[9]

---

[5] *Id.* at 437.
[6] *Burlington Northern Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters, Local 174* ("Burlington Northern Santa Fe"), 203 F.3d 703, 709 (9th Cir. 2000) (en banc).
[7] *Burlington Northern*, 481 U.S. at 441.
[8] 29 U.S.C. § 102.
[9] 29 U.S.C. § 113(c).

Thus, federal courts have recognized this broad definition of "labor dispute" to apply to controversies between (i) employer and labor union;[10] (ii) employer and employee;[11] and (iii) employer and the public.[12] Illustrative of the breadth of the definition of "labor dispute" is *New Negro Alliance v. Sanitary Grocery Company*, where the Supreme Court reversed a district court injunction of non-employee picketing by an African-American mutual aid organization against a grocery store that did not employ African-American store clerks.[13]

Section 1 of the Act deprives federal courts of subject matter jurisdiction to issue injunctions "in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of [the Act]."[14] Section 2 explicitly states that Congress enacted the Act to "protect the rights of employees" to engage in "concerted activities . . . for mutual aid or protection" free from federal court interference.[15] Section 4 of the Act implements this Congressional policy by prohibiting injunctions "involving or growing out of any labor dispute" relating to: (b) "becoming or remaining a member of any labor organization;" (e) "giving publicity to the existence of . . . any labor dispute;" (f) organizing "to act in promotion of their interest in a labor dispute;" and (i) "advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified . . . ."[16]

---

[10] *Jacksonville Bulk Terminals,* 457 U.S. 702 (reversed injunction issued by district court in dispute between shipping operator-employer and dockworker union); *Firebird Structures*, 252 F. Supp. 3d at 1139 (district court denied injunction during labor dispute between employer and union).

[11] *Brady v. NFL*, 640 F.3d 785, 790 (8th Cir. 2011) (district court lacked jurisdiction under the Act to issue injunction in dispute between an employer and individual employees.)

[12] *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 554 (1938) (reversed injunction obtained by employer-grocery store in dispute against picketing by non-employee African-American mutual aid society).

[13] 303 U.S. 552, 554 (1938).

[14] 29 U.S.C. § 101.

[15] *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 805 (1945).

[16] 29 U.S.C. § 104 (b), (e), (f), (g), (h), and (i).

Section 7 is the only part of the Act that authorizes an injunction under limited basis, and only after an undertaking with adequate security in an amount sufficient to compensate those enjoined for any loss or expense caused by issuance of an erroneous injunction, including attorneys' fees.[17] To obtain an injunction ex parte under Section 7 without a hearing (which SkyWest is attempting to do), the plaintiff must provide sworn testimony to support an unavoidable, substantial, and irreparable injury to its property not able to be remedied by money damages. Further, if such injunction is ordered, it may be no longer than 5 days.

Under Section 7, an injunction beyond the 5 day TRO, is only appropriate "after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto . . . ."[18] After such a hearing, a court must have heard facts sufficient to support a finding of all of the following: (a) unlawful acts have been threatened and will be committed unless restrained; (b) substantial and irreparable injury to complaint's property will follow; (c) greater injury will be inflicted upon complainant than the denial of relief will be inflicted upon defendants by the granting of relief; (d) that the complainant has no adequate remedy at law; and (e) the public officers charges with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

Lastly, Section 8 mandates that even if an injunction is appropriate, it cannot be entered if the complaining party has failed to make every reasonable effort to settle such dispute.[19]

---

[17] 29 U.S.C. § 107.
[18] *Id.*
[19] 29 U.S.C. § 109.

# ARGUMENT

## I. THIS COURT LACKS JURISDICTION TO ENJOIN MOUSSARON FOR LABOR ORGANIZING UNDER THE ACT

In both its Complaint and Motion for TRO, SkyWest has painted an inaccurate picture of Mr. Moussaron's actions by omitting the critical fact that everything he did was in support of his efforts to lawfully organize his fellow pilots to form a labor union. Instead, SkyWest focuses on his access to the SWOL directory in isolation from these efforts. Indeed, SkyWest tells a fraction of the story, claiming that an employee got *unauthorized* access to its employee directory and *stole* contact information for some malicious purpose contrary to SkyWest's interest. This leaves the Court with the impression that Mr. Moussaron sold the data to a third-party or used it himself to make a buck. This truncated explanation sounds alarming especially when SkyWest asserts that having this information in Mr. Moussaron's possession is somehow a safety risk to its pilots. However, when the Court learns the full story, it is clear that there is no mal intent and Mr. Moussaron was only using non-confidential information for a lawful purpose.

As explained above, Mr. Moussaron, as an OC executive member, created the database containing contact information of pilots for the sole purpose of recruiting his fellow pilots to join a labor union as an ALPA affiliate. The OC obtained the vast majority of the pilot contact information for the database from sources outside of the SWOL directory. While Mr. Moussaron legitimately accessed the SWOL directory for pilot contact information based on his own, and all other employee authorization settings, determined by SkyWest at the time, he did not use that information, except for that of pilots hired between September and December.

After creating the database, Mr. Moussaron used the contact information, only a fraction of it from the SWOL directory, to send one mass text message to gauge the pilots' interest in joining the ALPA labor union. In response, SkyWest fired Mr. Moussaron for his union

organizing in violation of the Railway Labor Act.[20] The point of this lawsuit and the emergency TRO is not, as SkyWest represents, to get back pilot contact information but to chill future labor union organizing of its pilots, which it has a long history of opposing.

As explained above, under the Act, this case "involve[es] or grow[s] out of a labor dispute," because it relates to "becoming or remaining a member of any labor organization;" publicizing "the existence of . . . any labor dispute;" organizing "to act in promotion of [the employees'] interest in a labor dispute;" and "advising, urging, or otherwise causing or inducing without fraud or violence [the employees' organizing drive]." [21] Here, the labor dispute between the pilots' OC and interested pilots and SkyWest is both whether the pilots' want a labor union and, further, whether that union should be an ALPA affiliate. Each action taken by Mr. Moussaron for which SkyWest seeks to enjoin him stems from this dispute. Thus, SkyWest seeks an injunction in a labor dispute under the Act and, as such, pursuant to the Act's Section 4, an injunction here is prohibited.

## II.   EVEN THE ACT'S SECTION 7 DOES NOT ALLOW SKYWEST AN INJUNCTION AGAINST MOUSSARON

While, as analyzed above, Section 7 of the Act authorizes injunction of a labor dispute in an extremely limited basis, SkyWest cannot and does not meet those requirements to enjoin Mr. Moussaron's activities in furtherance of a pilot union. For a court to issue an ex parte TRO, the plaintiff must provide credible, sworn testimony that if the defendant is not enjoined emergently that substantial and irreparable injury to its property will be unavoidable. SkyWest has not

---

[20] 45 U.S.C.S. § 152 ("No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization")
[21] 29 U.S.C.S § 104 (b), (e), (f), (g), (h), and (i).

11

provided such testimony.

Instead, SkyWest provided only the Declaration of Justin Esplin, its Vice President of Information Technology, to support its Ex Parte Motion for TRO and Preliminary Injunction (Dkt. No. 5-1), which fails to credibly assert that without an injunction SkyWest will sustain unavoidable, substantial, and irreparable injury to its property. At best, this declaration only speculates, devoid of the relevant facts about why this information was gathered to begin with, that contact information that Mr. Moussaron may have accessed from the SWOL directory is "uniquely valuable to third parties seeking to mass communicate with SkyWest Pilots . . . [and] unauthorized circulation of pilot contact and location information creates security risks. . . . can spread quickly and be used for mass texts and calls, scams (including phishing), and harassment." (Dkt. No. 5-1 ¶¶ 10, 26.) However, this information was accessed only from August until December 2025, Mr. Moussaron and the OC sent only one text message, using a fraction of this contact information, and made just one alleged phone call. Both the email and the phone call have been for lawful unionizing, not harassment or for financial gain. Additionally, only two people, Mr. Moussaron and an ALPA organizing representative have access to the data. Furthermore, since nearly all individual contact information is available online with a simple search and the employee list was even more accessible through SWOL directory than the phone numbers and addresses, SkyWest will be hard-pressed to argue that the information was confidential. This is especially true because it did not take proper steps to protect the phone and address information. Thus, SkyWest has failed to provide credible, sworn testimony allowing the Court to determine that its employee contact list even in the form of a data compilation is confidential information that when held by Mr. Moussaron creates a concern of unavoidable, substantial, and irreparable injury its property.

In the same vein the Esplin declaration raises the issue of why a TRO is necessary when money damages can provide adequate remedy. The declaration details the more than $5,000 it cost SkyWest to investigate the mass text sent to SkyWest pilots gauging union interest, including using IT and other personnel to investigate. Therefore, it has not provided any facts indicating why, if it prevails, monetary relief would be inadequate.

Because SkyWest has not met the requirement for sworn testimony to secure an ex parte TRO, the next consideration is whether it can secure an injunction after an evidentiary hearing. Specifically, Section 7 provides for an injunction only after a hearing on the merits with the opportunity for cross-examination. At that hearing, SkyWest would have to provide credible evidence to the satisfaction of the Court to prove all of elements listed above. Thus, the Court cannot enjoin Mr. Moussaron without a live hearing.

Lastly, even if the Court holds an evidentiary hearing that satisfies all of the elements for injunction, Section 8 of the Act prohibits such injunction, if the plaintiff has failed to make every reasonable effort to settle the dispute.[22] Here, SkyWest fired Mr. Moussaron on January 26th and then wrote him a cease and desist letter insisting that he meet its various demands, like turning over all of his devices for it forensic inspection, while threatening him with both criminal and civil action. Because the letter claimed that Mr. Moussaron breached a non-disclosure ("NDA") agreement, Mr. Moussaron's attorney requested a copy of the NDA and time to investigate the situation, as he had just been retained. Instead of providing the requested time, SkyWest asked counsel to accept service of a lawsuit against Mr. Moussaron, and then the following business day filed this TRO. Certainly such actions do not meet the requirement of "every reasonable effort to settle the dispute."

---

[22] 29 U.S.C. § 108.

On Friday, February 6th, the Court directed the Parties to meet and confer, which they did on Saturday, February 7th. However, SkyWest demanded that Mr. Moussaron turn over his electronic devices to be reviewed and imaged. Such a draconian measure is not a reasonable demand to resolve this matter.

## CONCLUSION

Accordingly, under the Act, this Court does not have jurisdiction to issue an injunction upon SkyWest's ex parte TRO motion, because this is a labor dispute. Further, SkyWest's briefing does not meet the Act's Section 7 requirements that would allow for such an emergent injunction. Therefore, the Court should dismiss SkyWest's motion with prejudice.

DATED THIS 8th day of February, 2026.

                                              **SCHOLNICK THORNE HOLLAND**

                                              */s/ Jonathan K. Thorne*
                                              Jonathan K. Thorne
                                              Lauren I. Scholnick

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of February, 2026, I caused a true and correct copy of the foregoing **DEFENDANT MOUSSARON'S MOTION TO DISMISS FOR LACK OF JURIDICTION** to be served via CMECF:

Gregory M. Saylin
Zachary T. Burford
Tyler S. Erickson
*Attorney for SkyWest*

And by electronic mail to:
Timothy D. Ducar (tducar@azlawyers.com)
*Attorney for Vikaas Krithivas*