Gregory M. Saylin, #9648
Zachary T. Burford, #19771
Tyler S. Erickson, #19523
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101-2194
Telephone: 801.799.5800
GMSaylin@hollandhart.com
ZTBurford@hollandhart.com
TSErickson@hollandhart.com

*Attorneys for Plaintiff SkyWest Airlines, Inc.*

<div style="text-align:center">

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH – SOUTHERN DIVISION**

</div>

| | |
|---|---|
| SKYWEST AIRLINES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DANIEL MOUSSARON, and VIKAAS KRITHIVAS, <br><br> Defendants. | **PLAINTIFF'S OPPOSITION TO DEFENDANT MOUSSARON'S MOTION TO DISMISS FOR LACK OF JURISDICTION** <br><br> Civil No. 4:26-cv-00015-DN-PK <br><br> Senior District Judge David Nuffer <br> Magistrate Judge Paul Kohler |

Plaintiff SkyWest Airlines, Inc. ("SkyWest"), by and through its undersigned counsel, hereby responds in opposition to Defendant Daniel Moussaron's ("Defendant" or "Moussaron") Motion to Dismiss for Lack of Jurisdiction ("Motion") (Dkt. 25). Defendant accuses SkyWest of "weaponizing" the federal courts. The record shows the opposite. SkyWest did not choose this forum to silence anyone; it came to federal court because Defendants used their SWOL credentials to bypass role-based controls, scripted a mass extraction of non-public employee phone numbers and home addresses from a protected system, and then used and shared that data

outside SkyWest—including uploading it to a third-party SMS platform and transmitting a CSV to an ALPA organizer. That conduct violates their NDAs, SkyWest's Code of Conduct and policies, and state and federal computer-access laws. SkyWest first attempted to resolve the matter by meeting with Mr. Moussaron after discovering the hack, and with cease-and-desist letters and preservation demands; only after Defendants denied involvement and refused adequate assurances did SkyWest seek judicial protection to stop the ongoing misuse and secure employee data. The Norris–LaGuardia Act ("NLGA") does not immunize theft or unauthorized computer access, and SkyWest's narrowly tailored request does not restrain any lawful organizing—it seeks only to prevent further use and spread of SkyWest-derived, non-public information and to preserve evidence.

## BACKGROUND

SkyWest operates a secure, internal employee portal—SkyWest Online (SWOL)—that requires unique credentials and multifactor authentication and applies role-based permissions that restrict front-line pilots from viewing restricted fields such as personal cell phone numbers and home addresses. Dkt. 5-1, Esplin Decl. ¶¶5–8; Dkt. 1 ¶¶12–15, 57. SkyWest treats employee personal information as confidential and invests financial, technical, and personnel resources to safeguard it within SWOL. Dkt. 5-1, Esplin Decl. ¶¶7–8; Dkt. 1 ¶¶12–14. SkyWest's Code of Conduct expressly classifies "Personal information about SkyWest employees" as confidential and prohibits disclosure of non-public information, and its Social Media policy prohibits sharing "any details about employees . . . such as their contact information, address" or any "content from . . . SkyWest Online"; SkyWest's Corrective Action policy identifies "Misuse or theft of . . .

2

employee's personal information" as a serious infraction. Dkt. 35-1 (SP 150 §13.B); *id.* (SP 161 §§2.C, 3.A); *id.* (SP 73 §2.C.4).

As a condition of employment, both Defendants executed Confidentiality and Nondisclosure Agreements (NDAs) in which they agreed not to use SkyWest Confidential Information for non-business purposes or to disclose it, and which define Confidential Information to include "employee data" in "personnel records." Dkt. 1 ¶¶16–20, 42–45; Dkt. 5-1, Esplin Decl. ¶¶27–29 & Ex. A-1. Defendants separately acknowledged SkyWest's policies, including the Code of Conduct and Social Media policy. Dkt. 35 at 3 & Ex. 2. Notwithstanding these obligations, Defendants extracted massive amounts of employee data from the SWOL directory and used that information for non-SkyWest purposes. Dkt. 5-1, Esplin Decl. ¶¶18–22; Dkt. 5 at 6–8; Dkt. 1 ¶¶30–33.

Defendants' own sworn submissions admit the essential facts: they used browser tools to circumvent SWOL's role-based permissions, and they used scripts to mass extract this data. Dkt. 34-1, Moussaron Decl. ¶¶7, 10–13, 18–19; Dkt. 33-2, Krithivas Decl. ¶¶3–4. Defendants further admit they used the dataset for non-SkyWest purposes by exporting it to a third-party SMS platform to send a mass text to pilots on December 9, 2025, and shared it externally by providing the dataset to an ALPA organizer. Dkt. 34-1 ¶¶24, 26. While Defendants seek to limit the extent of their use and sharing, Defendants fail to address that SkyWest's logs and pilot reports show that pilots continue to receive unsolicited calls and messages on their devices. Dkt. 5-1, Esplin Decl. ¶¶23–24; Dkt. 5 at 8–9; Dkt. 1 ¶¶36–37.

This lawsuit does not seek to regulate wages, hours, or other terms and conditions of the employment of SkyWest pilots or to restrain union activity; it seeks only to halt further use,

retention, and dissemination of non-public, SkyWest-derived employee data and to preserve and locate that data and related artifacts. Dkt. 5 at 2–4, 21. Moreover, there is no ongoing employment relationship at issue: Defendant Krithivas resigned effective September 12, 2025, and Defendant Moussaron's employment ended on January 26, 2026. Dkt. 1 ¶28; Dkt. 5-1, Esplin Decl. ¶17; Dkt. 25 at 10. And Defendants present no evidence that SkyWest knew they were acting on behalf of an ALPA organizing committee; they never disclosed such roles, ALPA gave no notice identifying Defendants as part of an organizing committee (which is typical for ALPA to do), and SkyWest first learned of their claimed ALPA affiliation through these filings. Dkt. 35 at 5; Dkt. 25 at 2–6. Defendants now seek to cloak their wrongful scraping and dissemination of non-public employee data in union-organizing rhetoric. But as shown below, this is not a labor dispute. This is a straightforward case of data misappropriation by two former employees.

## LEGAL STANDARD

The Norris–LaGuardia Act, 29 U.S.C. §§ 101–115, limits federal courts' power to issue restraining orders and injunctions only in cases "involving or growing out of a labor dispute," and then only "in strict conformity with the provisions of this chapter." 29 U.S.C. § 101. Congress declared the Act's policy in § 102 to protect employees' freedom of association, self-organization, and designation of representatives for collective bargaining and mutual aid, free from judicial interference.

A threshold requirement is the existence of a "labor dispute" as defined by § 113(c): "any controversy concerning terms or conditions of employment, or concerning the association or

representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment," regardless of a proximate employer–employee relationship.

If a case qualifies as a labor dispute, § 104 withdraws jurisdiction to restrain specified conduct, including: ceasing or refusing to perform work; joining or remaining in a labor organization; giving publicity to a labor dispute by lawful means; peaceably assembling to act or organize to act in promotion of interests in a labor dispute; advising, urging, agreeing to do such acts; and related lawful support activities, so long as the conduct does not involve fraud or violence. 29 U.S.C. § 104(b), (e)–(i).

Even in labor-dispute cases, injunctions are permitted upon compliance with § 107's prerequisites, which include: (i) a hearing with testimony in open court and opportunity for cross-examination; and specific findings that unlawful acts have been threatened or committed and will continue unless restrained; (ii) that substantial and irreparable injury to the complainant's property will follow; (iii) that greater injury will result from denial than from granting relief; that there is no adequate remedy at law; and (iv) that public officers are unable or unwilling to furnish adequate protection. 29 U.S.C. § 107.

## ARGUMENT

### A.    Defendant's Motion Is Procedurally Improper.

Defendant's Motion asks the Court to dismiss SkyWest's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 5). While Defendant's Motion does not invoke any specific rule of procedure, Federal Rule 12(b) provides for motions to dismiss "a claim for relief in any pleading." Fed. R. Civ. P. 12(b). Rule 7(a) exhaustively defines what counts as a pleading. *Id.* 7(a) (including complaints and answers). A motion is not a pleading.

*See H.S. Field Servs., Inc. v. CEP Mid-Continent, LLC*, 2015 U.S. Dist. LEXIS 10254, at *2 (N.D. Okla. Jan. 29, 2015) (overruling objections to and accepting report and recommendations from magistrate that held that a motion to dismiss was "not a pleading within the meaning of the Federal Rules of Civil Procedure"); *AIG Annuity Ins. Co. v. Law Offices of Theodore Coates, P.C.*, 2008 U.S. Dist. LEXIS 66674, at *17 (D. Colo. Sep. 2, 2008) (holding that a motion to strike under Rule 12(f) cannot be directed at a motion to dismiss because it is not a pleading). Defendants' Motion to dismiss, which is not directed at SkyWest's pleadings and only attacks the appropriateness of relief sought, is thus procedurally improper and could be denied on that ground alone. *See United States v. Maricopa Cnty., Ariz.*, 915 F. Supp. 2d 1073, 1082 (D. Ariz. 2012) ("A 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings, not the appropriateness of the relief sought").

And to be sure, even if the Court were to grant Defendant's procedurally improper motion and dismiss SkyWest's pending Rule 65 applications, that ruling would not dispose of or diminish any of SkyWest's claims on the merits. The motion targets only the requested temporary remedy; it does not challenge the Complaint or the Court's subject-matter jurisdiction to adjudicate those claims. *See, e.g.*, *Bray Sheet Metal Co. v. Int'l Ass'n of Sheet Metal*, 2020 U.S. Dist. LEXIS 209461, at *26 (E.D. Ark. Nov. 9, 2020) ("For these reasons, the Court determines the [NLGA] does not serve as a basis to dismiss in its entirety plaintiffs' amended complaint."). Properly understood, the NLGA at most limits the availability of certain interim injunctions in true labor disputes; it does not strip jurisdiction to adjudicate statutory, contractual, and tort claims, nor does it preclude damages or declaratory relief. *See Sheet Metal Workers Int'l Ass'n v. Seay*, 693 F.2d 1000, 1003 (10th Cir. 1982) ("The argument that the district courts are

without jurisdiction to hear labor cases in which injunctive relief is sought, based on the use of the term 'jurisdiction' in the [NLGA], was put to rest by the Supreme Court . . . ." (footnote omitted), *modified on other grounds*, 696 F.2d 780 (10th Cir. 1983)).

SkyWest's causes of action for breach of confidentiality agreements, violations of the CFAA and UCADRA, breach of fiduciary duty, and civil conspiracy would proceed to discovery and adjudication, and SkyWest would remain entitled to damages, declaratory relief, and, if appropriate, tailored injunctive relief after an evidentiary hearing consistent with 29 U.S.C. § 107. In short, dismissing the TRO/PI requests would affect only the timing and form of interim relief, not the viability or adjudication of the claims themselves. However, even if the Court were to reach Defendant's Norris–LaGuardia contention, it fails on the merits

## B.    The NLGA Does Not Apply Because This Is Not a Labor Dispute.

Defendant's NLGA argument depends on recharacterizing a data-theft and confidentiality dispute as a union-organizing case. That characterization does not withstand scrutiny. The claims pleaded and the relief sought arise from Defendants' unauthorized access to SkyWest's protected computer systems, extraction and compilation of nonpublic employee contact information, and subsequent misuse and dissemination of that information in violation of federal and state computer statutes and express confidentiality obligations. They do not concern bargaining, representation, or the terms and conditions of employment, and the injunction SkyWest seeks is carefully tailored to halt further misuse of SkyWest-derived data and to preserve evidence without infringing on any such organizing activity. The NLGA's jurisdictional limits reach only "cases involving or growing out of a labor dispute," 29 U.S.C. § 101, and this is not such a case.

Congress defined "labor dispute" for NLGA purposes as a controversy "concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." 29 U.S.C. § 113(c). The Supreme Court has emphasized that the "critical element" in determining NLGA applicability is whether "the employer–employee relationship [is] the matrix of the controversy." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712 (1982).[1] Thus, while the definition of "labor dispute" is broad, it has its limits.

For example, in *Columbia River Packers Ass'n v. Hinton*, 315 U.S. 143 (1942), the Supreme Court reversed a jurisdictional dismissal and held that a dispute between a fish processor and independent fishermen over the terms on which fish would be sold was not a "labor dispute" because it did not concern "terms or conditions of employment" or representation within the meaning of § 13(c) of the NLGA; the "attention of Congress was focused upon disputes affecting the employer-employee relationship," and the Act "was not intended to have application to disputes over the sale of commodities." *Id.* at 145–46. The Court emphasized that "statutory classification, however broad, of parties and circumstances to which a 'labor dispute' may relate does not expand the application of the Act to include controversies upon which the employer-employee relationship has no bearing." *Id.* at 147. Likewise here, the controversy concerns unauthorized access to and misuse of nonpublic data and enforcement of confidentiality and computer-abuse statutes; it "does not place in controversy the wages or hours, or other terms and conditions of employment." *Id.* at 147.

---

[1] Pursuant to the Court's Minute Entry Order (Dkt. No. 31), SkyWest provides further detail on the cases cited in its Memorandum on the Inapplicability of the NLGA (Dkt. No. 26, at 3).

*Taylor v. International Union of Journeymen Horseshoers*, 353 F.2d 593 (4th Cir. 1965), reinforces that the NLGA does not apply where the employer–employee relationship is not the matrix of the controversy. There, racehorse trainers sued a horseshoers' union for group boycott and price-fixing. The district court dismissed, deeming it a "labor dispute" barred by the NLGA, but the Fourth Circuit reversed after concluding the farriers were independent contractors, not employees, and that "we fail to discover the existence of any employer–employee relationship which is the 'matrix' of this controversy." *Id.* at 606.

In *New Orleans Steamship Ass'n v. General Longshore Workers*, 626 F.2d 455 (5th Cir. 1980), the International Longshoremen's Association (ILA) responded to the Soviet invasion of Afghanistan by instructing its Gulf and Atlantic locals to boycott all Soviet-bound cargo. In New Orleans, the stevedores operating under collective bargaining agreements with the ILA attempted to hire longshore gangs to load licensed grain on the motor vessel JULIA L; the locals refused. The New Orleans Steamship Association and TTT Stevedores invoked expedited arbitration under three separate CBAs, and three arbitrators each found the work stoppage violated the agreements' no-strike clauses, issuing cease-and-desist awards. When the locals persisted, the district court enforced the awards and preliminarily enjoined work stoppages tied to licensed grain. On consolidated appeal, the Fifth Circuit emphasized that the Norris–LaGuardia Act was enacted "to curb federal courts in their use of injunctions against strikes and other economic weapons in labor disputes," *id.* at 464, but held the district courts could issue injunctions to enforce the arbitrators' cease-and-desist awards.

Defendant's contrary position relies entirely on unpled assertions about organizing efforts and his subjective motivation. He cites no authority—and SkyWest has found none—holding

that a defendant may invoke the NLGA to bar an injunction against theft or misuse of confidential information simply by claiming an organizing purpose. Courts look to the nature of the controversy before them, not a party's asserted motive, to determine whether the NLGA applies.

Take *Retail Clerks Union v. Alfred M. Lewis, Inc*., 327 F.2d 442 (9th Cir. 1964), for example. There, a union sued employers under § 301 of the LMRA to enforce a collectively bargained cost-of-living wage clause; the court held the district court had jurisdiction and that the NLGA did not strip it, because the relief sought did not enjoin any conduct specified in § 104 and the controversy was, at most, a "mere disagreement" over contract terms—not the sort of economic pressure the Act was designed to curb. Here, there is not even a collective bargaining agreement at issue, a represented unit, or any request to enjoin strikes, picketing, publicity, or organizing. If the NLGA did not deprive jurisdiction in *Retail Clerks*—where the parties' relationship was governed by a CBA and the union sought specific performance—then a fortiori it does not apply to this non-CBA, non-bargaining dispute that targets no § 104 activity and seeks only an injunction expressly carved to leave all lawful, non-SkyWest-derived communications and organizing untouched.

Courts consistently decline to apply the NLGA when the employer–employee relationship is not the "matrix of the controversy" and the injunction sought does not restrain the activities enumerated in § 104:

- *In re Continental Airlines, Inc*., 484 F.3d 173 (3d Cir. 2007): The Third Circuit affirmed an injunction against resuming arbitration and held the NLGA did not apply because the case was not a "labor dispute," explaining that, although the term has been construed broadly, "this case involves one employee group's claims for money damages against another employee group under a CBA that no longer governs any employer-employee

10

relationship," and thus "the 'matrix' of this controversy cannot fairly be considered the 'employer-employee relationship.'"

- *Carpenters Pension Trust Fund of Kansas City v. Industrial Maintenance of Topeka, Inc.*, 2023 U.S. Dist. LEXIS 16297 (D. Kan. Jan. 31, 2023): The court rejected an NLGA jurisdictional bar in an ERISA contributions case because "Plaintiffs' requests are specific to fringe benefit contributions—they don't seek to negotiate terms or conditions of employment," and therefore the defendant "hasn't shown this matter concerns a 'labor dispute' under the NLA."

- *Tomkins Industries, Inc. v. Sheet Metal Workers' Int'l Ass'n, Local No. 2*, 903 F. Supp. 1438 (D. Kan. 1995): The court found the NLGA inapplicable where the employer sought an injunction related to union labels, noting "the injunction requested by the employer does not seek to enjoin one of the acts enumerated in § 104," and that a disagreement over the contractual requirements in the CBA regarding union labels "is not a labor dispute" as defined by the NLGA.

- *San Diego Police Officers' Ass'n v. Aguirre*, 2005 U.S. Dist. LEXIS 38166 (S.D. Cal. Nov. 1, 2005): The police union brought a broad § 1983 and state-law challenge arising from alleged pension underfunding and benefit reductions. The court held the NLGA did not bar injunctive relief because the claims (breach of contract, conversion, fraud, breach of fiduciary duty, violation of public policy) and facts surrounding them (failing to fund a retirement fund and unlawfully interfering with retirement benefits) were not a "labor dispute" as intended under § 104 and the requested injunction did not restrain § 104 activities, emphasizing the Act's purpose "to prevent the then widespread use of the labor injunction as a means of defeating the efforts of labor to organize and bargain collectively."

- *Pineda v. Skinner Servs.*, 22 F.4th 47, 57–58 (1st Cir. 2021): Holding that claims for unpaid wages under the FLSA do not constitute a "labor dispute" as defined by the NLGA because the responsibility to pay wages "is not related to employer–employee negotiations or their disputes."

These cases teach that there are limits to the NLGA's application in cases that do not involve true labor disputes. The facts and circumstances of these cases are much more analogous to the matter before the Court here than any case provided by Defendant.  Taken together, these authorities confirm the NLGA's reach is confined to controversies whose gravamen is collective bargaining or the use of traditional economic weapons, with the employer–employee relationship as the matrix. It is not here. The operative issues are whether Defendants exceeded authorized

access to a protected computer under the CFAA and Utah's Computer Abuse and Data Recovery

Act, breached their confidentiality agreements and duties, and conspired to scrape and use

nonpublic personal phone numbers and home addresses from SkyWest's role-restricted

directory. Those are classic statutory, contractual, and property-rights questions that do not

require the Court to referee a bargaining dispute or restrain economic pressure between labor and

management.[2]

And while the definition of a "labor dispute" may capture a wide range of controversies,

this case bears no resemblance to the types of cases that have been captured under this broad

definition. *See, e.g., Bhd. of Maintenance Way Employees*, 481 U.S. at 441-42 (holding that

NLGA prevents ***injunctions against union picketing*** of terminals through which employer's

trains ran); *Jacksonville Bulk Terminals*, 457 U.S. at 712 (holding that NLGA applied to power

of federal court to enjoin a  union's work stoppage to unload goods shipped from the Soviet

Union in protest of the Soviet invasion of Afghanistan was a "labor dispute"); *Marine Cooks &*

*Stewards v. Panama Steamship Co*., 362 U.S. 365, 370, 80 S. Ct. 779, 4 L. Ed. 2d 797 (1960)

(holding that union dispute with foreign ship over substandard wages and working conditions of

employees of foreign employer is a NLGA labor dispute); *Order of R.R. Telegraphers v.*

---

[2] Defendants' position extends the NLGA past the point of absurdity. If every breach of an NDA, misuse of confidential information, or violation of computer-access laws could be recast as a "labor dispute" merely by asserting an organizing motive, the NLGA would be stretched beyond recognition and would swallow ordinary contract, property, and statutory claims—an outcome the cases above squarely reject. The NLGA was enacted to curb anti-union labor injunctions, not to immunize wrongful access to protected computers or the theft and dissemination of confidential employee PII; accepting Defendants' theory would turn the NLGA into a "get-out-of-liability" card for any employee who invokes organizing after the fact, which is precisely what the statute and the case law do not permit.

*Chicago N.W. Ry.*, 362 U.S. 330, 335, 4 L. Ed. 2d 774, 80 S. Ct. 761 (1960) (holding that a

union's demand that no existing position be abolished except by agreement between employer

and union is a "labor dispute" under NLGA); *New Negro Alliance v. Sanitary Grocery Co.*, 303

U.S. 552, 562, 82 L. Ed. 1012, 58 S. Ct. 703 (1938) (holding that federal court did not have

jurisdiction to issue an injunction restraining picketing in dispute between an employer and a

nonlabor organization over racial discrimination in hiring is a labor dispute).

      Finally, there is no labor-related activity to enjoin here. Both Defendants are no longer

SkyWest employees, and by their own account they have voluntarily halted any organizing

campaign. SkyWest disputes Defendants' narrative that the cessation of organizing was caused

by SkyWest's conduct and instead attributes it to Defendants' wrongful acquisition and misuse

of nonpublic, SWOL-derived contact data. But either way, the narrow order SkyWest seeks

would not reach any labor activity protected by the NLGA. The proposed injunction is expressly

limited to prohibiting the use, retention, disclosure, or dissemination of SkyWest-derived,

nonpublic employee contact information and to preserving related evidence, and it will include

an explicit carve-out confirming that Defendants remain free to communicate with SkyWest

employees by lawful means, including using contact information employees voluntarily provide

or information obtained from public sources. Thus, even if Defendants were to resume

union-related communications at some future point, they would be free to do so without relying

on misappropriated SkyWest data. There is, therefore, no labor conduct before the Court for the

injunction to restrain, and the NLGA is not implicated.

**C.    Even if the NLGA Applies, SkyWest's Request for Injunctive Relief Stands**.

      Even if the Act applied, dismissal of SkyWest's motion for preliminary injunction is not

the answer. The statute permits injunctions "in strict conformity" with its terms. Section 107 authorizes relief after a prompt evidentiary hearing with live testimony and specific findings. 29 U.S.C. § 107. SkyWest is prepared to present live testimony establishing unlawful acts that have occurred and will recur without restraint; substantial, irreparable injury to SkyWest's property and employee privacy; the lack of any adequate legal remedy to prevent further spread of the data; and that the balance of harms and public interest favor relief.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss (Dkt. 25).

Dated this 12th day of February, 2026

<div style="margin-left:40%">

HOLLAND & HART LLP

*/s/ Zachary T. Burford*
Gregory M. Saylin
Zachary T. Burford
Tyler S. Erickson

*Attorneys for Plaintiff SkyWest Airlines, Inc.*

</div>

37041512_v1