Jonathan K. Thorne (Utah Bar No. 12694)
Lauren I. Scholnick (Utah Bar No. 7776)
Jack Holland *(pro hac vice)*
**SCHOLNICK THORNE HOLLAND**
40 South 600 East
Salt Lake City, Utah 84102
Telephone:(801) 359-4169
Facsimile: (801) 359-4313
email:    jonathan@utahjobjustice.com
          lauren@utahjobjustice.com
          jack@laborwest.com

*Attorneys for Defendant Daniel Moussaron*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## SOUTHERN DIVISION

| | |
|---|---|
| SKYWEST AIRLINES, INC., <br><br>       Plaintiff, <br><br> vs. <br><br> DANIEL MOUSSARON, and VIKAAS KRITHIVAS, <br><br>       Defendants. | **DEFENDANT MOUSSARON'S REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS FOR LACK OF JURIDICTION** <br><br> Civil No. 4:26-cv-00015-DN <br><br> Judge David O. Nuffer |

Defendant Daniel Moussaron ("Defendant Moussaron" or "Mr. Moussaron"), by and through his undersigned counsel, hereby responds to Plaintiff SkyWest Airline's ("SkyWest") opposition to Defendant Moussaron's Motion to Dismiss for Lack of Jurisdiction ("Opp."), Dkt. 39.

## INTRODUCTION AND BACKGROUND

This case presents a straightforward application of the Norris-LaGuardia Act's ("the Act") jurisdictional limitations. The evidence plainly demonstrates that this matter involves a "labor dispute," as defined by the Act, and therefore this Court lacks jurisdiction to issue injunctive relief sought by Plaintiff SkyWest without all the Act's standards and procedural protections. The timeline of events, SkyWest's own communications, and critically, allegations made in SkyWest's own Complaint establish that SkyWest was fully aware that Defendant Moussaron's actions were undertaken in furtherance of organizing a labor union as the exclusive bargaining agent of SkyWest pilots.

The following timeline demonstrates that this case involves a labor dispute:

1. In April, 2025, Mr. Moussaron began organizing a union at SkyWest. Declaration of Defendant Daniel Moussaron in Support of Motion to Dismiss, Dkt. 42, ("Moussaron Decl.") ¶ 3.

2. Over the following several months, as a member of an "Organizing Committee" in coordination with the Air Line Pilots Association ("ALPA"), Mr. Moussaron launched an organizing website promoting unionization, communicated with fellow SkyWest pilots about forming a labor union, and created a database to track progress of the union organizing drive. Moussaron Decl. ¶¶ 4-7.

3. In August, 2025, to gather information to assist in building support for an ALPA-affiliated union, Mr. Moussaron accessed SkyWest Intranet ("SWOL") to obtain pilots' phone numbers and addresses. Moussaron Decl. ¶ 26; Esplin Decl., Dkt. 5-1, ¶ 14.

4. On December 9, 2025, Mr. Moussaron sent a mass group text to SkyWest pilots to gauge each one's interest in joining ALPA:



Moussaron Decl. ¶ 42; Def. Mot. to Dismiss, Dkt. 25 ("Mot."), at 5.

5.  The next day, on December 10th, in response to the SkyWest ALPA Organizing Committee's text message, SkyWest posted an "urgent notice," entitled "Spam Text Notice," warning employees not to respond to "text messages on personal devices" and advising them not to "provide your contact or personal information to anyone not acting in an official SkyWest capacity":



Dkt. 25-2. Critically, SkyWest has provided no evidence of any other mass communication to employees during this time to which such a notice could have been responsive.

6.  On January 26, 2026, Mr. Moussaron was questioned by SkyWest Management regarding his SWOL access, threatened with criminal charges and then immediately terminated his employment. Moussaron Decl. ¶¶ 33, 34.

7.  That same day, at 8:30 p.m. MST, SkyWest, through its President/CEO, Chip Childs, sent all pilots a message through SWOL stating, in part:

> We recently became aware that two non-former pilots' actions trampled on these values, violating our company policies and, more importantly, your trust. Their actions serve as an appalling reminder of the lengths to which certain organizations and interests will go to gain access to our people. In this case, they went as far as unethically and unlawfully stealing your information in the hopes of reaching and influencing you.

A Message to Pilots from Chip, attached as Exhibit ("Ex.) 1.

This sequence of events reveals that SkyWest was fully aware that Mr. Moussaron's access to pilot information through SWOL was part of a larger concerted effort to organize his fellow pilots into a union represented by ALPA. Thus, in no uncertain terms, this matter involves a "labor dispute."

## ARGUMENT

## I.    DEFENDANTS' UNION ORGANIZING ACTIVITY FALLS SQUARELY WITHIN THE ACT'S DEFINITION OF "LABOR DISPUTE"

The Act's clear definition of a "labor dispute" encompasses the present controversy. The statute defines "labor dispute" to include "*any controversy* concerning terms or conditions of

employment or *concerning the association* or representation of *persons* in negotiating, fixing, maintaining, changing, or *seeking to arrange terms or conditions of employment*, regardless of whether or not the disputants stand in the proximate relation of employer and employee."[1]

Mr. Moussaron's efforts to contact his coworkers about forming a union at SkyWest is the essence of what the Act calls a "labor dispute." The undisputed facts establish that Mr. Moussaron began organizing in April 2025 and in the following months, he and his fellow union organizers built a website to track their progress; launched a social media campaign to promote interest in forming a union; and communicated directly with coworkers through calls, emails, postcards, texts, and one-on-one talks about joining ALPA. In August 2025, he accessed SWOL and obtained coworker contact information for the purpose of communicating with them about forming a union. On December 9, 2025, he sent a mass text message to gauge pilot interest in joining an ALPA affiliated labor union. These activities directly concern "the association or representation of persons" and constitute efforts "seeking to arrange terms or conditions" of employment through union representation.

The Act further establishes that "a case shall be held to involve or grow out of a 'labor dispute' when the case involves persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests therein; or who are employees of the same employer."[2] Here, the pilots all ply the same trade; work for SkyWest as employees, not independent contractors; and are communicating about whether to form a union, which satisfies this statutory requirement.  In addition, the Act provides that a case meets the definition when there exist conflicting or competing interests of the parties in such "labor dispute."[3] SkyWest's

---

[1] 29 U.S.C. § 113(c) (emphasis added).
[2] 29 U.S.C. § 113(a).
[3] 29 U.S.C. § 113(a)(3).

own actions and communications demonstrate that it is a party in the labor dispute competing with the interests of the pilots. Specifically, in response to Mr. Moussaron's December 9th text message to coworkers about ALPA, SkyWest immediately sent pilots a message mischaracterizing the organizing message as "SPAM TEXT NOTICE" and advised them not to respond. Likewise, SkyWest's CEO's message to its pilots, sent on the same day SkyWest threatened Mr. Moussaron with criminal charges regarding his activity within SWOL and terminated his employment is unmistakable evidence that SkyWest knew that that activity was connected to the ALPA organizing efforts, even though SkyWest was calculated in not naming ALPA. Ex. 1. There is close temporal proximity between SkyWest's responses to union activity. First, SkyWest sent the spam notice immediately after the December 9th organizing text to all pilots. Then, on January 26, 2026, after receiving an alleged complaint from a pilot regarding an "unsolicited call . . . promoting an outside effort unrelated to legitimate SkyWest business,"[4] SkyWest interrogated and terminated Mr. Moussaron. Later that same day, SkyWest's CEO sent his Message to Pilots characterizing Mr. Moussaron's actions as "appalling reminder of the lengths which certain organizations and interest will go to gain access to our people."[5] SkyWest's quick and combative action establishes the connection to and the adversarial nature of this dispute concerning an attempt by employees to organize a union.

## II.    SKYWEST'S COMPLAINT ALLEGATIONS CONFIRM ITS KNOWLEDGE OF UNION ORGANIZING ACTIVITIES

If the suspicious timing of SkyWest's punitive actions are not enough to prove its knowledge of union organizing by Defendants, SkyWest's Complaint allegations confirm that it knew of Mr. Moussaron's organizing efforts. First, the Complaint ¶ 36 alleges that "shortly after

---

[4] Compl. ¶ 37.
[5] Exhibit 1.

Defendants' last download session on December 8, 2025, SkyWest pilots were sent mass messages on their personal cell phones regarding matters unrelated to legitimate SkyWest business operations."[6] Even though SkyWest does not explain the purpose of the "illegitimate" mass messages, it cannot be denied that it refers to the December 9[th] union organizing message that was sent to pilots. This paragraph also demonstrates that SkyWest connects the message about ALPA sent to pilots with Defendants' actions in accessing SWOL alleging, "Defendants, *or persons acting in concert with them*, used the compiled Company Directory data—including personal phone numbers and, upon information and belief, home addresses—to facilitate and distribute those communications."[7]

Then in Compl. ¶ 37, SkyWest admits that it received a pilot complaint after someone "promoting an outside effort" and "acting in concert with Defendants and using SkyWest Confidential Information impermissibly obtained from SWOL to contact this pilot" called him.

In Compl. ¶ 38, SkyWest concludes, "On information and belief, Defendants plan, if not enjoined by a court, to continue to use, exploit, and/or disseminate SkyWest's Confidential Information for their own benefit or the benefit *of other third parties* and to the detriment of SkyWest and its employees." When all these allegations are linked, there is no other conclusion than "other third parties" refers to ALPA, the union that Mr. Moussaron and the Organizing Committee were attempting to organize at SkyWest.

The Complaint's allegations, combined with the actual timeline, demonstrate that SkyWest was aware that Defendants' actions were taken in furtherance of union organizing activities. The CEO of SkyWest's message to pilots explicitly referenced "certain organizations" – obviously referring to ALPA – and characterized Defendants' actions as "unethically and

---

[6] Complaint, Dkt. 1 ("Compl.").
[7] Compl. ¶ 36 (emphasis added).

unlawfully stealing your information in the hopes of reaching and influencing you." This statement directly acknowledges that SkyWest knew that Defendants' purpose in accessing the contact information was to communicate with their coworkers about union representation.

## III.    CASELAW CLARIFIES THE ACT APPLIES TO UNION ORGANIZING ACTIVITIES

Based on the timeline which shows SkyWest's knowledge of Defendants' union organizing purposes, the caselaw demonstrates the applicability of the Act to this labor dispute. Courts have held that union organizing itself and other matters relating to employees' efforts to associate with and be represented by an exclusive bargaining representative, *i.e.* a labor union, fall squarely within the Act's protections, barring federal courts from enjoining the employees' actions without following its dictates. In *Corporate Printing Company v. New York Typographical Union No. 6*, the Second Circuit vacated a district court injunction to halt customer service employees' attempts to organize a union after the National Labor Relations Board ("NLRB") determined that the employees were "managerial" and therefore excluded from coverage under the National Labor Relations Act ("NLRA").[8] In reversing, the circuit court determined that "there can be no doubt that there was a controversy 'concerning the association or representation' of the customer service men for the purpose of collective bargaining over the terms and conditions of employment."[9] It further held that the customer service employees' ineligibility under the NLRA  had no impact on their right of association for the purpose of collectively bargaining terms of employment with their employer under the Act.[10] Notably, even organizing campaigns of employees ineligible for NLRA coverage may not be enjoined under

---

[8] 555 F.2d 18 (2d Cir. 1977).

[9] *Id.* at 21.

[10] *Id*. ("We believe that there is no controlling authority which equates ineligibility under NLRA with amenability to the injunction process as prohibited by the Norris-LaGuardia Act.")

the Act.

But not just the circuits recognize organizing as a labor dispute. The Supreme Court in *Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc* held that a union organizing campaign was a "labor dispute" under the Act, recognizing activity to organize workers to address working conditions, constituted a "labor dispute."[11] It further explained that a labor dispute is a controversy "concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment."[12]

Then, more recently, the Ninth Circuit in *Amazon.com Servs., LLC v. Teamsters Amazon Nat'l Negotiating Comm.* affirmed the district court's denial of Amazon's preliminary injunction motion in a labor dispute due to Amazon's treatment of employees who attempted to unionize and its refusal to recognize the Teamsters as a bargaining representative.[13]  In response to Amazon's conduct, the Teamsters filed unfair labor practice charges with the NLRB,  which prompted Amazon to sue the NLRB seeking an injunction to halt its administrative proceedings.[14] The Ninth Circuit rejected Amazon's argument that the Act was not triggered because the dispute was Amazon's with the Board not its employees.[15] Notably, both Amazon and SkyWest here relied on *Columbia River Packers Ass'n. v. Hinton*[16] for the proposition that the Act should not apply in "controversies upon which the employer-employee relationship has no bearing." However, in *Amazon*, the Ninth Circuit held that, as here, the case grew out of the labor dispute between Amazon and the Teamsters, which means it is a labor dispute that cannot

---

[11] 311 U.S. 91 (1940).

[12] *Id.* at 99.

[13] 163 F.4th 624, 2025 U.S. App. LEXIS 33827 (9th Cir. 2025); accord *Spring Creek Rehab. & Nursing Ctr. LLC v. NLRB,* 160 F.4th 380 (3d Cir. 2025). *Contra Space Exploration Technologies Corp. v. NLRB*, 151 F.4th 761 (5th Cir. 2025).

[14] *Id.* at *6.

[15] *Id*. at *16.

[16] Dkt. 39 at 8 (citing *Columbia River Packers Ass'n v. Hinton*, 315 U.S. 143, 147 (1942)).

be enjoined under the Act.[17] Here, although SkyWest terminated Mr. Moussaron for his organizing activities and Defendant Krithivas left after his actions to advance the union, they were SkyWest employees and the employer-employee was central to the controversy, even more clearly than in *Amazon*. Thus, based on the current and historic caselaw, Defendants' efforts to organize a union and SkyWest's attempts to stop that organizing most certainly constitutes a "labor dispute." Confirming this is SkyWest's own knowledge that his activities were part of an organized effort to form a union and affiliate with ALPA.

Perhaps the most helpful case is *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*[18] There, the union mounted a pressure campaign on the employer after it fired an employee for union activity using both phone and email to jam the employer's sales offices so customers could not reach the company.[19] The district court denied the employer's preliminary injunction for relief under the same statute that SkyWest uses here, the Computer Fraud and Abuse Act ("CFAA"), holding that it lacked jurisdiction to issue the injunction of the labor dispute under the Act. The Sixth Circuit rejected Pulte Homes' argument, identical to the one SkyWest makes here:

> [Plaintiff] proffers one final, unpersuasive reason for reversing the district court. It argues that the [Act] does not foreclose injunctive relief under the CFAA—a more specific, later-enacted statute. The CFAA, however, regulates computer crimes rather than labor activity. And the [Act's)] "ban on federal injunctions is not lifted" simply because a union's nonviolent conduct violates "some other nonlabor statute."[20]

As the Sixth Circuit did in *Pulte*, this Court cannot be distracted from the underlying labor

---

[17] *Amazon* at *12-13 (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 275 (1947)).
[18] 648 F.3d 295 (6th Cir. 2011).
[19] *Id.* at 298-99.
[20] *Id.* at 307 (citations omitted).

dispute simply because SkyWest asserts a claim under the CFAA. Thus, the Act and all of its protections for labor organizing must apply.

## IV.    SKYWEST MISCONSTRUES CASE LAW INTERPRETING THE ACT

The above-cited caselaw is clear that a fight between employees attempting to organize a labor union in their workplace and their employer who opposes the formation of a union is a "labor dispute" under the Act. In its opposition, SkyWest cannot dispute that basic principle. Instead, it takes cases that have very different factual contexts and attempts to use their holding to twist the law to support its argument that the current matter is not a "labor dispute."

It cites *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n* to demonstrate again that the "critical element" to determine coverage under the Act is whether "the employer-employee relationship is the matrix of the controversy."[21] But in that case, when the employer argued that the dispute was political and not labor related, because the union refused to load cargo in  protest of the Soviet invasion of Afghanistan, the Supreme Court used this test to *expand*, not narrow the Act's coverage, holding that the Act "deprives courts of the power to enjoin the Union's work stoppage  . . . without regard to whether the Union also has a nonlabor dispute with another entity."[22] The Court further held that "the term 'labor dispute' **must not be narrowly construed** because the statutory definition itself is extremely broad and because Congress deliberately included a broad definition."[23] SkyWest invokes this case to imply there are limits on the scope of the definition of a "labor dispute." But *Jacksonville Bulk Terminals* explains that there is no basis "for the argument that the Act requires that *each* dispute relevant to the case be a labor dispute."[24] Here, labor organizing is central to the present dispute sufficient

---

[21] Opp. at 8.
[22] 457 U.S. 702, 711 (1982).
[23] *Id* at 703.
[24] *Id* at 711 (emphasis in original).

to trigger the Act's protections, even if SkyWest is asserting claims that do not relate to that labor dispute.

SkyWest also relies on *Columbia River Packers Ass'n v. Hinton* – but this case, however, involved a dispute between fish sellers and fish buyers over the sale of a commodity – not a labor dispute.[25] The fishers in this case were independent contractors who did not want to be employees and so were not trying to improve their working conditions. The court explained the fishers this way, "The sellers are not employees of the petitioner or any other employer nor do they seek to be. On the contrary, their desire is to continue to operate as independent businessmen."[26] Although SkyWest tries to analogize their pilots to the *Columbia River Packers* fishers arguing that the pilots dispute with it "does not place in controversy the wages, hours, or other terms of employment,"[27] that is patently false and distinguishable from the facts in *Columbia River Packers*, which only concerned the sale of fish.[28] The current controversy involves employees, not independent contractors or vendors, acting to form a labor union in their workplace to collectively bargain changes to their working conditions, actions that squarely implicate the employee-employer relationship.

SkyWest also cites *Taylor v. Local No. 7, Int'l Union of Journeymen Horseshoers of U. S. & Canada (AFL-CIO)* for the principal that the Act should not apply when unions engage in coercive or unlawful conduct.[29] Like *Columbia River Packers*, the *Taylor* workers were independent and not employees, which allowed the Fourth Circuit to conclude there was no labor dispute. The court held that, "[t]he only interests sought to be advanced by the activities of these

---

[25] 315 U.S. 143, 147 (1942).
[26] *Columbia River Packers* at 147.
[27] Opp. at 8.
[28] *Columbia River Packers* at 147.
[29] Opp. at 9.

defendants are the interests of those independent horseshoers who render services to trainers and owners for a certain fee, unilaterally fixed, per horse. They are independent business[men],” and as a result, “[w]e fail to discover the existence of any employer-employee relationship which is the ‘Matrix’ of this controversy.”[30] This had nothing to do with alleged illegal behavior, as SkyWest suggests.

SkyWest also argues that the Act does not apply and injunctions may issue when a dispute is motivated by something other than wages or working conditions, relying on *New Orleans S.S. Ass'n v. Gen. Longshore Workers.*[31] To the contrary and once again, the holding in *New Orleans S.S. Ass'n* emphasizes the broad application of the Act’s anti-injunction provisions, even where the labor dispute is politically, not economically, motivated.[32] But in that case as in *Retail Clerks Union*, discussed below, the Fifth Circuit balanced the Act’s anti-injunction provision with the Labor-Management Relations Act’s (“LMRA”) dictate to enforce CBAs and affirmed only that injunctions could be used to enforce arbitration awards that found work stoppages to be in violation of a CBA’s no-strike provisions, stating “an injunction may issue to prevent the violation of an arbitration award, once rendered.”[33] While that factual context is nothing like the dispute here, *New Orleans S.S. Ass'n* does support the principle that the Act is broadly applied to labor disputes, regardless of the underlying motivations.

SkyWest also misinterprets *Retail Clerks Union v. Alfred M. Lewis, Inc.*[34] asserting that if the Act did not apply where there was already a collective bargaining agreement (“CBA”) then surely it could not apply here where there is not one.[35] But in *Retail Clerks*, the Ninth Circuit had

---

[30] 353 F.2d 593, 606 (4th Cir. 1965).
[31] Opp. at 9-10.
[32] 626 F.2d 455, 465 (5th Cir. 1980).
[33] *Id.* at 466-67.
[34] 327 F.2d 442 (9th Cir. 1964).
[35] Opp. at 10.

to determine whether the district court had jurisdiction under LMRA Section 301(a), which explicitly empowers district courts to decide claims of CBA breaches and whether the Act then barred relief.[36] In determining that the Act does not apply to enforcement of an existing CBA as within the protected activities set forth under § 104, which finds remedy under LMRA, the decision does not apply when the actions of organizing a union is squarely within § 104. Importantly *Retail Clerks*, in reiterating the public policy behind the Act, states that Congress's objective was to address the employers' use of injunction as "a means of defeating the efforts of labor to organize and bargain collectively."[37] Mr. Moussaron was trying to organize the formation of a union so that he and his fellow pilots could collectively bargain with SkyWest. Even *Retail Clerks* supports that this is activity that falls squarely within the Act's protected activity under § 104.[38]

SkyWest then summarizes five cases to support its incorrect assertion that Defendants' actions are outside the employer-employee relationship or demonstrate actions that do not trigger the Act's protections.[39] Only by ignoring Mr. Moussaron's union organizing and focusing instead on "whether Defendants exceeded authorized access to a protected computer under the CFAA and Utah's Computer Abuse and Data Recovery Act, breached their confidentiality agreements and duties, and conspired to scrape and use nonpublic personal phone numbers and home addresses from SkyWest's role-restricted directory"[40] can SkyWest hope to make any of

---

[36] *Retail Clerks* at 443, 445-46.
[37] *Retail Clerks* at 447.
[38] 104(b) : "becoming or remaining a member of any labor organization"; 104(e) "giving publicity to the existence of, or the facts involved in any labor dispute ([§ 113(c): "includes any controversy . . . concerning the association or representation of persons in negotiating . . . or seeking to arrange terms or conditions of employment . . ."]) whether by advertising, speaking, patrolling or any other method not involving fraud or violence."
[39] Opp. at 10-11.
[40] Opp. at 11-12.

these cases applicable. But if the court properly determines that Mr. Moussaron's actions were taken in furtherance of organizing a union at SkyWest then there is nothing to be gained through a review of these five cases.

Specifically, *Continental Airlines, Inc*. does not apply the Act in a dispute under a defunct CBA of two employee groups and not of an employee group against an employer, which is why involved the "matrix" of the controversy was *not* the employer-employee relationship.[41]

In *Carpenters Pension Trust Fund,* a controversy involving unpaid pension contributions, where plaintiffs were ERISA trust funds of the allegedly delinquent employers, was not a "labor dispute" covered under the Act.[42] This is because there was no direct employee-employer relationship at issue.

Again in *Tomkins Industries, Inc*., there was no finding of employer-employee "labor dispute" because the dispute was over a union's ownership and control of its label and decision to revoke permission for the employer's use of that label.[43] Additionally, the court held that the relief sought by the employer did not aim to enjoin any of the acts set forth in § 104 of the Act.[44]

SkyWest asserts that *San Diego Police Officers Association v. Aguirre* is useful but the facts in this public employee dispute over vested pension benefits differ enough from this one as to strain comparison.[45] Further, the court provides less than four of a total of 51 paragraphs in the opinion to analyzing the Act. The district court dismisses the Act's application by summarily stating, "The facts surrounding these claims concern the failure to fund the retirement fund and unlawfully depriving, eliminating and/or reducing retirement benefits. These allegations do not

---

[41] 484 F.3d 173, 184 (3d Cir. 2007).
[42] 2023 U.S. Dist. LEXIS 16297 (D. Kan. Jan. 31, 2023).
[43] 903 F. Supp. 1438, 1442 (D. Kan. 1995).
[44] *Id.*
[45] 2005 U.S. Dist. LEXIS 38166 (S.D. Cal. Nov. 1, 2005)

constitute a "labor dispute" as intended under § 104."[46]

Finally, *Pineda v. Skinner Services* involved Fair Labor Standards Act claims against an employer without any underlying organizing efforts.[47] Critically, FLSA rights are non-waiveable and do not exist by virtue of association or representation by a union. In holding that the Act inapplicable, the First Circuit observed:

> The Act defines "labor disputes" to include "any controversy concerning terms or conditions of employment, or **concerning the association or representation of persons negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment**." . . . By contrast, the FLSA protects the statutory -- rather than contractual -- rights of individual workers to guaranteed compensation for all work performed.[48]

In no uncertain terms, Mr. Moussaron's activities to form a labor union constitute a labor dispute. If the court were to grant SkyWest's request for an injunction without following the Act's requirements, it would be doing the very thing that Congress aimed to eliminate: an employer's weaponization of the federal judiciary issue labor injunction as "a means of defeating the efforts of labor to organize and bargain collectively."[49]

## CONCLUSION

Accordingly, this Court does not have jurisdiction to issue an injunction without following the Act's statutory instructions because this is a labor dispute. Therefore, the Court should dismiss SkyWest's Motion for TRO with prejudice and only grant its Motion for Preliminary Injunction after a full evidentiary hearing that meets the Act's standard for its issuance.

//

---

[46] *Id.* at *31.
[47] *Pineda v. Skinner*, 22 F.4th 47 (1st Cir. 2021).
[48] *Id.* at 57.
[49] *Retail Clerks* at 447.

//

DATED THIS 20th day of February, 2026.

**SCHOLNICK THORNE HOLLAND**

*/s/ Jonathan K. Thorne*
Jonathan K. Thorne
Lauren I. Scholnick
Jack Holland

*Attorneys for Defendant Moussaron*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2026, I caused a true and correct copy of

the foregoing to be served via CMECF to:

Gregory M. Saylin
Zachary T. Burford
Tyler S. Erickson
*Attorney for SkyWest*

Timothy D. Ducar (tducar@azlawyers.com)
*Attorney for Vikaas Krithivas*