Jonathan K. Thorne (Utah Bar No. 12694)
Lauren I. Scholnick (Utah Bar No. 7776)
Jack Holland *(pro hac vice)*
**SCHOLNICK THORNE HOLLAND**
40 South 600 East
Salt Lake City, Utah 84102
Telephone:(801) 359-4169
Facsimile: (801) 359-4313
email:      jonathan@utahjobjustice.com
             lauren@utahjobjustice.com
             jack@laborwest.com

*Attorneys for Defendant Daniel Moussaron*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## SOUTHERN DIVISION

| | |
|---|---|
| SKYWEST AIRLINES, INC., | **DEFENDANT MOUSSARON'S ANSWER AND COUNTERCLAM** |
| Plaintiff and Counterclaim Defendant, | |
| vs. | Civil No. 4:26-cv-00015-DN |
| DANIEL MOUSSARON, | Judge David O. Nuffer |
| Defendant and Counterclaim Plaintiff, | |
| and VIKAAS KRITHIVAS, | |
| Defendant. | |

Defendant Daniel Moussaron ("Defendant Moussaron" or "Mr. Moussaron"), by and through his undersigned counsel, hereby answers Plaintiff SkyWest Airline Inc's ("SkyWest") Complaint ("Compl."), Dkt. 1, as follows:

### PARTIES

1.      Admits Paragraph 1.

2.     Admits Paragraph 2.

3.     Mr. Moussaron admits Defendant Krithivaas ("Defendant Krithivass" or "Mr. Krithivaas") is a former SkyWest pilot but lacks sufficient information as to the remainder of Paragraph 3and therefore denies the same.

4.     Paragraph 4 makes legal conclusions to which no response is required and where it does not Mr. Moussaran denies the remaining allegations.

## JURISDICTION AND VENUE

5.     Mr. Moussaron admits that jurisdiction is proper in this Court.

6.     Jurisdiction is a legal conclusion to which no response is required. To the extent a response is required Mr. Moussaron admits there is diversity in this case but denies that SkyWest has suffered damages exceeding $75,000, and otherwise denies the remaining Paragraph 6.

7.     Jurisdiction is a legal conclusion to which no response is required. To the extent a response is required Mr. Moussaron admits venue is proper in the District of Utah, but otherwise denies Paragraph 7.

8.     Venue is a legal conclusion to which no response is required. To the extent a response is required Mr. Moussaron admits venue is proper in the District of Utah, but otherwise denies Paragraph 8.

## FACTUAL ALLEGATIONS

9.     Mr. Moussaron lacks information and denies Paragraph 9.

10.    Admit Paragraph 10.

11.     Mr. Moussaron admits that Krithivas is a former SkyWest pilot but otherwise lacks sufficient information about where he was based and therefore denies the remaining Paragraph 11.

12.     Mr. Moussaron admits that SkyWest maintains an online directory within SkyWest Intranet ("SkyWest Online") known as SWOL that in 2025 provided contact information of its pilots in which he had access to via SkyWest authorization, including login credentials. Mr. Moussaron also admits that SWOL provides news and alerts. Mr. Moussaron denies and lacks information about the remaining allegations in Paragraph 12.

13.     Mr. Moussaron admits that SWOL includes a company directory that provides contact information and employee details and requires login credentials to access the data. Mr. Moussaron otherwise lacks information and denies the remaining Paragraph 13.

14.     Denies Paragraph 14.

15.     Denies Paragraph 15.

16.     Mr. Moussaron lacks sufficient information about the allegations and denies Paragraph 16.

17.     Mr. Moussaron lacks sufficient information about the allegations and denies Paragraph 17.

18.     Mr. Moussaron lacks sufficient information about the allegations and denies Paragraph 18.

19.     Mr. Moussaron lacks sufficient information about the allegations and denies Paragraph 19.

20.     Mr. Moussaron lacks sufficient information about the allegations in and denies Paragraph 20.

21.     Denies Paragraph 21.

22.     Mr. Moussaron admits that he accessed SWOL and viewed pilot contact information based on SkyWest's authorization. Mr. Moussaron denies the remaining Paragraph

22.

23.     Mr. Moussaron admits that he accessed SWOL, that he was in Minnesota at the time, and that he viewed certain pilot contact information that was available to him and other pilots based on SkyWest's authorization. Mr. Moussaron lacks information and denies the remaining Paragraph 23.

24.     Mr. Moussaron admits that on August 29, 2025, he accessed SWOL and viewed certain pilot contact information, that he was in Winnipeg, Manitoba and stayed at the Holiday Inn. Mr. Moussaron lacks information and denies the remaining Paragraph 24.

25.     Mr. Moussaron admits that he accessed contact information of pilots using SWOL the following day based on SkyWest's authorization. Mr. Moussaron lacks information and denies the remaining Paragraph 25.

26.     Mr. Moussaron admits that on September 1, 2025, he had a layover at Minneapolis-St. Paul International Airport and logged into SWOL and viewed pilot contact information. Mr. Moussaron lacks information and denies the remaining Paragraph 26.

27.     Mr. Moussaron admits that over the following months he accessed SWOL, viewed pilot contact information, and saved names, employee number, phone numbers and addresses of various pilots sequentially based on seniority. Mr. Moussaron denies the remaining Paragraph 27.

28.     Mr. Moussaron admits that at some point Mr. Krithivas resigned his employment with SkyWest but lacks sufficient information and denies the remaining Paragraph 28.

29.     Mr. Moussaron lacks information and denies Paragraph 29.

30.     Mr. Moussaron admits that on September 3, 2025, he and Krithivas accessed pilot contact information and saved pilot contact information. Mr. Moussaron also admits that he was

in St. Michael, Minnesota. Mr. Moussaron lacks information and denies the remaining Paragraph 30.

31.     Mr. Moussaron lacks information and denies the remaining Paragraph 31.

32.     Mr. Moussaron admits that over the following months he accessed pilot contact information for newly hired SkyWest pilots. Mr. Moussaron lacks information and denies the remaining Paragraph 32.

33.     Mr. Moussaron admits that the Defendants used a script to access and save pilot contact information. The remaining Paragraph 33 makes legal conclusions to which no response is required and where it does not Mr. Moussaron denies the remaining allegations.

34.     Mr. Moussaron admits that he has technical experience with scripting and developer tools and has led software integration in airline systems, with experience in enterprise identity and cloud platforms. Mr. Moussaron also admits that he founded several airline travel related technology businesses. He denies the remaining allegations of Paragraph 34.

35.     Paragraph 35 makes legal conclusions to which no response is required and where it does not Mr. Moussaron lacks information and denies the remaining allegations.

36.     Mr. Moussaron admits that he provided pilot contact information to a representative of the Air Line Pilot Association ("ALPA") for the purpose of union organizing and helped send one mass text message to the majority of SkyWest Pilots to gauge their interest in having an ALPA affiliate at SkyWest. The remainder of Paragraph 36 makes legal conclusions to which no response is required and where it does not Mr. Moussaron lacks information and denies the remaining allegations.

37.     Mr. Moussaron denies that he did not use and is not using SkyWest information for his own purposes. Additionally, the allegations in this paragraph calls for a legal conclusion

and to the extent they do not Mr. Moussaron lacks sufficient information and therefore denies the remaining allegations in Paragraph 37.

38.     Denies Paragraph 38.

39.     Denies Paragraph 39.

40.     Mr. Moussaron lacks information and denies Paragraph 40.

## FIRST CAUSE OF ACTION
### (Breach of Contract against Defendants)

41.     Mr. Moussaron incorporates his responses to the allegations contained in the Complaint as if fully stated herein.

42.     Denies Paragraph 42.

43.     Denies Paragraph 43.

44.     Denies Paragraph 44.

45.     Denies Paragraph 45.

46.     Denies Paragraph 46.

47.     Denies Paragraph 47.

48.     Denies Paragraph 48.

49.     Denies Paragraph 49.

50.     Denies Paragraph 50.

## SECOND CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Defendants)

51.     Mr. Moussaron incorporates his responses to the allegations contained in the Complaint as if fully stated herein.

52.     Denies Paragraph 52.

53.     Denies Paragraph 53.

54.    Denies Paragraph 54.

55.    Denies Paragraph 55.

## THIRD CAUSE OF ACTION
### (Computer Fraud and Abuse Act against Defendants)

56.    Mr. Moussaron incorporates his responses to the allegations contained in the

Complaint as if fully stated herein.

57.    Denies Paragraph 57.

58.    Denies Paragraph 58.

59.    Denies Paragraph 59.

60.    Denies Paragraph 60.

61.    Denies Paragraph 61.

62.    Denies Paragraph 62.

## FOURTH CAUSE OF ACTION
### (Utah Computer Abuse and Data Recovery Act (UCADRA) against Defendants)

63.    Mr. Moussaron incorporates his responses to the allegations contained in the

Complaint as if fully stated herein.

64.    Denies Paragraph 64.

65.    Denies Paragraph 65.

66.    Denies Paragraph 66.

67.    Denies Paragraph 67.

68.    Denies Paragraph 68.

69.    Denies Paragraph 69.

## FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duties Against Defendants)

70.    Mr. Moussaron incorporates his responses to the allegations contained in the

Complaint as if fully stated herein.

71.    Denies Paragraph 71.

72.    Denies Paragraph 72.

73.    Denies Paragraph 73.

74.    Denies Paragraph 74.

75.    Denies Paragraph 75.

## SIXTH CAUSE OF ACTION
### (Conspiracy against Defendants)

76.    Mr. Moussaron incorporates his responses to all the allegations contained in the

Complaint as if fully stated herein.

77.    Denies Paragraph 77.

78.    Denies Paragraph 78.

79.    Denies Paragraph 79.

80.    Denies Paragraph 80.

81.    Denies Paragraph 81.

## SEVENTH CAUSE OF ACTION
### (Declaratory Judgment against Defendants)

82.    Mr. Moussaron incorporates his responses to all the allegations contained in the

Complaint as if fully stated herein.

83.    Denies Paragraph 83.

84.    Denies Paragraph 84.

85.    Denies Paragraph 85.

## REQUEST FOR INJUNCTIVE RELIEF

86.    Mr. Moussaron incorporates his responses to the allegations contained in the

Complaint as if fully stated herein.

87.    Denies Paragraph 87.

88.    Denies Paragraph 88.

89.    Denies Paragraph 89.

90.    Denies Paragraph 90.

91.    Denies Paragraph 91.

**GENERAL DENIAL**

Each and every allegation of the Complaint, including, but not limited to, any unnumbered Paragraphs or subheadings not specifically admitted herein is denied. Mr. Moussaron denies that Plaintiff is entitled to relief under any theory.

**ANSWER TO PRAYER FOR RELIEF**

To the extent Plaintiff's prayer for relief asserts allegations, Mr. Moussaron denies each and every one of them.

Wherefore, Mr. Moussaron requests:

1.    That Plaintiff receive nothing by way of this Complaint, and that his claims be dismissed with prejudice and be forever barred;

2.    Recovery of Mr. Moussaron's costs and attorney's fees incurred in this action;

3.    Other and further relief as this Court deems just and proper.

**AFFIRMATIVE DEFENSES**

1.    Plaintiff's Complaint and each cause of action asserted in it are barred by the affirmative defenses set forth in F.R.C.P. 8(c) and any other applicable affirmative defenses not specifically set forth in this Answer.

2.    The Complaint fails to state a claim upon which relief may be granted.

3.      Plaintiff's claims are barred by its own misconduct, or limited by the doctrines of waiver, estoppel, laches, unclean hands, applicable statute of limitation, accord and satisfaction, consent, and/or other equitable principles.

4.      Plaintiff's injuries were caused by its own actions.

5.      At all times material, the actions of the Defendants were in good faith, based upon reasonable grounds, and not in violation of law.

6.      Mr. Moussaron breached no legal duty owed to Plaintiff.

7.      Plaintiff is not entitled to recover some or all the remedies sought.

8.      Plaintiff's claim for punitive damages is unconstitutionally vague.

9.      Plaintiff's contractual claims fail for lack of consideration,

10.      Plaintiff's Complaint fails because the contract it seeks to enforce is overly broad and unenforceable.

11.      Plaintiff's damages, if any, are limited because Plaintiff has failed to mitigate the damages it claims are caused by Mr. Moussaron.

12.      Plaintiff's Complaint fails, in part, because Mr. Moussaron did not knowingly accept any contract.

13.      Plaintiff's claims are barred because any damages it has suffered are outweighed by the damage it has caused Mr. Moussaron, as outlined in the Counterclaim below.

14.      Defendant reserves the right to amend these defenses and assert additional defenses against Plaintiff's claims based upon further investigation and discovery in this case. Defendant further reserves the right to adopt, by reference, and does hereby adopt, by reference, any affirmative defenses raised by other named Defendants in this action.

## **COUNTERCLAIM**

Daniel Moussaron, Counterclaim Plaintiff ("Mr. Moussaron"), by and through his undersigned attorney, hereby complains against Counterclaim Defendant SkyWest Airline Inc. ("SkyWest") as follows:

## NATURE OF THE CASE

This is an action against SkyWest for violation of the Railway Labor Act, (45 U.S.C. § 151, et seq) (hereinafter the "Act") when it fired Mr. Moussaron in retaliation for engaging in union organizing activities. Mr. Moussaron seeks reinstatement of employment and seniority and back wages or, in the alternative front pay damages, as well as attorneys' fees and costs for SkyWest's termination of his employment. Additionally, SkyWest has since published at least one defamatory statement about Mr. Mousaron, alleging he engaged in criminal conduct, which resulted in damages to Mr. Moussaron. SkyWest has also interfered with Mr. Moussaron's economic relations by firing him for union organizing and reporting his termination to the FAA, making it unlikely that another airline with hire him as a pilot. Mr. Moussaron seeks compensatory, general emotional distress, and punitive damages.

## THE PARTIES

1.      Mr. Moussaron is a former SkyWest employee and pilot who resides in Minnesota.

2.      SkyWest is a business incorporated under the laws of the state of Utah with its principal place of business in St. George, Utah.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction, pursuant to 28 U.S.C. § 1331, because Mr. Moussaron asserts claims arising from the Railway Labor Act (45 U.S.C. § 151, et seq.).

4.      Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332(a) because there

is complete diversity between Mr. Moussaron and SkyWest, and the amount in controversy and Mr. Moussaron's damages and attorneys' fees exceeds $75,000 exclusive of interest and costs.

5.     Venue is proper in this court pursuant to 28 U.S.C. § 1391 because SkyWest's corporate offices are located in this Division.

### GENERAL FACTUAL ALLEGATIONS

6.     In May 2022 SkyWest hired Mr. Moussaron as a pilot.

7.     In April 2025, Mr. Moussaron and other SkyWest pilots began organizing to form a labor union.

8.     Mr. Moussaron was a member of the union Organizing Committee ("OC") working with a national labor union, the Air Line Pilots Association ("ALPA"), to organize SkyWest pilots.

9.     In May 2025, the OC launched a website providing information about its intent to unionize and affiliate with ALPA to negotiate a collective bargaining agreement with SkyWest that would provide pilots with job security, enforceable grievance procedures through arbitration, legal representation, industry-leading safety/security resources, etc.

10.    Over the following months, the OC communicated with SkyWest pilots, using email, the website, social media, and pilot-to-pilot conversation off-duty, receiving positive feedback to both the OC's efforts and its intent to affiliate with ALPA.

11.    The OC began creating a database of pilots' contact information so it could provide the pilots with periodic updates concerning unionization efforts, assess interest, uncover current working condition issues, and reach ALPA's required threshold of interest for a card drive.

12.    The OC populated the database by obtaining contact information from a variety of

sources through multiple phases.

13.    In phase 1, the OC gathered contact information using a Google Form.

14.    In phase 2, the OC created a campaign website, https://skywestalpa.org, showing the benefits ALPA would bring to the pilots that included a self-registration form.

15.    Notably, this same domain name had been used in past pilot organizing drives at SkyWest in 2008 and 2019-23, before being revived in 2025.

16.    In this phase, the ALPA organizer also provided a pilot contact list from these previous drives.

17.    These contacts were all merged into the 2025 database.

18.    Then in phase 3, Mr. Moussaron built a Data Management System ("DMS") for the OC members and pilots to share pilot-to-pilot contact information (phone, email, address) for any pilots they might have in their devices.

19.    Every pilot that had registered and for whom the OC had an email address received a login to the initial iteration of DMS, and the DMS was used to share contact information for other pilots they might have been flying with or otherwise knew.

20.    Then, in phase 4, the OC used automated tools and manual lookups on public data, like the Federal Aviation Administration's ("FAA") Airman Registry, White Pages, etc., to pull additional pilot contact information.

21.    With all this contact information, it was able to send a postcard about the union efforts to approximately 97% of the pilots in late July or early August 2025.

22.    ALPA then took over the website, by publishing a new version at https://skw.alpa.org, to help legitimize the campaign, as some pilots were concerned that SkyWest might be behind the OC's site.

23.     During the months-long drive wherein the OC obtained more contact information from pilots, Mr. Moussaron also obtained contact information through SkyWest's employee directory.

24.     SkyWest maintains an employee directory that is accessible to all SkyWest employees, including its pilots, known as SWOL.

25.     During this time Mr. Moussaron had an active SWOL user account and credentials issued to him as an employee.

26.     SWOL stores each SkyWest employee's name, phone number, home address, among other data.

27.     While SkyWest insists that 99% of pilots, including Mr. Moussaron and Vikaas Krithivas, only had access to view the names, base/location, and supervisor but not phone numbers or addresses, prior to January 12, 2026, SWOL did not limit the data that pilots could view.

28.     All this data (including phone numbers and addresses) was available to every employee, including pilots using any browsers' web development tools even if it was not provided on a user-friendly interface.

29.     Specifically, SWOL was a standard web application, which loaded an employee's profile details after a search.

30.     Although SWOL displayed only certain information to employees in a user-friendly format, the complete employee profile data could be viewed, without any additional authorization and/or without exceeding authorized access, by using standard browser developer tools on the profile page.

31.     In 2025, when Mr. Moussaron and Mr. Krithivas requested the employee details

from SkyWest's server, the server returned employee details such as cell phone numbers and addresses.

32.    Cell phone numbers and addresses were provided to Mr. Moussaron and Mr. Krithivas using the access levels set by SkyWest.

33.    On January 12, 2026, SkyWest made a change to its server and/or its employee directory to prevent Mr. Moussaron and most of its pilots from receiving cell phone numbers and addresses when employee details were requested (by Mr. Moussaron or other pilots) from the SkyWest server.

34.    Meanwhile, in August 2025, for the sole purpose of union organizing, Mr. Moussaron accessed SWOL to obtain pilots' phone numbers and addresses to contact them and determine their interest in joining ALPA.

35.    Using his authorized SWOL access and credentials, Mr. Moussaron retrieved pilots' profiles.

36.    While the phone numbers and addresses did not populate in the user interface, SkyWest's server readily provided that information through the browser's development tools.

37.    These development tools are standard, built-in features that provide any user of any browser the ability to view the webpage in a different way.

38.    This provided Mr. Moussaron with the sought-after information clearly laid out and identified with field labels and values.

39.    These Chrome browser's developer tools do not create any additional access, defeat authentication, or retrieve any additional, unauthorized data.

40.    It is just another way to view the data and network traffic that is already provided by the responding server.

41.    In short, in 2025 SWOL provided phone numbers and addresses to its employees.

42.    SkyWest could have limited access to that data, as it did after discovering that the data was being used for a union drive, but at the time of Mr. Moussaron's actions, it did not.

43.    While SkyWest provided this information based on Mr. Moussaron's access level, he did not use the initial data he obtained and instead decided that the OC should collect the contact information as described in the phases above, as opposed to relying solely on SWOL.

44.    This is why it took the OC months after Mr. Moussaron's SWOL directory access to get the contact information necessary to send out its one text message (described below) to the pilots.

45.    Despite obtaining contact information of most of SkyWest's pilots through SWOL, the only information that Mr. Moussaron used from it was that of pilots hired between September and early December.

46.    On December 9, 2025, Mr. Moussaron, as an OC executive member and on its behalf, sent a mass text message to a large subset, but not all, of SkyWest pilots inquiring about their interest in joining ALPA, which read:

SKW Pilots: SkyWest ALPA Organizing Committee poll re ALPA representation.

Reply 1=yes 2=unsure 3=no.

ALPA Confidential Study

Skw.alpa.org – STOP=opt out

47.    Within 24 hours of this text message, approximately 1,500 pilots responded, an overwhelming 87% of those pilots contacted responded favorably to ALPA representation.

48.    Nearly 24 hours later, in response to the mass text, SkyWest posted on SWOL an urgent notice titled "SPAM TEXT NOTICE" stating:

We have received reports that pilots have received text messages on personal devices from groups claiming to be connected to SkyWest. SkyWest does not provide contact information to outside third parties and we are investigating if any company policies have been violated. Employees are under no obligation to respond to the message and may report it to their mobile carrier as spam. Remember, you should never provide your contact or personal information to anyone not acting in an official SkyWest capacity (e.g., Crew Support, Travel Center, Employee Relations, etc.), even if they claim to be fellow employees.

49.    This was one way in which SkyWest attempted to defeat a legitimate union organization drive initiated by its pilots.

50.    After this December 9th text message, the OC did not send any other text messages to the pilots.

51.    On January 11, SkyWest was made aware of a post on a private pilots Facebook group that, in part, indicated that a SkyWest pilot had received a phone call from someone promoting union representation that indicated that he obtained the pilot's phone number through SWOL.

52.    On January 12, SkyWest changed pilot authorization levels on SWOL, precluding pilots from viewing employees' phone numbers and addresses.

53.    Around this time SkyWest began investigating the identities of those behind the ALPA union organizing text message and the related access of SWOL pilot contact information.

54.    During its investigation, SkyWest determined that Mr. Moussaron and Mr. Krithivas had accessed SWOL contact information and used it to send the ALPA union organizing text message.

55.    On January 26, 2026, SkyWest called Mr. Moussaron into a meeting and threatened him with criminal and civil action and then fired him for using SWOL to organize a pilots' union.

56.    That same day, SkyWest's CEO, Russel "Chip" Childs posted a message on

SWOL, referencing his termination.

57.    In that message Mr. Childs wrote that SkyWest had fired two pilots for "trampl[ing] on SkyWest's values and violating company policies."

58.    Mr. Childs further stated that the two pilots had "gained unauthorized access to and downloaded pilot contact information that was not accessible to line pilots . . . [that] took extensive effort and manipulation to retrieve . . . ."

59.    Mr. Childs then indicated that SkyWest would be pursuing "this matter through every legal means possible," and that "we're shocked and disgusted by this unethical behavior and violation of trust from colleagues prior to their departure." He also said that "[w]e will not tolerate theft of any kind."

60.    This message also implored employees who had been contacted by an "organization" – a reference to ALPA – to report the contact through a portal set up by SkyWest.

61.    Mr. Child's message also stated, "Their actions serve as an appalling reminder of the lengths to which certain organizations [ALPA] and interests will go to gain access to our people. In this case, they went as far as unethically and unlawfully stealing your information in the hopes of reaching and influencing you."

62.    This was a reference to the text message and the OC's efforts to contact pilots to organize a union.

63.    SkyWest also knew at this time that Mr. Moussaron was able to access the contact information through the access it had set for him.

64.    In other words, SkyWest knew that it was making a false statement.

65.    When a pilot leaves an airline, either through voluntary means or through termination, an airline reports the discharge with the Federal Aviation Administration ("FAA")

in a Pilot Records Database ("PRD") that is accessible to all airlines.

66.    SkyWest reported Mr. Moussaron's termination for "non-performance" to the FAA.

67.    Mr. Moussaron's termination record is a barrier to obtaining replacement employment.

68.    Following Mr. Moussaron's retaliatory termination and SkyWest's lawsuit against him, the entire OC executive committee and dozens of people on the OC quit, fearful of being a future target of SkyWest retaliation.

## FIRST CAUSE OF ACTION
### (Violation of the Railway Labor Act)

69.    Mr. Moussaron realleges and incorporates by reference all other paragraphs of his counterclaim as set forth above.

70.    SkyWest is an airline which is subject to the Railway Labor Act pursuant to 45 U.S.C. § 181.

71.    The Fourth section of 45 U.S.C. §152 specifically states that employees of airlines have the right to organize and join a union. It further provides:

> It shall be an unlawful for any carrier to interfere in any way with the organization of its employees . . .  Or to influence or coerce employees in an effort to induce them to join or not to join or remain members of any labor organization. . . .

72.    The Third section of 45 U.S.C. §152 also specifically prohibits an airline from interfering, influencing, or coercing someone over the designation of a bargaining representative.

73.    SkyWest was aware of efforts to organize a pilot union at the latest on December 10, 2025 when it sent out the "Spam Text Notice" in response to the mass text message to SkyWest pilots gauging interest in having an ALPA-affiliated union at SkyWest.

74.    SkyWest was also aware on January 11, 2026, that the OC was calling pilots for

union organizing purposes.

75.    Thereafter, upon investigation, SkyWest determined that Mr. Moussaron and Mr. Krithivas were responsible for both organizing the union and sending out the text message.

76.    SkyWest then fired Mr. Moussaron and filed a lawsuit against him and Mr. Krithivas, who had already resigned, for their organizing efforts.

77.    SkyWest also notified its employees that they had fired an employee and would seek legal action against two pilots for obtaining contact information that SkyWest said was being used by "an organization" (ALPA) to influence pilots (to unionize).

78.    As set forth above, SkyWest has violated these provisions of the Act by interfering with Mr. Moussaron's organizing efforts and influencing and coercing its pilots to oppose the organizing efforts.

79.    In addition, SkyWest violated these provisions by firing Mr. Moussaron for attempting to organize a union for the pilots at SkyWest.

80.    Mr. Moussaron has been injured by SkyWest's violation of the Railway Labor Act and he is entitled to all remedies available under the Act, including reinstatement of his job and seniority, front pay in lieu of reinstatement, damages, backpay and benefits, and attorneys' fees.

## SECOND CAUSE OF ACTION
### (Defamation)

81.    Mr. Moussaron realleges and incorporates by reference all other paragraphs of his counterclaims as set forth above.

82.    On January 26, 2026, SkyWest published a statement to all its pilots about Mr. Moussaron.

83.    That statement detailed  that a pilot (Mr. Moussaron) had trampled on SkyWest's

values; violated company policies; gained unauthorized access to pilot contact information through manipulation and extensive efforts; engaged in disgusting unethical behavior related to the pilot contact access; violated colleagues trust; engaged in "theft"; and unethically and unlawfully stole contact information to influence pilots. It also explained that SkyWest would pursue all legal remedies against the offending pilots.

84.     Four days after publishing this statement, SkyWest filed a public lawsuit that has been reported on by several news outlets, identifying Mr. Moussaron as the SkyWest pilot who had been fired on January 26 and who SkyWest was referencing in its January 26 statement.

85.     Following SkyWest's investigation into this matter, on or about January 12, 2026, SkyWest made a change to its servers and directories that limited the contact information that was available to pilots – removing cell phone numbers and addresses from being provided to a pilot user when accessing the directory.

86.     By January 12, 2026, SkyWest knew that the access levels set in SWOL in 2025 allowed Mr. Moussaron and other pilots to access cell phone and address information based on their 2025 access levels.

87.     SkyWest knew that Mr. Moussaron's access was authorized by its own servers.

88.     When SkyWest published its statement on January 26, 2026, it knew it was false.

89.     SkyWest's statement was defamatory in nature, accusing Mr. Moussaron of theft, unethical behavior, unlawful behavior, etc.

90.     SkyWest's statement has damaged Mr. Moussaron's reputation.

91.     At a minimum SkyWest was negligent in publishing its false statement.

92.     SkyWest acted with malice or reckless disregard for the truth.

93.     SkyWest's statement has caused financial and reputational damage to Mr.

Moussaron, such that he is unlikely to obtain another pilot position.

94.    Mr. Moussaron has been injured by SkyWest's publication, and he is entitled to all remedies available under the law, including compensatory, general, and punitive damages.

### THIRD CAUSE OF ACTION
**(Interference with an Economic Relation)**

95.    Mr. Moussaron realleges and incorporates by reference all other paragraphs of his counterclaims as set forth above.

96.    SkyWest employed Mr. Moussaron from 2022 until it fired him on January 26, 2026.

97.    SkyWest reported Mr. Moussaron's termination to the FAA as a non-performance termination, which will negatively impact his ability to get a new pilot job.

98.    SkyWest's termination of Mr. Moussaron and its report to the FAA interfered with his economic relations.

99.    SkyWest's interference with Mr. Moussaron's employment was based on improper motive and improper means.

100.    SkyWest's purpose was to injure Mr. Moussaron in retaliation for his union organizing efforts.

101.    SkyWest intended for Mr. Moussaron to lose his job and stop him from being hired by another airline.

102.    SkyWest's improper means was that it retaliated against him in violation of the Railway Labor Act's prohibition on interference with union organizing.

103.    SkyWest's interference was not undertaken to protect its own legitimate and lawful interest.

104.    Because SkyWest's actions were malicious, using improper means and for

improper motive, Mr. Moussaron is entitled to all remedies available under the law, including compensatory, general, and punitive damages.

## JURY DEMAND

Mr. Moussaron hereby requests that this matter be heard before a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Moussaron prays for relief as follows:

1. For damages to be proven at trial, due to the loss of Mr. Moussaron's employment and inability to regain a comparable position;

2. For back pay and reinstatement of his employment and seniority, or front pay in the alterative;

3. For compensatory damages due to emotional distress and reputational damage;

4. For punitive damages to be determined at trial;

5. For all consequential damages caused by SkyWest's actions;

6. For attorneys' fees and costs;

7. For pre and post judgment interest as permitted by law;

8. For an offset of taxes; and

9. For all other such relief as the Court deems equitable and just.

DATED THIS 27th day of February, 2026.

SCHOLNICK THORNE HOLLAND
*/s/ Jonathan K. Thorne*
Jonathan K. Thorne
Lauren I. Scholnick
Jack Holland
*Attorneys for Defendant Moussaron*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of February, 2026, I caused a true and correct copy of

the foregoing to be served via CMECF to:

Gregory M. Saylin
Zachary T. Burford
Tyler S. Erickson
*Attorney for SkyWest*

Timothy D. Ducar
*Attorney for Vikaas Krithivas*