SCHOLNICK · THORNE · HOLLAND
Employment & Labor Law

July 10, 2026

**Sent via Electronic Mail (*ztburford@hollandhart.com*)**

Zachary T. Burford
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, Utah 84101-2194

**Re:** **_SkyWest Airlines, Inc. v. Moussaron and Krithivas_, No. 4:26-cv-00015-DN-PK (D. Utah) – Response to Your June 24, 2026 Meet-and-Confer Letter Regarding Discovery**

Dear Zach:

This letter is in response to your June 24, 2026 meet-and-confer letter, the parties' July 7, 2026 meet-and-confer conference, and in response to your July 8, 2026 email that summarizes your understanding of that conference. Your email asked that we advise you immediately of any disagreement with the summary; this letter serves that purpose, and where the summary differs from the positions and proposals stated here, this letter reflects Mr. Moussaron's position. Because the conference did not exhaust the issues your letter raises – and because SkyWest stated its intention to move to compel production of union organizing data – we are also detailing Mr. Moussaron's positions and the specific proposals he has made and renews here before any motion is filed as we continue to be willing to meet and confer.

As set out below, a number of the issues your letter raises can still be resolved or substantially narrowed by agreement, and this letter makes concrete proposals to that end. On other issues, we want to be direct about the nature of the dispute: several of SkyWest's requests ask Mr. Moussaron to identify, by name, SkyWest employees who participated in a union organizing campaign, and to hand the internal records of that campaign to the carrier whose pilots it sought to organize. Those requests implicate the protections provided by the Railway Labor Act and the First Amendment associational privilege, and they are not resolved by labeling the concern a "privacy" issue addressed by the protective order.

**UTAH**
40 South 600 East
Salt Lake City, Utah 84102
P: 801-359-4169

utahjobjustice.com

**WASHINGTON**
705 Second Avenue, Suite 1100
Seattle, Washington 98104
P: 801-359-4169

laborwest.com

## Moussaron's Objections

**The RLA.** The cases you cite in your meet-and-confer are distinguishable to this case. In *NetJets*, the union was the plaintiff, sued the employer, and invoked a chilling-effect argument to resist producing its own litigation-related materials; the court rejected the argument because the union cited no supporting authority. In *Hernandez*, an umpire claimed a "union communications privilege" over his personal conversations with union officials about his own discrimination complaint, outside any disciplinary proceeding under a collective bargaining agreement. Neither case involves an employer suing individual employees and using civil discovery to compel identification of the participants in an active organizing campaign – and neither is binding in this District.

Instead, Mr. Moussaron contends 45 U.S.C. § 152, Fourth, prohibits a carrier from interfering "in any way" with its employees organizing a union, and the information sought is not relevant to the matter at hand. Using discovery in carrier-initiated litigation to compel identification of organizers, callers, employee responses to union organizing, and organizing communications during a live campaign is itself interference; the NLRB reached exactly that conclusion under the parallel NLRA provision, holding that an employer's litigation discovery requests seeking the names of employees who had joined the union violated Section 8(a)(1). *Dilling Mech. Contractors, Inc.*, 357 NLRB No. 56 (2011). Indeed, interference here is not hypothetical. SkyWest terminated Mr. Moussaron; its January 26, 2026, memorandum from the Chief Executive Officer publicly accused organizers of "hacking" and "stealing" the records of more than 5,300 pilots; the Hansen email to American Airlines identified Mr. Krithivas by name, after which Mr. Krithivas was constructively discharged; the entire executive committee resigned upon Mr. Moussaron's termination; and this lawsuit followed. Separately and apart from the RLA protections, this information is protected from court mandated disclosure by the First Amendment associational privilege recognized in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), which the Tenth Circuit has expressly held applies to civil discovery between private parties. *Grandbouche v. Clancy*, 825 F.2d 1463, 1465–67 (10th Cir. 1987) ("Although the First Amendment does not normally restrict the actions of purely private individuals, the amendment may be applicable in the context of discovery orders, even if all of the litigants are private entities.").

The protective order does not eliminate this analysis, because the compelled compilation and disclosure of organizer identities and associational records to the employer's litigation team is itself a chilling act. That said – and as detailed in Part B – Mr. Moussaron does not assert a blanket refusal. He distinguishes between the mechanics of data collection and

transmission, which he has answered and will continue to answer, and the associational core (identities of rank-and-file participants, poll responses, and engagement data), which the privilege protects absent a compelling-need showing SkyWest has not attempted to make.

**"SkyWest Confidential Information" (Definition 12).** Definition 12 defines "SkyWest Confidential Information" to include pilot names, contact information, employment status, qualifications, and base assignments, "regardless of whether any individual data point was independently available from a public source." That definition embeds SkyWest's merits position – that data also appearing in public records such as the FAA Airmen Registry is nonetheless SkyWest's confidential information – into the vocabulary of the requests themselves. A party may not embed its merits conclusion in a defined term and then insist that the responding party answer within that framework. We note that SkyWest took the identical approach when it objected to Defendants' defined terms – including "API endpoint, service call, method, or function" and "bypassed RBAC" – as "vague and ambiguous" and narrowed its substantive responses accordingly.

**"Equally Accessible" Information (Int. Nos. 7, 8; RFP Nos. 7, 23).** Your letter states that availability from another source "is not a recognized basis for refusing discovery." SkyWest's own General Objection No. 4 – asserted in its responses to both Defendants – objects to any request that would require producing information "equally accessible to Defendants" and directs Defendants to "seek those documents or information from others." SkyWest cannot maintain that objection for itself while calling it improper when asserted against it. In the interest of resolving the issue rather than debating it: as set out in the Source Attribution discussion below, Mr. Moussaron will produce the specific FAA Airmen Registry file(s) he actually downloaded and used, which moots the dispute as to RFP No. 23.

**Adamo Systems and Dorrus (Int. No. 14; RFP No. 11).** The requests as written sweep in the complete business records of operating companies that are not parties to this case. That Mr. Moussaron used an @adamo.aero email address for certain case-related communications does not make every record of Adamo Systems or Dorrus discoverable. As detailed in our discovery responses he has produced all information related to this litigation.

**"Automated Extraction Process" (Definition 8).** Definition 8 defines "Automated Extraction Process" to include "browser developer tool[s]" and any userscript used to "reveal" data fields "not visible to a standard user interface." Browser developer tools

display the HTTP response the server has already transmitted to the authenticated user, and SkyWest admitted in response to RFA No. 6 that the SWOL response payload included the contact fields at issue for all authenticated users. A definition that characterizes viewing the server's own response as "extraction" of hidden data presupposes the central merits dispute and contradicts SkyWest's own admission. As with Definition 12, Mr. Moussaron states that the userscript, the browser tooling, and the data flows have been and will continue to be described factually – without adopting the definition's characterization. Again, SkyWest did the same when it declined to answer within Defendants' definitions of "bypassed RBAC" and "without authorization."

**DMS Source Code (RFP No. 22).** First, the DMS codebase contains no code for accessing, scraping, or extracting data from SWOL: the userscript is not part of the application, and no component of the codebase interacts with SWOL or its empdetail endpoint. Production of the full application would therefore reveal nothing about how SWOL was accessed – the stated rationale for the request – while exposing the organizing campaign's internal infrastructure. Second, SkyWest's own General Objection No. 3 conditions production of its "confidential, proprietary, or trade secret information" on "entry of an appropriate protective order," and SkyWest has to date declined to produce its SWOL system architecture, the empdetail API implementation, and its RBAC configuration – materials that go directly to whether the data at issue was in fact access-restricted. Will you be producing that information? If the protective order cures proprietary concerns, it does so for both parties. The Remote Server discussion below sets out a specific schema and source-code production proposal.

## Moussaron's Responses

**Destruction of Evidence (Interrogatory No. 11).** Your letter characterizes Mr. Moussaron's answer as detailing "a series of deletions" requiring immediate explanation. The answer itself states that each identified item was deleted, overwritten, or disposed of before Mr. Moussaron's termination and before this litigation – that is, before any preservation obligation attached. Rule 37(e) applies only to information that "should have been preserved in the anticipation or conduct of litigation." Each item also has the explanation already given in the response: the Migadu account lapsed on its billing cycle (on or about January 13, 2026) after ALPA assumed administration of organizing communications on November 1, 2025; the December 16, 2025 database migration was a routine development step transitioning the application from contact collection to assessment functionality; and the userscript was simply not retained after its last use on December 9, 2025.

The post-litigation record shows preservation efforts, not destruction. The February 7–8, 2026 Migadu correspondence your letter cites (RFP No. 17) is Mr. Moussaron affirmatively attempting to recover information after litigation began – an exchange he voluntarily disclosed and produced – and his January 30, 2026 text asking Mr. Krithivas whether he had retained the script ("I'm trying to show the changes they made") is likewise an effort to preserve evidence. As to the two specific items raised at the conference: the Rindfleisch email correspondence resided on the Migadu-hosted account and became inaccessible when that account lapsed on its billing cycle, as described above; the text messages with Mr. Krithivas were deleted consistent with Mr. Moussaron's routine personal practice of not retaining older text conversations and emails he no longer needs – a practice that predates this dispute – and before any litigation was anticipated; their content has in any event been produced from Mr. Krithivas's records (Krithivas 000001–000033). As for "exact dates": the response states "prior to January 26, 2026" because that is the most specific information Mr. Moussaron has. Mr. Moussaron did not log the dates on which he deleted text messages or emails and it is not important given it occurred prior to January 26, 2026.

**Remote Server, Database, and Data-Collection Records (RFP Nos. 6, 10, 18–22, 28).** Mr. Moussaron has not refused production; each of these responses offered to meet and confer on a scoped production under the protective order. Your July 8 summary records only that Mr. Moussaron "is unwilling to produce documents/information that he contends contain union-organizing information absent a court order." Mr. Moussaron offers, subject to ATTORNEYS' EYES ONLY designation under the Standard Protective Order:

> **(a) Database schema.** The complete table definitions (CREATE TABLE statements) for the tables relevant to contact-data intake and storage – pilot_members, interest_submissions, DMS_contacts, pilot_import_comments, and pilot_member_meta – showing every field, including the source field, without row-level data containing pilot identities or poll responses.

> **(b) Intake source code.** The source-code components implementing each channel by which contact data entered the system: the public self-registration API and registration form (skyapi/src/routes/register.php; skyproxy/public/pages/register.php); the manual contact-entry pages (dms/submit.php; dms/actions/handle_submit.php); the ALPA-list import (dms/import_csv_comments.php); the web-comments import (dms/import_web_comments.php); and the export routine that carries the source field (dms/export_pilots.php).

> **(c) A supplemental answer regarding source attribution (RFP No. 24; Int. No. 10).** The pilot_members table includes a source field with three values reflecting intake channel: DMS (3,626 records), WEB (1,606 records – pilots who self-registered through the public website), and ALPA (52 records reflecting the list provided from ALPA's prior campaign). That field records the channel through which a record entered the database, not the original source of the underlying contact information: records entered manually by committee members and records derived from the userscript both appear as "DMS," and no field sub-tags the origin of any individual record.

For the avoidance of any dispute, the retained codebase contains no SWOL-access code – no userscript, no scraping or extraction routines, and no code referencing SWOL or the empdetail endpoint – and that the routine that promoted staged contact records into pilot_members was not retained.

What Mr. Moussaron will not produce absent a court order is the associational core of the database: individual pilot identities coupled with poll responses and interest-level assessments; communication-engagement logs showing which pilots opened or responded to organizing outreach; and the identities of organizing-committee members. Those categories sit at the center of the RLA protections that prohibits a carrier from interfering "in any way" with the organization of its employees. They are also protected under the First Amendment associational protections detailed in *NAACP v. Alabama* and *Grandbouche*, and blanket production of the "complete contents" of the server to the carrier is precisely what the privilege forbids absent the compelling-need showing discussed above. We also renew the reciprocity point: SkyWest continues to withhold its SWOL system architecture, empdetail implementation, and RBAC configuration – the materials that would establish whether the data was access-restricted at all – citing the same proprietary concerns it dismisses here.

**Communications (RFP No. 7).** RFP No. 7 seeks all communications "regarding … union organizing at SkyWest," on every platform, for the entire Relevant Period – a request that on its face encompasses a months-long campaign involving dozens of participants, overwhelmingly on subjects having nothing to do with SkyWest's claims. Mr. Moussaron responded as to the subject matter actually in dispute: the SWOL Directory and the acquisition, storage, and use of pilot contact data. As to the two items your letter identifies: the August 29, 2025 Telegram messages are internal organizing-committee strategy discussions, which Moussaron's access was removed after he was terminated and thus he has no access to the messages. ; limited organizing email ran through @skywestalpa.org

addresses on the now-expired Migadu tenant, which are not accessible, and the Rindfleisch text messages are communications with an ALPA representative in furtherance of the campaign

**Microsoft Teams (RFP No. 8).** The Teams account at issue is the Microsoft 365 tenant of Adamo Systems associated with daniel.moussaron@adamo.aero – a non-party business's environment, not a SkyWest system. Two points. First, the request as written demands "a complete native export of all Microsoft Teams accounts, workspaces, channels, and direct-message conversations." Microsoft 365 offers no such export mechanism: Teams content is exported through targeted eDiscovery searches (Microsoft Purview), not a wholesale "native export" of an entire tenant. The request as phrased therefore demands something the platform does not support – and a complete tenant export would in any event sweep in Adamo's unrelated business communications, implicating the non-relevant information, and proportionality limits discussed above in connection with Interrogatory No. 14 and RFP No. 11. Second, Mr. Moussaron conducted a targeted eDiscovery search (Microsoft Purview) of the Teams content in the tenant across the entire Relevant Period (January 1, 2025 to present), using search terms directed to SWOL, SWOL Data, the alleged extraction script, and union organizing at SkyWest. The search located no Teams chat messages and – directly responsive to this Request – no Automated Extraction Process, script, code, or instructions of any kind transmitted via Teams to Mr. Krithivas or anyone else, and Moussaron is unaware of any other responsive documents.  As to the meeting chats themselves: Microsoft applies its own default retention policies to Teams meeting chats; that data was managed by Microsoft's platform and became unavailable when the retention period expired, before this litigation. There are no "recovery steps" to identify for data a third-party platform deleted in the ordinary course under its own policies. If SkyWest has a basis to believe otherwise, we are happy to discuss it.

**Rindfleisch Text Messages (RFP No. 25).** These are communications between an employee-organizer and a representative of the union the pilots sought to join, during the campaign, about the campaign. ALPA is not a stranger "third party"; transmitting organizing data to the union is the organizing activity itself, and § 152, Fourth, protects that activity without regard to certification status. The protective order does not answer the concern, because SkyWest's litigation team would still acquire the substance of organizer-union communications about the scope and strategy of a campaign directed at SkyWest. That said, we see room for compromise: Mr. Moussaron is prepared to discuss producing the messages that concern data-transmission mechanics – what was sent, when, and in what format – with organizing-strategy content redacted.

**Files Transmitted to Rindfleisch (RFP No. 26).** The exported files (encrypted CSV and XLS documents) existed only as attachments to the transmittal email, and Mr. Moussaron did not retain separate copies of them. The email account is no longer accessible, as addressed in his Interrogatory No. 11 response and the Migadu correspondence being produced. The underlying data resides on the Remote Server and is subject to the scoping proposal above.

**Krithivas Communications (RFP No. 29).** Confirmed: the responsive text messages were produced (Krithivas 000001–000033); Mr. Moussaron is aware of no other responsive communications; and nothing responsive is being withheld on the basis of any objection.

**EZ Texting Report (RFP No. 12).** As discussed at the conference, there are two relevant exports from the EZ Texting platform. Consistent with the parties' agreement, Mr. Moussaron is producing the report containing the contact list uploaded to the platform – pilot names and contact information – which is the data set used to generate the poll outreach and which answers SkyWest's stated purpose of determining "which pilots were contacted, using what data, and from what source." He will not produce, absent a court order, the report containing group assignments, poll responses, and opt-out dates. Those fields directly record individual pilots' union sympathies and their engagement with organizing outreach – the associational core protected under *NAACP v. Alabama* and *Grandbouche*, which § 152, Fourth, prohibits the carrier from obtaining. The protective order does not resolve the issue, particularly in light of SkyWest's position on AEO review addressed below.

**Public-Source Data and Source Attribution (RFP Nos. 19–24).** Two concrete steps. First, notwithstanding the equal-accessibility point addressed above, Mr. Moussaron will produce the specific FAA Airmen Registry file(s) he actually downloaded and used in the "phase 4" data-collection work – which is what your letter says SkyWest needs in order "to distinguish[] SWOL-sourced from public data." Second, as set out in the Remote Server discussion above, the source field records intake channel (DMS/WEB/ALPA), not data origin, and the database contains no per-record origin tag. His prior statement that the DMS "does not tag or categorize the upload source location" is accurate as to origin. The ALPA prior-drive list (RFP No. 21) and the phase-by-phase collection records are within the same scoping discussion.

**Social Media (RFP No. 15).** To complete the record on this request and although this is not an interrogatory: Mr. Moussaron is aware of two responsive posts, both to private Facebook groups – a post about a training resource he created, which SkyWest asked him

to take down, and a post about his positive experience with the United Pathway Program at SkyWest. He was removed from those groups shortly after his termination and cannot retrieve or produce the posts. He is aware of no other responsive posts or comments or other forms of participation on other platforms.

**Callers / Complaint ¶ 37 (RFP No. 16).** Interrogatory No. 16 already provides the substantive information: the callers were organizing-committee members; the calls were outreach coordinated through the DMS call queue; and their purpose was to build support for ALPA representation. What remains is solely the demand that Mr. Moussaron name the SkyWest employees who made protected organizing calls – to their employer, in litigation their employer initiated. As addressed above this information is protected.

**Unnamed Individuals (Int. Nos. 6, 7, 12, 13, 16).** The same framework governs. The two individuals referenced in the Interrogatory No. 12 response are SkyWest employees who participated in the organizing campaign; the response identified their roles and the substance of the communications while withholding their names. Their identities are protected for the reasons stated above.

**Skywestalpa.org / skw.alpa.org (RFP No. 27).** To clarify the record on this request, the domain name and the server are distinct. The skywestalpa.org domain was registered to and controlled by a third party, not Mr. Moussaron, and that registration has since expired (April 29, 2026); the domain-registration records sought in item (a) are therefore not in his possession, custody, or control. The website itself, however, resolved to a Virtual Host on the Remote Server, which remains in Mr. Moussaron's exclusive control. As to those server-resident materials, Mr. Moussaron withdraws the "not under his control" objection: the categories identified in items (b), (e), and (f) – website source code, access logs, and analytics – are within the Remote Server scoping proposal above and can be produced under the protective order as part of that package. Items (c) and (d), however, seek pilot self-registration submissions and the contact lists generated from them: a record of every pilot who voluntarily raised a hand to the campaign. Those items fall squarely within the protections detailed above. As to skw.alpa.org, ALPA built and operates that site, and records concerning it are not in Mr. Moussaron's possession, custody, or control.

**AEO Condition.** The Standard Protective Order in effect in this District under DUCivR 26-2 itself provides two tiers – CONFIDENTIAL and ATTORNEYS' EYES ONLY – and permits a producing party to designate material AEO where it in good faith believes the material warrants that protection, limiting disclosure to outside counsel, experts, and litigation-support personnel. Requesting AEO treatment for union organizing data is an

application of the court's own standard form, not a departure from it. The Supreme Court has upheld protective orders restricting dissemination of associational materials obtained in discovery, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), and the Tenth Circuit affords district courts broad flexibility in fashioning and modifying such protections, *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424 (10th Cir. 1990). SkyWest is familiar with the sensitivity of this intersection from *Association of Flight Attendants-CWA v. SkyWest, Inc.*, No. 2:23-cv-00723 (D. Utah). The July 8 conference confirmed why the designation matters here: SkyWest's position is that its in-house counsel managing this litigation should be permitted to review AEO-designated materials. That position defeats the purpose of the designation – the two-tier structure exists precisely so that the most sensitive material is reviewed by outside counsel and experts rather than by the party itself – and it is why the assertion that the protective order fully addresses the associational concerns fails as to union organizing data. To the extent the parties conclude the existing order does not adequately address organizing data, the appropriate course is a stipulated supplemental order.

*   *   *

Consistent with the conference, Mr. Moussaron confirms he is producing the FAA Airmen Registry file(s) and the EZ Texting contact-list report, and will provide the remaining confirmations identified in your July 8 email; by July 17, 2026, he will also provide a privilege log (which we are still missing from SkyWest) and any responses that require amending.

We believe the proposals above – the scoped schema and source-code production, the supplemental source-attribution answer, and production of the FAA registry files and contact-list report – resolve or substantially narrow most of the issues in your letter. Each of them remains open to continuing to meet and confer notwithstanding SkyWest's statement at the conference that it intends to move to compel as to the union organizing data. Mr. Moussaron reserves all rights and objections.

Sincerely,

**SCHOLNICK THORNE HOLLAND**
*/S/ Jonathan K. Thorne*