Gregory M. Saylin, #9648
Tyson C. Horrocks, #12557
Zachary T. Burford, #19771
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101-2194
Telephone: 801.799.5800
GMSaylin@hollandhart.com
TCHorrocks@hollandhart.com
ZTBurford@hollandhart.com

*Attorneys for Plaintiff and Counterclaim Defendant SkyWest Airlines, Inc. and Counterclaim Defendant Dale Hansen*

---

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH – SOUTHERN DIVISION**

| | |
|---|---|
| SKYWEST AIRLINES, INC.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>and DALE HANSEN,<br><br>Additional Counterclaim Defendant,<br><br>vs.<br><br>DANIEL MOUSSARON,<br><br>Defendant and Counterclaim Plaintiff,<br><br>and VIKAAS KRITHIVAS,<br><br>Defendant and Counterclaim Plaintiff. | **PLAINTIFF AND COUNTERCLAIM DEFENDANT SKYWEST AIRLINES, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS II AND III OF MOUSSARON'S COUNTERCLAIM**<br><br>Civil No. 4:26-cv-00015-DN-PK<br><br>Senior District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ....... 1

RELEVANT ALLEGATIONS ....... 2

LEGAL STANDARD ....... 6

ARGUMENT ....... 7

I. COUN T II FAILS TO STATE A CLAIM FOR DEFAMATION. ....... 7

A. The Challenged Statements Are Protected Opinion. ....... 8

B. The January 26 Communication Is True. ....... 12

C. The January 26 Communication Is Protected by Utah's Common-Interest Privilege. ....... 14

D. Count II Is Fatally Conclusory. ....... 16

II. COUNT III FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS. ....... 18

A. The Counterclaim Does Not Allege Interference with Any Existing or Identifiable Prospective Economic Relationship. ....... 18

B. The Counterclaim Does Not Allege Improper Means. ....... 20

C. The Counterclaim's Allegations of Injury Are Conclusory. ....... 22

D. Federal Law Expressly Preempts Liability Based on the PRD Report. ....... 23

CONCLUSION ....... 24

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... passim

*Atl. Richfield Co. v. Farm Credit Bank of Wichita*,
226 F.3d 1138 (10th Cir. 2000) .......... 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6, 16, 19

*Bisch v. Cnty. of YOLO*,
2026 U.S. Dist. LEXIS 35369 (E.D. Cal. Feb. 20, 2026) .......... 10

*Brehany v. Nordstrom, Inc.*,
812 P.2d 49 (Utah 1991) .......... passim

*Brightspot Solutions, LLC v. A+ Prods.*,
2021 U.S. Dist. LEXIS 65569 (D. Colo. Apr. 5, 2021) .......... 20

*C.R. England v. Swift Transp. Co.*,
2019 UT 8, 437 P.3d 343 .......... 18, 20, 21

*Classic Jet Ctr. LLC v. Strmac*,
761 F. Supp. 3d 1060 (N.D. Ohio 2024) .......... 23

*Cox v. Hatch*,
761 P.2d 556 (Utah 1988) .......... 8

*DeBry v. Godbe*,
1999 UT 111, 992 P.2d 979 .......... 8

*DP Creations, LLC v. Ortiz*,
2021 U.S. Dist. LEXIS 141253 (D. Utah Mar. 5, 2021) .......... 10

*Eldridge v. Johndrow,*
2015 UT 21, 345 P.3d 553 .......... 18, 22

*Ferguson v. Williams & Hunt, Inc.*,
2009 UT 49, 221 P.3d 205 .......... 14, 15, 20, 21

*Hale v. Metrex Research Corp.*,
963 F.3d 424 (5th Cir. 2020) .......... 7

*Hardy v. D&D Mgmt. 2, LLC*,
2024 U.S. Dist. LEXIS 231138 (D. Utah Dec. 20, 2024) ........ 22

*Hogan v. Winder*,
2012 U.S. Dist. LEXIS 137399 (D. Utah Sept. 24, 2012) ........ 10

*Hogan v. Winder*, 762 F.3d 1096, 1107–08 (10th Cir. 2014) ........ 10, 11, 12

*In2 Networks, Inc. v. Honeywell Int'l*,
2011 U.S. Dist. LEXIS 117589 (D. Utah Oct. 11, 2011) ........ 19

*Jacob v. Bezzant*,
2009 UT 37 ........ 7, 8, 9

*Keisel v. Westbrook*,
2023 UT App 163 ........ 9, 11

*Khalik v. United Air Lines*,
671 F.3d 1188 (10th Cir. 2012) ........ 6

*Kim v. Kihwan Yoon*,
2021 U.S. Dist. LEXIS 185924 (N.D. Cal. Sept. 28, 2021) ........ 17

*Mackey v. Krause*,
2025 UT 37 ........ 18, 20

*Mathews v. McCown*,
2025 UT 34 ........ 9, 14

*Mohamed v. New Bern Transp. Corp.*,
2023 U.S. Dist. LEXIS 208126 (D. Md. Nov. 21, 2023) ........ 17

*Nelson v. Target Corp.*,
2014 UT App 205 ........ 14, 15, 16

*Nunes v. Rushton*,
299 F. Supp. 3d 1216 (D. Utah 2018) ........ 10

*Oirya v. Brigham Young Univ.*,
2020 U.S. Dist. LEXIS 4563 (D. Utah Jan. 9, 2020) ........ 15

*Oman v. Davis Sch. Dist.*,
2008 UT 70, 194 P.3d 956 ........ 8

*P&G v. Haugen*,
1997 U.S. Dist. LEXIS 23832 (D. Utah July 14, 1997) ........ 19

*Pace v. Swerdlow*,
519 F.3d 1067 (10th Cir. 2008) ........................................ 7

*Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*,
442 F.3d 1239 (10th Cir. 2006) ........................................ 6, 7

*Pipkin v. Acumen*,
2020 UT App 111 ........................................ 8

*Plant Oil Powered Diesel Fuel Sys. v. ExxonMobil Corp.*,
801 F. Supp. 2d 1163 (D.N.M. 2011) ........................................ 7

*Pratt v. Nelson*,
2007 UT 41 ........................................ 16

*Prismview, LLC v. Old Dominion Freight Line, Inc.*,
2022 U.S. Dist. LEXIS 5735 (D. Utah Jan. 11, 2022) ........................................ 7

*Purco Fleet Servs. v. Towers*,
38 F. Supp. 2d 1320 (D. Utah 1999) ........................................ 19, 20

*RainFocus v. Cvent, Inc.*,
2023 UT App 32 ........................................ 12, 16

*Shanley v. Hutchings*,
716 F. Supp. 3d 1179 (D. Utah 2024) ........................................ 19

*St. Benedict's Dev. Co. v. St. Benedict's Hosp.*,
811 P.2d 194 (Utah 1991) ........................................ 18, 20

*Utah Gospel Mission v. Salt Lake City Corp.*,
425 F.3d 1249 (10th Cir. 2005) ........................................ 7

*Vowell v. Gannett Satellite Info. Network, LLC*,
2017 U.S. Dist. LEXIS 17846 (D. Utah Feb. 6, 2017) ........................................ 12

*West v. Thomson*,
872 P.2d 999 (Utah 1994) ........................................ passim

*Wittner v. Banner Health*,
720 F.3d 770 (10th Cir. 2013) ........................................ 6, 17, 22

*Yadan Zhang v. Transpore Platform Mgmt., LLC*,
2024 U.S. Dist. LEXIS 95753 (D. Utah May 29, 2024) ........................................ 22, 23

**RULES AND STATUTES**

14 C.F.R. § 111.120 .......... 5, 21

14 C.F.R. § 111.215 .......... 21

14 C.F.R. § 111.235 .......... 21

14 C.F.R. § 111.310 .......... 21

49 U.S.C. § 44703 .......... 23

Code § 45-2-2 .......... 8

Fed. R. Civ. P. 10 .......... 7

Fed. R. Civ. P. 12 .......... passim

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 566 cmt. c (Am. L. Inst. 1977) .......... 12

Restatement (Second) of Torts § 581A cmt. f (Am. L. Inst. 1977) .......... 12, 14

Pursuant to Federal Rule of Civil Procedure 12(c), Plaintiff and Counterclaim Defendant SkyWest Airlines, Inc. ("SkyWest"), by and through its undersigned counsel, hereby respectfully moves this Court for judgment on the pleadings dismissing Counts II (Defamation) and III (Intentional Interference with Economic Relations) of Defendant and Counterclaim Plaintiff Daniel Moussaron's ("Moussaron") Counterclaim ("Counterclaim"). Dkt. No. 47, Moussaron's Counterclaim.

## INTRODUCTION

This case is about data theft. Between August and December 2025, Moussaron and his co-defendant used their SkyWest credentials, browser developer tools, and automated scripts to reach into SkyWest's secure, login-protected employee directory and extract the names, home addresses, and personal cell phone numbers of more than 5,000 SkyWest pilots. Moussaron admits he did it; he disputes only whether the law should label his admitted access as "unauthorized." Moussaron now asserts state-law claims for defamation and intentional interference with economic relations (Counts II and III) arising from statements made regarding his admitted conduct. These causes of action fail as a matter of law and should be dismissed.

The defamation count rests on a single truthful publication: a message SkyWest's Chief Executive Officer, Russell "Chip" Childs, posted on SkyWest Online to notify SkyWest's pilots on January 26, 2026 of the data breach (the "January 26 Communication"). Counterclaim ¶¶ 56–61, 63. This message did not name either Defendant and consists of Chip's opinions regarding the conduct and a truthful description of Defendants' actions in "gaining unauthorized access to and download[ing] pilot contact information that was not accessible to line pilots" and that

"information consisted of names, addresses, and phone numbers."[1] Moussaron's defamation claim fails because the statements are either nonactionable expressions of opinion or characterizations of conduct Moussaron admits.

The intentional interference claim fares no better. Utah law requires a plaintiff to plead interference with an existing or identifiable prospective economic relationship through independently wrongful means. The Counterclaim does neither. Instead, it states that Moussaron's future employment prospects have been impaired. It identifies no existing or prospective business relationship with which SkyWest allegedly interfered and alleges no independently actionable improper means separate from the alleged retaliation. Moreover, to the extent the claim is premised on SkyWest's reporting obligations under the Pilot Records Database, it is independently barred by federal law.

Because Counts II and III fail to state plausible claims for relief under governing Utah and federal law, the Court should grant SkyWest's Motion for Judgment on the Pleadings and dismiss both claims with prejudice.

## **RELEVANT ALLEGATIONS**[2]

[1] *See* Ex. A, January 26 Communication. The Counterclaim references but fails to attach or include a complete copy of the January 26 Communication. SkyWest provides the full statement here as **Exhibit A** ("Ex. A"). Because the Counterclaim repeatedly references the January 26 Communication, the Court may consider it on a Rule 12(c) motion. *See Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005) ("We have recognized [ ] that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss, at least where the document's authenticity is not in dispute.").

[2] For purposes of this Motion only, and as required under Federal Rule of Civil Procedure 12(c), SkyWest accepts as true the Counterclaim's well-pleaded factual allegations and draws all reasonable inferences in Moussaron's favor, except with respect to certain aspects of his defamation claim as described below. In doing so, SkyWest does not admit the truth of any

The following summary is drawn solely from the allegations of the Counterclaim, the parties' pleadings, the admissions in Moussaron's answer, and the documents incorporated therein for purposes of this Motion.[3]

1. SkyWest maintains an employee directory within its intranet portal called SkyWest Online ("SWOL"), which stores each employee's name, phone number, and home address, among other data, and which requires login credentials and multi-factor authentication to access. Countercl. ¶¶ 24 –26; Dkt. No. 47, Moussaron's Ans. ("Answer"), ¶¶ 12–13.

2. SkyWest hired Moussaron as a pilot in May 2022. According to Moussaran, as stated in his counterclaim, beginning in April 2025, he started serving on an Organizing Committee ("OC") working with the Air Line Pilots Association ("ALPA") and began organizing to form a labor union with other SkyWest pilots. Countercl. ¶¶ 6–10.

3. As a condition of his employment, Moussaron entered into an NDA (*see* Dkt. No. 1-1, Ex. A), pursuant to which he acknowledged and agreed that "SkyWest values and seeks to protect the privacy of its employees," that "Confidential and Privileged Information includes SkyWest business records . . . includ[ing] employee records in the form of personnel records[,]" among other things, and that all such information was confidential and he would "not disclose,

allegation in the Counterclaim, waive any factual or legal defense, or concede that any allegation is supported by the evidence.

[3] Because a Rule 12(c) motion is resolved on the pleadings as a whole, it is appropriate for the Court to consider Defendants' admissions in the pleadings, as well as the documents incorporated by the pleadings. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000); *Prismview, LLC v. Old Dominion Freight Line, Inc.*, 2022 U.S. Dist. LEXIS 5735, at *4 (D. Utah Jan. 11, 2022).

divulge, or otherwise communicate at any time or in any manner, to any party other than those employees of SkyWest as necessary, any Confidential Information, either during or subsequent to employment with SkyWest." Dkt. 1, Compl., ¶¶ 16–18.

4. In August 2025, Moussaron accessed SWOL to obtain pilots' phone numbers, home addresses, names, and other personal and employment-related information in order to contact them. Although those fields did not populate in his user interface, he used browser developer tools to remove the blocks SkyWest had in place to view the profile data that the server returned. Countercl. ¶¶ 23, 34–38. Working with Krithivas, Moussaron obtained contact information for most of SkyWest's pilots through SWOL. *Id.* ¶ 30.

5. Moussaron admits that he accessed SWOL, viewed pilot contact information, and "saved names, employee number, phone numbers, and addresses of various pilots sequentially based on seniority." Answer ¶ 27.

6. Moussaron further admits that "the Defendants used a script to access and save pilot contact information,"—this script being "Tampermonkey"—and that he has technical experience with scripting and developer tools. Answer ¶¶ 33–34.

7. Moussaron also admits that he provided pilot contact information to someone outside of SkyWest for union-organizing purposes and that he used the information to send a mass text message to a majority of SkyWest pilots on their personal devices. Answer ¶ 36; Countercl. ¶¶ 46–47.

8. Moussaron alleges that SkyWest investigated the breach and determined that he and Krithivas were responsible, and terminated his employment on January 26, 2026. Countercl. ¶¶ 53–55.

9. That same day, SkyWest's CEO Chip Childs posted the January 26 Communication to SWOL and shared it with "all [SkyWest's pilots]." Countercl. ¶¶ 55–56. The message was not distributed or shared outside of SkyWest. *Id.* ¶¶ 56–61, 83.

10. Mr. Childs wrote in the January 26 Communication that SkyWest "recently became aware that two now-former pilots' actions trampled on [SkyWest's] values, violating [its] company policies, and more importantly, [the pilots'] trust." Ex. A. He wrote that the two pilots had "gained unauthorized access to and downloaded pilot contact information that was not accessible to line pilots" and that "took extensive effort and manipulation to retrieve." Ex. A.

11. Mr. Childs added that SkyWest would pursue "this matter through every legal means possible," that "we're shocked and disgusted by this unethical behavior and violation of trust from colleagues prior to their departure," and that "[w]e will not tolerate theft of any kind." *Id.* He also wrote that the pilots' "actions serve as an appalling reminder of the lengths to which certain organizations and interests will go to gain access to our people. In this case, they went as far as unethically and unlawfully stealing your information in the hopes of reaching and influencing you." *Id.*

12. The January 26 Communication referred to "two pilots," but it did not name Moussaron or Krithivas, nor did it name ALPA. Ex. A.

13. When a pilot leaves an airline, the airline must report the discharge to the Federal Aviation Administration's Pilot Records Database ("PRD"). 14 C.F.R. pt. 111. Moussaron alleges that airlines may access the PRD when evaluating pilot applicants. *Id.* ¶¶ 65–67.

14. Federal regulations require a pilot's written consent before a prospective airline may access the pilot's records. 14 C.F.R. § 111.120(a).

15. SkyWest's PRD report identifies January 26, 2026, as the date of Moussaron's separation and categorizes the separation as "Other—Employer initiated separation not due to pilot performance." Attached hereto as **Exhibit B** ("Ex. B").

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) is evaluated under the same standard governing a motion to dismiss under Rule 12(b)(6). *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000); *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

"[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (internal citation omitted). Although the Court accepts well-pleaded factual allegations as true, it is not required to accept legal conclusions, conclusory allegations, or formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is plausible only when the facts alleged permit the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts should not give weight to "a legal conclusion couched as a factual allegation." *Wittner v. Banner Health*, 720 F.3d 770, 774 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

In resolving a Rule 12(c) motion, the Court may consider the pleadings, documents attached to the pleadings as exhibits, and documents incorporated by reference into the pleadings

without converting the motion into one for summary judgment. Fed. R. Civ. P. 10(c); *Park Univ.*, 442 F.3d at 1244 (recognizing that documents attached to the pleadings are properly considered on a Rule 12(c) motion under Rule 10(c)); *see Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008); *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005) ("We have recognized [ ] that a document central to the plaintiff's claim and referred to in the complaint may be considered in resolving a motion to dismiss . . . .").

Unlike a motion under Rule 12(b)(6), which tests the sufficiency of the challenged pleading standing alone, a motion for judgment on the pleadings under Rule 12(c) invites consideration of all pleadings in determining whether dismissal is appropriate. *Prismview, LLC v. Old Dominion Freight Line, Inc.*, 2022 U.S. Dist. LEXIS 5735, at *4 (D. Utah Jan. 11, 2022); *see also Hale v. Metrex Research Corp.*, 963 F.3d 424, 427 (5th Cir. 2020); *Plant Oil Powered Diesel Fuel Sys. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1187 (D.N.M. 2011) ("The Court notes . . . other courts have refused to 'pretend . . . [a plaintiff's admissions] do not exist.'").

Although courts generally accept well-pleaded factual allegations as true, that rule operates differently in Utah defamation actions. Because of the First Amendment interests at stake, the Court should independently determine, as a matter of law, whether the challenged statements are capable of a defamatory meaning. *Jacob v. Bezzant*, 2009 UT 37, ¶¶ 18–19. In making that determination, the Court does not indulge the nonmoving party with favorable inferences regarding the defamatory meaning of the statements, but instead conducts an independent, context-driven analysis. *Id.*

## <u>ARGUMENT</u>

### I. COUNT II FAILS TO STATE A CLAIM FOR DEFAMATION.

To establish defamation under Utah law, a plaintiff must prove five elements: "(1) the defendant[s] published the statements in question, either orally or in writing; (2) the statements were false; (3) the statements were not protected by any privilege; (4) the defendant[s] acted with the required degree of fault; and (5) the statements caused damages." *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 62, 194 P.3d 956 (quoting *DeBry v. Godbe*, 1999 UT 111, 992 P.2d 979). Count II fails on the second, third, fourth, and fifth elements for the following reasons: (1) as a threshold issue, the evaluative characterizations Moussaron isolates in the January 26 Communication are nonactionable expressions of opinion protected by the First Amendment; (2) the challenged statements are substantially true based on Moussaron's own admissions; (3) the January 26 Communication is independently protected by Utah's conditional common-interest privilege; and (4) the Counterclaim's allegations of fault, causation, and damages are fatally conclusory.

**A. The Challenged Statements Are Protected Opinion.**

Under Utah law, "before the matter may proceed to the trier of fact, the court must initially determine whether, as a matter of law, the challenged statement 'is capable of conveying a defamatory message.'" *Pipkin v. Acumen*, 2020 UT App 111, ¶ 16 (quoting *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988)); *Jacob v. Bezzant*, 2009 UT 37, ¶ 18 ("Whether a statement is susceptible to a defamatory interpretation is a question of law."). "A statement is defamatory if it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West v. Thomson*, 872 P.2d 999, 1008 (Utah 1994) (citing *Cox*, 761 P.2d at 561 and Utah Code § 45-2-2(1)). "A publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff." *Id*. at 1009. To be "defamatory," the statement must be "more than sharp criticism." *Id*.

Rather, the party "must establish that it damaged his reputation . . . in the eyes of at least a substantial and respectable minority of its audience." *Id*. "[T]he guiding principle is the statement's tendency to injure a reputation in the eyes of its audience." *Id*. at 1008.

When determining whether statements are defamatory, the court must look at the entire context in which the statements were made. *West,* 872 P.2d at 1008. Critically, to "accommodate the respect [courts] accord [constitutional] protections of speech," Utah courts do not "indulge [a plaintiff] by interpreting inferences that may be reasonably drawn from the statements in favor of a defamatory meaning." *Jacob v. Bezzant*, 2009 UT 37, ¶ 18, 212 P.3d 535 (cleaned up).

The "Utah Constitution provides an independent source of expressions of opinion." *Mathews v. McCown*, 2025 UT 34, ¶ 96 (quoting *West*, 872 P.2d at 1013). "Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability." *Id.* Accordingly, pure opinion is not actionable unless it states or implies undisclosed, defamatory facts. *Id.* Utah applies four factors to separate fact from opinion: (1) the common usage of the words; (2) whether the statement can be objectively verified as true or false; (3) the full context of the statement; and (4) the broader setting in which it appears. *Id.* The Court must evaluate the challenged communication as a whole, not isolated words or phrases excerpted from their surrounding context. *Keisel v. Westbrook*, 2023 UT App 163, ¶ 45.

Childs' statements in the January 26 Communication are quintessential opinions. Moussaron takes umbrage with the Communication's descriptions of him as "trampl[ing] on SkyWest's values," "engag[ing] in disgusting unethical behavior," "violat[ing] colleagues trust," and generally acting "unethically and unlawfully." *See* Counterclaim, ¶ 83. Mr. Childs also

expressed that he was "shocked and disgusted" by Defendants' conduct. Ex. A. None of those characterizations has a single, objectively verifiable meaning. Whether conduct "tramples on" a company's values, is "unethical," or amounts to a "violation of trust" depends upon the speaker's own values and reaction. It is not the kind of assertion a jury could find "true" or "false" against any external standard. *See Hogan v. Winder*, 2012 U.S. Dist. LEXIS 137399, at *24–25 (D. Utah Sept. 24, 2012) (words that "convey one's subjective belief about another's ability or behavior" cannot be objectively verified), *aff'd*, 762 F.3d 1096 (10th Cir. 2014); *Bisch v. Cnty. of YOLO*, 2026 U.S. Dist. LEXIS 35369, at *84 n.32 (E.D. Cal. Feb. 20, 2026) (collecting cases for the proposition that "[a] statement that someone is unethical is broadly understood to be a statement of opinion"). The phrase "shocked and disgusted" is not even a statement about Moussaron; it merely describes Childs' and SkyWest's reaction. Courts have consistently held that statements concerning a person's ethics, character, or values are not actionable expressions of opinion. *See Nunes v. Rushton*, 299 F. Supp. 3d 1216, 1232 (D. Utah 2018) (holding that "terms such as 'fraud' and 'harassment' . . . would have been understood to be 'no more than rhetorical hyperbole'"); *DP Creations, LLC v. Ortiz*, 2021 U.S. Dist. LEXIS 141253, at *8–9 (D. Utah Mar. 5, 2021) (holding that statements describing a party as "demented," "bitter," "angry," or "childish" were nonactionable opinion). Accordingly, a reasonable person would take those statements to reflect Mr. Childs' assessment and personal views of Defendants' conduct—not objectively verifiable factual assertions. *See West*, 872 P.2d at 1018.

The context only confirms that conclusion. The January 26 Communication is a first-person message from SkyWest's CEO, signed simply "Chip," who speaks throughout in his own voice: "I want to be clear," "I also want to personally apologize to you," and "we're shocked and

disgusted." Ex. A. It is a leader's personal reaction to conduct he has already described in full, addressed directly to his own workforce. Courts recognize that this kind of setting signals opinion. *See West*, 872 P.2d at 1020 (setting associated with personal viewpoint, rather than "hard news," favors treating evaluative language as opinion); *cf. Keisel*, 2023 UT App 163, ¶ 42 (personal qualifiers like "for me," "to me," and "I think" "anchored" the speaker's statement to "his own perception," confirming it was opinion). Because Mr. Childs disclosed the factual basis for his opinions, the recipients of the post were free to accept or reject his characterizations for themselves. *West*, 872 P.2d at 1015. Mr. Childs' use of his own voice, even apologizing for the Defendants' conduct, reinforces that the context and broader setting of the post were of a leader giving his personal views on the subject. *Cf. Keisel*, 2023 UT App 163, ¶ 42. A reader encountering "I want to be clear" and "I also want to personally apologize" understands that this is Chip's characterization of events—not a separate, verifiable factual charge.

The references to "theft" and "stealing" do not change the analysis. Read in the context of a message that disclosed exactly what the two pilots had done—retrieved pilot contact information from the Company directory and used it to text pilots—no reasonable employee would understand "[w]e will not tolerate theft of any kind" or "unethically and unlawfully stealing your information" as charging Moussaron with the commission of a crime. Countercl. ¶¶ 59, 61. Accusatory terms of this kind, deployed to condemn conduct the speaker has already described, are nonactionable rhetorical characterization rather than factual accusation. *See Hogan v. Winder*, 762 F.3d 1096, 1107–08 (10th Cir. 2014) (accusation of "extortion," read in the context of a disclosed employment dispute, was "rhetorical hyperbole" that no reasonable reader would take as charging a crime); *West*, 872 P.2d at 1008 & n.17 (loose, figurative epithets describing disclosed conduct are not

defamatory); Restatement (Second) of Torts § 566 cmt. c (Am. L. Inst. 1977).

For these reasons, the January 26 Communication is not capable of a defamatory meaning.

**B. The January 26 Communication Is True.**

Falsity is an essential element of a defamation claim. *West*, 872 P.2d at 1007–08. Thus, Utah law recognizes that "truth is an absolute defense to an action for defamation." *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57–58 (Utah 1991). "The defense of truth is sufficiently established if the defamatory charge is true in substance," such that "[i]nsignificant inaccuracies of expression do not defeat the defense of truth." *RainFocus v. Cvent, Inc.*, 2023 UT App 32, ¶ 10 (quoting *Brehany*, 812 P.2d at 57–58). "It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." Restatement (Second) of Torts § 581A cmt. f (Am. L. Inst. 1977). When "the underlying facts as to the gist or sting are undisputed, substantial truth may be determined as a matter of law." *Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014) (affirming dismissal of defamation claim because, in part, the statements were substantially true); *see also Vowell v. Gannett Satellite Info. Network, LLC*, 2017 U.S. Dist. LEXIS 17846, at *3–6 (D. Utah Feb. 6, 2017) (dismissing a defamation claim based on a finding that the statement was substantially true). Accordingly, the relevant inquiry is not whether every word of the challenged publication is literally accurate, but whether the publication's overall substance is true.

Moussaron's own pleadings establish the essential conduct the January 26 Communication described. The January 26 Communication merely states that "two now-former pilots" had "gained unauthorized access to and downloaded pilot contact information that was not accessible to line pilots or any employee through normal processes, even after completing multi-factor SkyWest

Online login," consisting of "names, addresses, and phone numbers." Ex. A. These factual assertions are true and admitted.

Importantly, Moussaron admits to the conduct discussed and referenced in the January 26 Communication. More specifically, Moussaron admits the following:

- He accessed SWOL, viewed pilot contact information, and "saved names, employee numbers, phone numbers, and addresses of various pilots sequentially based on seniority." Moussaron's Ans., ¶ 27.
- "Defendants used a script to access and save pilot contact information." *Id.* ¶ 33.
- The phone numbers and addresses did not populate in the user interface, and he had to invoke browser developer tools to view them. This process required a script and unfolded over months. Countercl. ¶¶ 36–38, 44 –46; Moussaron's Ans. ¶¶ 27, 33, 36.
- He furnished that pilot contact information to someone outside of SkyWest and helped send a mass text to a majority of SkyWest's pilots. *Id.* ¶ 36.
- He did this for non-SkyWest business purposes—specifically, union organizing. *Id.*
- He used browser developer tools to obtain phone numbers and addresses that SWOL's user interface did not display. Countercl. ¶¶ 36–38, 45.

Viewed in context, the gist of the January 26 Communication was that two unnamed pilots obtained pilot contact information from SkyWest's directory that ordinary users did not see in the interface, that retrieving it required extra effort and manipulation of the directory, and that they used it to reach and influence SkyWest's pilots. Although Moussaron disputes SkyWest's characterization of that conduct as "unethical," "shock[ing] and disgust[ing]," "unauthorized," or "stealing," the substantial-truth doctrine does not require literal precision in every descriptive term. It requires only that the defamatory charge be "true in substance." *Brehany*, 812 P.2d at 57–58.

Any "[s]light inaccuracies of expression" in the January 26 Communication "are immaterial provided that the defamatory charge is true in substance." Restatement (Second) of

Torts § 581A cmt. f. Therefore, any disagreement over whether Moussaron's conduct should be characterized as hacking or stealing is, at most, an immaterial disagreement over terminology that does not plausibly establish falsity.

**C. The January 26 Communication Is Protected by Utah's Common-Interest Privilege.**

Utah recognizes a qualified privilege protecting communications made to advance a legitimate common interest shared by the publisher and the recipient. *Brehany*, 812 P.2d at 58–59. The privilege "protects an employer's communication to employees and to other interested parties concerning the reasons for an employee's discharge." *Nelson v. Target Corp.*, 2014 UT App 205, ¶ 23; *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 27, 221 P.3d 205. It exists because a "chilling effect would harm legitimate interests if employers could not speak candidly to those who share a legitimate stake in an employee's conduct." *Nelson*, 2014 UT App 205, ¶ 23. It applies, for example, where an employer tells its store managers that an employee's termination was drug-related, *Brehany*, 812 P.2d at 58–59, or where a law firm tells a client that a terminated attorney had overbilled the client's matter. *Ferguson*, 2009 UT 49, ¶¶ 30–33. Whether a communication is conditionally privileged presents a question of law for the Court. *Brehany*, 812 P.2d at 58; *see also Mathews*, 2025 UT 34, ¶ 143 (holding that evaluating a privilege on a motion for judgment on the pleadings is appropriate when the pleadings contain all information needed to decide the motion).

The January 26 Communication falls squarely within that privilege. SkyWest's President and Chief Executive Officer, Chip Childs, sent the communication only to SkyWest's pilot workforce following the Company's investigation into Moussaron's conduct. Countercl. ¶¶ 57–61, 83. The communication addressed matters of direct concern to both SkyWest and its employees, including the protection of employee personal information, the security of SkyWest's

computer systems, the integrity of Company operations, and the Company's response to the underlying incident. *Id.*; *see also* Ex. A. The message was distributed only to SkyWest pilots, through the Company's internal Flight Operations channels and employee-messaging system. Countercl. ¶ 82. Employees whose names, home addresses, and telephone numbers had allegedly been extracted from SkyWest's systems plainly shared a legitimate interest in understanding what had occurred, how the Company was responding, and what measures it was taking to protect employee information going forward. Ex. A.

The privilege likewise extends to SkyWest's explanation of why it took the actions it did. Utah courts have consistently recognized that an employer has a legitimate interest in communicating with its workforce concerning employee misconduct, discipline, and termination where those matters affect the employer's operations or the interests of other employees. *See Brehany*, 812 P.2d at 58–59; *Ferguson*, 2009 UT 49, ¶ 27; *Nelson*, 2014 UT App 205, ¶ 23; *see also Oirya v. Brigham Young Univ.*, 2020 U.S. Dist. LEXIS 4563, at *20 (D. Utah Jan. 9, 2020) ("[A]n employer is privileged in communicating to potential employers the reasons for an employee's discharge[.]"). Here, the January 26 Communication did not concern a private employment dispute bearing no relationship to other employees. Rather, it addressed alleged access to Company computer systems, the extraction of employee contact information, SkyWest's stated intent to pursue possible legal remedies arising from that conduct, and SkyWest's efforts to safeguard employee data. Those are precisely the types of workplace matters the common-interest privilege is intended to protect.

Accordingly, because the January 26 Communication was made by SkyWest's Chief Executive Officer to employees sharing a common business interest regarding matters directly

affecting Company operations, employee security, and the protection of confidential information, the common-interest privilege provides an independent basis for dismissal of Count II.[4]

### D. Count II Is Fatally Conclusory.

The Counterclaim repeatedly recites legal conclusions while omitting the factual allegations necessary to make those conclusions plausible. That is insufficient under *Twombly* and *Iqbal*. For example, although Moussaron alleges in a conclusory fashion that the January 26 Communication damaged his reputation and impaired his employment prospects, Countercl. ¶¶ 90, 93, he alleges no facts identifying any recipient who understood the communication to convey a false factual assertion or whose opinion of Moussaron changed because of it. Nor does the Counterclaim identify any recipient who drew a defamatory inference beyond the information expressly conveyed in the communication itself. *Id.* ¶¶ 82–94.

Likewise, the Counterclaim alleges that SkyWest acted with "malice or reckless disregard for the truth," Countercl. ¶ 92, but pleads no supporting facts. Although it asserts that SkyWest knew the January 26 Communication was false, *id.* ¶¶ 63–64, 86–88, those allegations merely

---

[4] To the extent Count II rests on the Complaint's allegations as an actionable publication, the claim is barred outright. Utah's judicial-proceeding privilege "immunizes certain statements that are made during a judicial proceeding from defamation claims," provided the statements were "(1) made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) [were] made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *RainFocus*, 2023 UT App 32, ¶ 14 (quoting *Pratt v. Nelson*, 2007 UT 41, ¶¶ 27–28). The privilege is absolute, and it applies regardless of the speaker's motive or alleged malice. *Pratt*, 2007 UT 41, ¶¶ 28–31. The privilege is construed broadly and "applies to every step in the proceeding until final disposition," including the allegations in pleadings. *Id.* ¶ 28. Accordingly, to the extent Count II relies on SkyWest's Complaint as a defamatory publication, the absolute privilege provides a complete bar to liability. Nor should Moussaron be permitted to attribute any alleged harm or damages to the January 26 Communication that are in fact associated with SkyWest's Complaint.

restate Moussaron's position that his access was authorized; they do not allege facts showing that any SkyWest representative knew a challenged statement was false, entertained serious doubts about its truth, or otherwise abused an applicable privilege. Instead, the Counterclaim labels SkyWest's conduct "malicious" and asks the Court to accept that legal conclusion. *See id.* ¶¶ 91–94. Such threadbare allegations are insufficient as a matter of law. *See Iqbal,* 556 U.S. at 678; *Wittner*, 720 F.3d at 774.

The Counterclaim likewise omits the allegations necessary to make its causation and damages theories plausible. It does not identify any recipient who acted on the January 26 Communication, any employer or prospective employer who saw it, or any concrete consequence traceable to it. Moussaron alleges only that the statement "has damaged" his reputation and left him "unlikely to obtain another pilot position." Countercl. ¶¶ 90, 93. Those are labels that are insufficient to survive a motion to dismiss. *See Mohamed v. New Bern Transp. Corp.*, 2023 U.S. Dist. LEXIS 208126, at *9–10 (D. Md. Nov. 21, 2023) ("[T]he Amended Complaint fails to allege facts suggesting that Plaintiff suffered any special harm from the allegedly defamatory statement made to his co-workers."); *Kim v. Kihwan Yoon*, 2021 U.S. Dist. LEXIS 185924, at *8 (N.D. Cal. Sept. 28, 2021) (dismissing defamation claim because "allegation in the Complaint that the performance review 'damaged [Plaintiff's] reputation and standing' . . . is conclusory").

Ultimately, Count II depends upon speculation rather than factual allegations. The Counterclaim asks the Court to infer that recipients understood the January 26 Communication as a false assertion of fact, disregarded the disclosed conduct it truthfully described and the context in which it appeared, and acted adversely toward Moussaron because of it. The Counterclaim alleges no facts supporting those inferential leaps. Because it pleads only conclusions—not facts—

Count II fails to state a plausible claim for relief.

## II. COUNT III FAILS TO STATE A CLAIM FOR INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS.

To state a claim for intentional interference with economic relations, a plaintiff must allege "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, and (3) causing injury to the plaintiff." *Eldridge v. Johndrow,* 2015 UT 21, ¶¶ 13, 70, 345 P.3d 553, 556. In this context, "improper means" is "conduct contrary to law—such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession." *Mackey v. Krause*, 2025 UT 37, ¶ 105 (quoting *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 48, 437 P.3d 343). The Counterclaim fails to sufficiently plead these elements.

### A. The Counterclaim Does Not Allege Interference with Any Existing or Identifiable Prospective Economic Relationship.

Utah's tortious-interference tort requires proof that the defendant "intentionally interfered with the plaintiff's existing or potential economic relations . . . by improper means."[5] *Eldridge*, 2015 UT 21, ¶¶ 13, 70. A claim for intentional interference requires more than speculation that a plaintiff may lose future business opportunities; the plaintiff must identify an existing economic relationship or a sufficiently definite prospective economic relationship with which the defendant intentionally interfered. *Id.* ¶ 1; *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 200–01 (Utah 1991). Interference with an existing relationship requires that the defendant "cause[] one of the parties not to perform on [a] contract," while interference with a prospective relationship requires that the defendant prevented the formation of a contract that was substantially likely to be

[5] After *Eldridge v. Johndrow*, improper purpose alone will not suffice. 2015 UT 21, ¶ 42.

formed. *Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1201–02 (D. Utah 2024) (citing *St. Benedict's*, 811 P.2d at 201). In *St. Benedict's*, the Utah Supreme Court affirmed dismissal where the complaint contained no allegation that any existing contract was breached or that performance under it was impaired. 811 P.2d at 200–01.

Federal courts applying Utah law have held that "[i]n pleading a claim for interference with economic relations, '[a] plaintiff cannot rest on conclusory allegations that is has existing or potential economic relations. . . . [Rather, a plaintiff must] allege facts showing either an existing contract or business relationship with a third party, or a potential contract or business opportunity with a third party or identifiable class of persons." *In2 Networks, Inc. v. Honeywell Int'l*, 2011 U.S. Dist. LEXIS 117589, at *5–6 (D. Utah Oct. 11, 2011) (quoting *Purco Fleet Servs. v. Towers*, 38 F. Supp. 2d 1320, 1325 (D. Utah 1999) (alterations in *In2 Networks*)). Accordingly, even under pre-*Twombly/Iqbal* pleading standards, courts have dismissed interference claims that only vaguely reference "current and potential customers." *Purco Fleet*, 38 F. Supp. 2d at 1325; *P&G v. Haugen*, 1997 U.S. Dist. LEXIS 23832, at *11 (D. Utah July 14, 1997) (dismissing interference claim where plaintiff alleged only "classes" of third persons but no "facts showing present or potential business relationships").

Here, the Counterclaim fails to allege any identifiable third-party economic relationship or expectancy with which SkyWest allegedly interfered. It alleges only that SkyWest's report to the FAA "will negatively impact his ability to get a new pilot job" and that Moussaron is "unlikely to obtain another pilot position." Countercl. ¶¶ 93, 97. The Counterclaim does **not** allege:

- the existence of any specific third-party economic relationship or expectancy;
- that any existing contractual relationship was terminated because of SkyWest's conduct;

- that any pending employment negotiations were disrupted;
- that any identified employer reviewed the PRD report;
- that SkyWest improperly communicated with any identified prospective employer regarding Moussaron;
- that SkyWest induced any identified employer not to hire Moussaron; or
- that any employer withdrew an offer of employment because of SkyWest's conduct.

In sum, the Counterclaim wholly fails to allege that SkyWest interfered with any existing or identifiable prospective economic relationship between Moussaron and any third party. This is insufficient to survive a motion to dismiss. *See St. Benedict's*, 811 P.2d at 201; *Purco Fleet*, 38 F. Supp. 3d at 1325; *see also Brightspot Solutions, LLC v. A+ Prods.*, 2021 U.S. Dist. LEXIS 65569, at *34 (D. Colo. Apr. 5, 2021) (granting motion to dismiss tortious interference claim that failed to identify "any particular third parties with which it had existing or prospective business relationships").

**B. The Counterclaim Does Not Allege Improper Means.**

Improper means must be "conduct contrary to law—such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession." *Mackey*, 2025 UT 37, ¶ 105 (quoting *C.R. England*, 2019 UT 8, ¶ 48). None of the conduct alleged in the Counterclaim satisfies that requirement.

First, to the extent Moussaron relies on the January 26 Communication as an improper means, that theory fails with Count II. Although defamation may satisfy that element, an interference claim premised on defamation "will rise or fall with [the] defamation cause of action." *Id.* ¶¶ 106–07; *see Ferguson*, 2009 UT 49, ¶ 36. As explained above, the Communication is not actionable defamation and cannot be repackaged to sustain Count III.

Second, the RLA allegations do not supply improper means. Count III alleges that SkyWest interfered with future employment through its PRD report, but identifies the alleged "improper means" as SkyWest's earlier decision to terminate Moussaron in violation of the RLA. Countercl. ¶¶ 97–98, 102. Those are distinct acts. Even assuming the termination violated the RLA, the Counterclaim does not allege that SkyWest's later PRD report violated the RLA or otherwise explain how the alleged retaliation constituted the means by which SkyWest interfered with any relationship between Moussaron and another airline.

Finally, the PRD report was required by federal law. Covered air carriers must report a pilot's separation from employment within thirty days after it becomes final and state whether the separation resulted from pilot performance or another reason, including an "employer-initiated separation not related to pilot performance." 14 C.F.R. §§ 111.215(a), 111.235(a), (d), (f). SkyWest complied. Its PRD entry reported an employer-initiated separation "not due to pilot performance," identified January 26, 2026, as the separation date, and included no additional separation documents. Ex. B. The Counterclaim's characterization of the report as a termination for "non-performance," Countercl. ¶¶ 66, 97, identifies no inaccuracy in the entry.

The report was also confined to the federally prescribed PRD system, where a prospective airline may access it only with the pilot's written consent. 14 C.F.R. §§ 111.120(a), 111.310(a). A truthful communication made pursuant to a legal duty through a restricted channel to recipients possessing a corresponding safety and hiring interest is privileged, not an independently wrongful means of interference. *See C.R. England*, 2019 UT 8, ¶¶ 18–20; *Brehany*, 812 P.2d at 58–59; *Ferguson*, 2009 UT 49, ¶¶ 27–33. The Counterclaim alleges no facts showing that SkyWest abused that privilege. Accordingly, Count III fails to allege improper means.

### C. The Counterclaim's Allegations of Injury Are Conclusory.

Similarly, Count III fails because the Counterclaim does not plausibly plead injury. Injury is an essential element of the tort, and the plaintiff must allege facts showing an actual, concrete loss caused by the alleged interference. *Eldridge*, 2015 UT 21, ¶ 13. A plaintiff cannot satisfy that element by merely using generic labels for his purported harm—he must plead specific facts from which the Court can draw a reasonable inference that the interference caused him a cognizable loss. *Iqbal*, 556 U.S. at 678; *Yadan Zhang v. Transpore Platform Mgmt., LLC*, 2024 U.S. Dist. LEXIS 95753, at *22–23 (D. Utah May 29, 2024) (granting motion to dismiss tortious interference claim because plaintiff did not "allege pecuniary loss caused by the intentional interference").

The Counterclaim offers nothing more than vague, speculative statements as to Moussaron's alleged harm. It alleges that SkyWest's report to PRD "will negatively impact his ability to get a new pilot job" and that Moussaron is "unlikely to obtain another pilot position." Countercl. ¶¶ 93, 97. Both allegations are framed prospectively and speculatively—what *may* happen to Moussaron's employment prospects at some undefined point in the future, not what *has* happened to him. The Counterclaim does not allege that Moussaron applied for any pilot position, that he was rejected from any position, that any prospective employer reviewed his PRD record or the January 26 Communication, or that he lost any identified wages, benefits, or business opportunity. Nor does it allege any amount of lost compensation, any position he would otherwise have obtained, or any timeframe in which the claimed harm materialized. Those omissions are dispositive: "[a] legal conclusion couched as a factual allegation" is entitled to no weight. *Wittner v. Banner Health*, 720 F.3d 770, 774 (10th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678); *Hardy v. D&D Mgmt. 2, LLC*, 2024 U.S. Dist. LEXIS 231138, at *19 (D. Utah Dec. 20, 2024) (dismissing

interference claim that "fail[ed] to state facts to support injury").

To the extent Moussaron relies on reputational harm rather than economic loss, that theory fails as a matter of law. Reputational and emotional injuries, standing alone, are not remediable through a claim for intentional interference with economic relations; the tort requires pecuniary loss. *See Yadan Zhang*, 2024 U.S. Dist. LEXIS 95753, at *22–23 (holding that "[r]eputational and emotional injuries, standing alone, are not properly remedied through tortious interference"). Because the Counterclaim pleads only a generalized fear of future difficulty in the pilot labor market, it does not plead injury at all.

Accordingly, Count III fails for the independent reason that Moussaron has not alleged facts establishing any actual injury caused by SkyWest's purported interference.

### D. Federal Law Expressly Preempts Liability Based on the PRD Report.

Count III fails for the additional reason that it is expressly preempted because it seeks to impose state-law liability for SkyWest's PRD report. Section 44703(j)(2) provides that no State may enforce any law that "prohibits, penalizes, or imposes liability for furnishing or using records" in accordance with the federal pilot-records scheme. 49 U.S.C. § 44703(j)(2); *see Classic Jet Ctr. LLC v. Strmac*, 761 F. Supp. 3d 1060, 1066 (N.D. Ohio 2024) (recognizing that 49 U.S.C. § 44703(j)(2) "preempts certain State law claims, and a defendant may assert it as a defense to liability in certain cases"). Count III does precisely what the statute prohibits—it seeks to impose Utah tort liability because SkyWest furnished Moussaron's required separation record to the PRD.

The narrow exception to the defense applies only where the reporting party furnishes information it knows is false and that was maintained in violation of a federal criminal statute. *Id.* § 44703(j)(3). The Counterclaim alleges neither. Its assertions of knowing falsity address the

January 26 Communication, not the PRD entry, and it identifies no false information in the entry at all. *See* Countercl. ¶¶ 63–64, 86–92, 97. Count III therefore cannot impose tort liability for SkyWest's federally required and facially accurate PRD report.

**CONCLUSION**

For the foregoing reasons, SkyWest respectfully requests that the Court grant its Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) and dismiss Counts II and III of Moussaron's Counterclaim with prejudice.

Dated this 28th day of August, 2026.

HOLLAND & HART LLP

*/s/ Tyson C. Horrocks*
Gregory M. Saylin
Tyson C. Horrocks
Zachary T. Burford

*Attorneys for Plaintiff and Counterclaim Defendant SkyWest Airlines, Inc.*
*and Counterclaim Defendant Dale Hansen*

38494594