Jonathan K. Thorne (Utah Bar No. 12694)
Lauren I. Scholnick (Utah Bar No. 7776)
Jack Holland (pro hac vice)
**SCHOLNICK THORNE HOLLAND**
40 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 359-4169
Facsimile: (801) 359-4313
Email: jonathan@utahjobjustice.com
lauren@utahjobjustice.com
jack@laborwest.com
*Attorneys for Defendant and Counterclaim Plaintiff Daniel Moussaron*

Timothy D. Ducar (Utah Bar No. 13423)
Scott C. Uthe (pro hac vice)
**LAW OFFICES OF TIMOTHY D. DUCAR, PLC**
9280 E. Raintree Drive, Suite 104
Scottsdale, AZ 85260
Telephone: (480) 502-2119
Facsimile: (480) 452-0900
Email: orders@azlawyers.com
*Attorneys for Defendant and Counterclaim Plaintiff Vikaas Krithivas*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH – SOUTHERN DIVISION**

| | |
|---|---|
| SKYWEST AIRLINES, INC.,<br><br>Plaintiff and Counterclaim Defendant<br><br>and DALE HANSEN,<br><br>Additional Counterclaim Defendant,<br><br>vs.<br><br>DANIEL MOUSSARON, and VIKAAS KRITHIVAS,<br><br>Defendants and Counterclaim Plaintiffs | **DEFENDANTS' JOINT MOTION FOR PROTECTIVE ORDER**<br><br>Civil No. 4:26-cv-00015-DN-PK<br><br>Senior District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

## RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 26(c), the qualified First Amendment associational privilege, and the Court's August 18, 2026 Memorandum Decision and Order (Dkt. 108), Defendants and Counterclaim Plaintiffs Daniel Moussaron ("Moussaron") and Vikaas Krithivas ("Krithivas") (collectively, "Defendants") move for a protective order governing discovery that would otherwise disclose confidential, non-public information concerning association with the ongoing effort to organize SkyWest pilots by the Air Line Pilots Association ("ALPA").

To be clear, Defendants do not seek a blanket prohibition on union-related discovery and do not seek to withhold otherwise responsive evidence concerning the alleged acquisition, storage, transmission, possession, use, or disposition of SkyWest information. Rather, Defendants request an order permitting narrowly tailored redaction or protection of:

(1) the names and identification of nonparty pilots or employees whose identities have not been publicly disclosed as supporting, participating in, assisting, or privately communicating with the organizing campaign, where disclosure would itself reveal that private association;

(2) individualized pilot responses reflecting whether a pilot supported, opposed, was undecided about, or otherwise privately responded to organizing outreach; and

(3) confidential portions of non-public internal organizing communications that reveal campaign strategy, planning, assignments, or internal assessments of individual employee support, except to the extent such information is independently relevant and necessary to the technical or transactional (acquisition of contact information from SWOL) conduct alleged by SkyWest.

If this Motion is granted, responsive documents would not be withheld merely because they contain protected information. But responsive documents would be produced with appropriate redactions. SkyWest could then challenge a particular redaction after meaningful conferral, and the Court could review disputed material in camera where necessary.

These protections apply to the discovery presently disputed in Dkts. 61, 63, 67, 69, 70, 71, and 72 – the motions denied without prejudice in the Court's August 18th Order (Dkt. 108.) Further, any protective order granted should apply to SkyWest's Rule 45 subpoena to ALPA addressed in Dkt. 106.

## INTRODUCTION

This case concerns SkyWest's allegations that Defendants improperly obtained and used pilot contact information from SkyWest Online ("SWOL"). Defendants dispute SkyWest's characterization of their conduct as unauthorized access or "hacking." They have nevertheless disclosed substantial technical and transactional information concerning what occurred, including the use of their own SkyWest-issued credentials, the mechanics of the directory access, the information obtained, and the subsequent use of contact information in connection with pilot outreach to organize a labor union.

However, in discovery, SkyWest seeks information capable of identifying pilots who privately supported, assisted, communicated with, or responded to the ALPA organizing effort, as well as internal organizing communications and individualized expressions of employee sentiment. Those associational facts are distinct from and irrelevant to the technical evidence concerning how Defendants accessed or used SkyWest information.

That distinction matters because SkyWest has a long history, here and in response to other campaigns, of retaliating against employees who attempt to form such unions, giving

pilots reasonable and concrete fear of being identified by SkyWest. After the December 2025 ALPA outreach, SkyWest publicly characterized the organizing communication as "spam," investigated those involved, terminated Moussaron, publicly accused the two Defendants of unlawfully taking pilot information, and filed this lawsuit. SkyWest's General Counsel Dale Hansen then transmitted the Complaint against Krithivas to Krithivas's new employer, American Airlines. Krithivas was subsequently placed on administrative leave and was advised by representatives of the Allied Pilots Association ('APA') that American Airlines had identified the SkyWest Complaint as the issue giving rise to the anticipated employment action and was very likely to terminate him. Krithivas resigned before the scheduled meeting in an effort to protect his pilot employment record and future career. (Ex. A, Krithivas Decl. ¶¶ 12–25; Dkt. 114.)

The effect on the organizing campaign was substantial. Ronald Rindfleisch, an ALPA organizer with decades of airline-organizing experience, states that SkyWest pilots repeatedly expressed concern that their involvement with ALPA or the Organizing Committee ("OC") remain confidential; that after SkyWest terminated Moussaron and filed this action, the remaining OC leadership resigned; that several organizers expressly attributed their withdrawal to fear of retaliation; and that fear among SkyWest pilots during this campaign is greater than in any other organizing campaign in which he has participated. (Ex. B, Rindfleisch Decl. ¶¶ 16–19.)

Krithivas describes the same effect from his own experience. After SkyWest sent its Complaint to his new employer and he lost his position at American Airlines, he became unwilling to name any nonparty pilot who privately supported or discussed organizing. That reluctance has nothing to do with his own technical conduct, which he has disclosed. It is that

identifying those pilots to SkyWest would make him far less willing to have a private conversation about representation at all. (Ex. A, Krithivas Decl. ¶¶ 22–31.)

The First Amendment protects against compelled discovery where disclosure is reasonably likely to chill protected association. The Court has already identified the controlling framework and directed Defendants to present the issue through this Motion. (Dkt. 108.) Defendants satisfy their prima facie burden, by meeting each of the *Grandbouche* factors favoring the narrow protection requested.

## I. THE FIRST AMENDMENT AND RULE 26(c) GOVERN THE REQUESTED PROTECTION

The First Amendment protects "freedom to engage in association for the advancement of beliefs and ideas," which includes the prohibition of disclosure of private associational relationships. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–63 (1958). Such prohibitions even apply in discovery between private litigants. *Grandbouche v. Clancy*, 825 F.2d 1463, 1465–67 (10th Cir. 1987).

As the Court recognized in Dkt. 108, a party invoking the qualified associational privilege must initially make out a prima facie showing that disclosure is likely to result in chilling associational activity. *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 488, 491 (10th Cir. 2011). That showing may be established through affidavits describing harassment or intimidation of known participants and the resulting reluctance of sympathetic persons to associate for fear of reprisal. *Id.* at 491; *see also In re First Nat'l Bank, Englewood, Colo.*, 701 F.2d 115, 116–19 (10th Cir. 1983).

Once a party makes that showing, the Court balances "(1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information." *Grandbouche*, 825 F.2d at 1466.

The protection is not limited to formal membership lists but also to confidential internal associational communications that reveals internal campaign strategy, deliberation, or private association. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160–61, 1165 n.12 (9th Cir. 2010). At the same time, communications conveyed outwardly for purposes of persuasion or recruitment do not become categorically privileged merely because they concern organizing. *Id.* The proposed order follows that distinction: it protects non-public identities, individualized employee sentiment, and confidential internal strategy while leaving ordinary outreach and relevant technical evidence discoverable.

In addition to the First Amendment, Federal Rule of Civil Procedure 26(c) authorizes the Court, for good cause, to protect a party or person from annoyance, embarrassment, oppression, or undue burden by prescribing appropriate limitations on discovery.

Finally, Defendants do not contend that the Railway Labor Act ("RLA") creates a freestanding evidentiary privilege but, instead, supplies important statutory context for evaluating the associational burden as it protects airline employees' freedom to organize and prohibits carrier interference with employees' choice of representatives. 45 U.S.C. § 152, Third and Fourth. The discovery protection Defendants seek rests squarely on the First Amendment and Rule 26(c).[1]

---

[1] Defendants separately preserve any Rule 26(c) grounds applicable to confidential organizing infrastructure or other protected materials. This Motion addresses the First Amendment associational issue directed by Dkt. 108.

## II. DEFENDANTS HAVE MADE THE REQUIRED PRIMA FACIE SHOWING OF A CHILLING EFFECT

### A. The Present Organizing Campaign Depends on Confidential Participation.

Confidentiality is not hypothetical in this campaign. The organizing-interest materials assured pilots that their submissions would not be shared with SkyWest, that ALPA would not reveal who signed cards or expressed interest, and that the National Mediation Board would receive only the necessary information if a representation proceeding occurred. (Ex. C, Campaign Interest Page.) The December 2025 poll likewise advised recipients that the survey was confidential.

Rindfleisch explains that such assurances are essential in airline organizing because seniority directly controls a pilot's "quality of life and career trajectory, including areas like compensation, upgrades [to Captain], scheduling, and vacations." A pilot who leaves or is terminated "generally forfeits all accumulated seniority and starts from scratch with the next airline employer." As a result, the consequences of employer retaliation are "particularly great for airline pilots," and the chilling effect is "amplified." (Ex. B, Rindfleisch Decl. ¶ 3.)

Rindfleisch further states that throughout the current campaign SkyWest pilots repeatedly sought assurance that their involvement with ALPA or the OC remain confidential. Following Moussaron's termination and the filing of this action, the remaining OC leadership resigned, expressing fear of SkyWest retaliation as a reason. SkyWest's actions have made pilots reluctant to participate for fear of being identified to management, and that fear is greater than in any other organizing campaign in Rindfleisch's career. (Id. ¶¶ 16–19.)

Moussaron's account is concrete. Between April 2025 and January 2026 he spoke in person with more than 100 SkyWest pilots about joining the Organizing Committee or submitting an interest form. About ten told him they wanted to join but would not because of the

risk of being identified to SkyWest; about 45 more said they supported the effort but had to "protect their career" and would not put their name on anything SkyWest might have access to. (Ex. D, Moussaron Decl. ¶¶ 7–9.) The reasons were specific: SkyWest controls jeopardy checking and training events, and a failure follows a pilot to every future employer; and SkyWest has influence over hiring at its mainline partners. (Id. ¶ 10.) Of the roughly 70 pilots who did join the Committee, about three-quarters told Moussaron they would never allow themselves to be publicly identified, and none ever was by choice. (Id. ¶¶ 3–4.) Those who joined did so on the campaign's written assurance that their information was confidential and "never shared with SkyWest Airlines." (Id. ¶¶ 5–6; Ex. C.) The fear was borne out: within weeks of SkyWest's termination of Moussaron, the four other Organizing Committee leaders resigned, several telling ALPA's organizer they were doing so "out of fear of retaliation by SkyWest management." (Ex. B, Rindfleisch Decl. ¶ 17; see also Moussaron Decl. ¶ 11.)

Krithivas supplies his own experience as further proof, claiming this has made him reluctant to identify nonparty pilots who participated at all in the campaign. He has declined in discovery to identify persons based solely on such private association, not because he seeks to conceal the technical facts concerning his own conduct, but because identifying those pilots would disclose the very association they sought to keep private. (Ex. A, Krithivas Decl. ¶¶ 22–29.)

Krithivas's declaration is direct evidence of that reluctance: disclosure to SkyWest would make him less willing to involve any pilot in a private organizing discussion. (Id. ¶¶ 30–31.) That is the chilling effect Motor Fuel and First National Bank require.

**B. The Record Provides an Objective Basis for the Fear of Disclosure.**

The reluctance to disclose pilot involvement in the campaign described by Rindfleisch, Moussaron, and Krithivas is supported by what happened during this campaign. Those events merit review. First, on December 9, 2025, the ALPA OC sent a mass communication polling SkyWest pilots to determine whether they supported ALPA representation. The message advised recipients that the survey was confidential. (Dkt. 25-1.) Shortly thereafter, SkyWest posted a "SPAM TEXT NOTICE" on SWOL characterizing the communication as spam, encouraging pilots to report it to their cellular carriers, stating that SkyWest was investigating potential policy violations, and directing pilots not to provide personal information to anyone other than SkyWest officials, even if that person claimed to be a fellow employee. (Dkt. 25-2.)

Then, on January 11, 2026, Jessica Mulligan, SkyWest's Director, Flight Operations and Company Chief Pilot circulated internally an anonymous pilot's Facebook post concerning a call promoting union representation. The post referred to a claimed "back door" method of obtaining information. Greg Wooley, SkyWest's Executive Vice President, Operations responded that the allegation was concerning. Tracy Gallo, SkyWest's Senior Vice President, Flight Operations, then wrote: "If a pilot or anyone else is hacking our system and we find out who it is it will be automatic termination without question." (Ex. E, SkyWest_0000538.) Defendants dispute that they bypassed a technological access control or "hacked" SkyWest's system. The relevance here, however, is not whether SkyWest ultimately proves its technical characterization. The significance is that SkyWest, before the investigation was complete and knowing the activity involved union formation, stated that if a pilot was 'hacking our system' and SkyWest identified that pilot, it would 'automatic[ally] . . . without question' fire that pilot. Whether SkyWest's

characterization of Defendants' access as 'hacking' is ultimately correct is a merits question not presented by this Motion.

Just days later, on January 26, 2026, SkyWest terminated Moussaron. That same day, SkyWest CEO Russell "Chip" Childs sent a companywide communication stating that two former pilots had unlawfully taken pilot information for purposes of influencing pilots – which was a clear reference to ALPA campaign – and stating that SkyWest would pursue the matter through every legal means available. (Dkt. 44-1.) Then, by filing this action, SkyWest publicly identified Moussaron and Krithivas as the alleged "bad actors".

On February 2, 2026, even though SkyWest no longer employed Krithivas, SkyWest General Counsel Dale Hansen sent American Airlines, Krithivas's new employer, the Complaint here, notifying it of SkyWest's litigation against him. Hansen subsequently talked with American Airlines about the lawsuit and the SkyWest CEO also communicated with an American Airlines representative. (Ex. F, SkyWest First Supp. Resp. to Krithivas's Second Set, Interrogatory No. 13; Ex. G, SkyWest_0000475.)

After that, on April 6, 2026, American Airlines placed Krithivas on administrative leave and told him that it did not concern his performance, attendance, training, discipline, or operational conduct at American. After consulting with representatives of the Allied Pilots Association, Krithivas was advised that American Airlines had identified the SkyWest Complaint as the issue giving rise to the anticipated employment action and was very likely to terminate his employment. APA representatives also advised him concerning the potential consequences of a termination for his professional pilot record and future employment. Krithivas therefore resigned on April 10, 2026, before the scheduled meeting, in an effort to protect his pilot employment record and future career. He did not learn until June 2026 that American

Airlines learned of the lawsuit due to Hansen's direct transmission of it to his employer. (Ex. A, Krithivas Decl. ¶¶ 12–21; see also Dkt. 114.)

Similarly, former SkyWest pilot Mohammad Ali Hasnain Naqvi, who was employed by SkyWest for a year and half (ending in December 2023), was actively involved in the 2025 SkyWest ALPA organizing. (Ex. H, Naqvi Decl. ¶¶ 2–3.) He explains the chilling effect that SkyWest's action had on union organizing and his ongoing fear that SkyWest would retaliate against him for his involvement. To that point, just 10 days after he reported a pilot who was harassing pro-union SkyWest pilots to SkyWest, the FAA, based on an anonymous complaint, inquired about his mental health. (Id. ¶¶ 5–10, 14.)

Further, Doe, a recent SkyWest employee who submits a declaration under a pseudonym because of feared career consequences, explains that SkyWest anti-union animus is open, constant, and well known to employees, creating fear of harassment and intimidation among its workforce. (Ex. I, Doe Decl. ¶ 4.) Doe explains that SkyWest's opposition to unionization was open and well known within the workforce. Doe states that SkyWest's hiring process asks applicants about unions and that it was understood among pilots that expressing pro-union views could jeopardize an applicant's prospects. Doe also observed anti-union materials on SkyWest's internal employee website and in crew rooms, as well as company messaging responding to organizing activity. According to Doe, pilots feared that being publicly identified as union supporters or organizers could affect their employment, training, checking, or future airline careers, making confidentiality important to participation in the organizing effort. Thus, SkyWest's anti-union stance has a clear chilling effect and maintaining confidentiality of pilots is critical to obtain any participation in union organizing. *Id.* ¶¶ *5–14.*

This chain of events and sworn statements provide an objective basis for why a current or former SkyWest pilot might reasonably fear SkyWest's discovery of their union association to SkyWest.

**C. SkyWest's History of Anti-Union Animus Supports Defendants' Motion.**

The events and testimony concerning SkyWest's union animus in 2026 is just part of a long-standing pattern of its union opposition. In 2007, ALPA and a SkyWest pilot organizing committee obtained a preliminary injunction against SkyWest after a federal district court found a likelihood of success on claims that SkyWest had interfered with pilot organizing rights through, among other things, discriminatory application of policies concerning ALPA lanyards and distribution of union literature. *SkyWest Pilots ALPA Organizing Committee v. SkyWest Airlines, Inc.*, No. C-07-2688 CRB, 2007 U.S. Dist. LEXIS 48316, at *2, *5–7, *38, *47 (N.D. Cal. June 27, 2007). The court also examined SkyWest's relationship with its in-house pilot association – a carrier-funded "company union" being an old employer technique to defeat outside representation. The Court considered the SkyWest Airline Pilots' Association ("SAPA") – an entity that "purports to negotiate with SkyWest over rates of pay, rules, and working conditions," has "never been certified by the NMB as the SkyWest pilots' official representative", and for which "SkyWest provides … 100 percent of its funding, including the salaries of all three SAPA officers and all SAPA expenses" – and found that "SkyWest's unlimited funding of SAPA appears, on its face, to violate the RLA." *Id. at *8–10, *45–46.*[2]

In that case, sworn statements documented the pilots' concerns that public involvement in the organizing campaign could result in employment or career consequences. Those historical

[2] Section 2, Fourth of the RLA provides, in part, that "it shall be unlawful for any carrier …to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining …." 45 U.S.C. § 152, Fourth.

declarations are attached to Rindfleisch's declaration and provide context for his present observations concerning the 2025–2026 campaign. (Ex. B, Rindfleisch Decl., Ex. 2.)

Particularly relevant is the declaration of Jeffrey MacDonald, who supervised ALPA's assistance to SkyWest pilots during the 2007 organizing effort. MacDonald reported that OC members expressed concern that "active involvement in the union organizing campaign may result in disciplinary measures being taken against them by their employer," and that most were reluctant to discuss organizing where their activities might be observed by SkyWest management. (Ex. B, Rindfleisch Decl., Ex. 3, MacDonald Decl. ¶ 11.) He further explained:

> The Campaign has suffered from the atmosphere of fear and intimidation created by SkyWest because it has stripped pilots seeking to elect ALPA as their collective bargaining representative of an important tool for furthering their organizing goals.
> *Id.* at ¶ 12.

Defendants do not offer the 2007 evidence to establish that circumstances today are necessarily identical or to relitigate conduct occurring nearly twenty years ago. Its significance is corroborative. Rindfleisch participated in both the earlier SkyWest organizing efforts and the current campaign, and he now states that SkyWest pilots have again repeatedly expressed the same concern that their involvement with ALPA or the OC remain confidential and that the present fear of retaliation is greater than in any other organizing campaign in which he has been involved. (Ex. B, Rindfleisch Decl. ¶¶ 16–19.)

That historical context is reinforced by much more recent evidence from the pending SkyWest flight-attendant organizing litigation. There, the Association of Flight Attendants-CWA ("AFA") representative Gailen David testified that most SkyWest flight attendants did not publicly disclose their position concerning representation, that AFA treated non-public supporter identities as confidential, and that disclosure to SkyWest would likely reduce or end employees' willingness to communicate about organizing. (*Ass'n of Flight Attendants v. SkyWest Airlines*

*Inc.*, 2:23-cv-00723-DBB-DBP, ECF No. 131-4, David Decl. ¶¶ 4, 7–8, 10–11.) Magistrate Judge Pead thereafter entered a protective order protecting the names and identifying information of SkyWest flight attendants who had not publicly supported AFA, together with authorization-card information, subject to specified redaction and disclosure procedures. (*Id.* ECF No. 157 pp. 2–3.)

SkyWest's own agreement with its in-house association's representatives shows the same thing. SkyWest requires each SAPA representative to affirm that he "has resigned membership from any other labor organization and renounces his support or affiliation with any organizing group or committee that seeks, or may seek, to replace SAPA," and provides that "violating the terms of this Agreement will lead to discipline, up to and including termination of employment." (Ex. J, SkyWest_0000531; see also SkyWest_0000526.) The agreement is between SkyWest and the pilot – not between SAPA and its own officer – so it is the carrier itself that demands the renunciation. Defendants do not ask the Court to decide whether that clause is enforceable. The point is what it tells a pilot: a carrier that conditions a representative's position on renouncing any competing organizing committee, under threat of termination, has made clear that which side of an organizing effort a pilot is on matters to SkyWest – and that being identified as an ALPA supporter carries consequences.

The present declarations, the events of this litigation, and the corroborating historical record therefore satisfy Defendants' prima facie burden.

## III. THE GRANDBOUCHE FACTORS FAVOR THE REQUESTED PROTECTION

### A. Relevance

SkyWest's claims concern whether Defendants improperly accessed, acquired, possessed, used, disclosed, or transmitted SkyWest information. Defendants do not seek protection from discovery into those events.

Moussaron has disclosed the mechanics of the directory access, including his use of a browser-based script, the directory endpoint involved, the approximate timing of the bulk access, and the nature of the information returned. He has disclosed that Krithivas performed the bulk of the automated access using Krithivas's own credentials and that Moussaron performed testing and troubleshooting. (Dkt. 34-1 ¶¶ 9–20.) Defendants have also produced technical materials and contact data associated with the outreach.

Krithivas likewise states that he does not seek to withhold technical evidence concerning his conduct merely because the conduct occurred in the context of organizing. He has disclosed that he used his own SkyWest credentials and has provided information concerning the September 2025 directory access and Moussaron's involvement. (Ex. A, Krithivas Decl. ¶¶ 26–29.)

The disputed information is different and the disputed discovery takes several forms. Dkt. 67 challenges Moussaron's objections to multiple discovery requests seeking organizing-related information, objections that Moussaron also defended under the First Amendment associational privilege in Dkt. 78. Dkt. 69 seeks communications with the OC and ALPA and communications concerning pilot outreach. Dkt. 70 seeks, among other things, row-level DMS data and database tables that would provide individual pilots' ALPA poll responses, interest assessments, and organizing participation. Dkt. 71 seeks identities of persons who possessed, used, knew about, or

participated in activities involving the information at issue and persons involved in contacting pilots. Dkt. 72 seeks the unredacted identity of a nonparty associated with a private August 30, 2025 communication. And the forensic protocol presented in Dkts. 61 and 63 could likewise disclose private pilot responses, organizer identities, and internal campaign communications merely because they reside on Defendants' devices.

The relevant distinction is between evidence of conduct and evidence of association. If a particular person actually obtained, possessed, transferred, or used SkyWest-derived information in a manner relevant to a pleaded claim or defense, that conduct may present a legitimate discovery issue subject to the Court's balancing analysis. But the fact that a pilot received an organizing communication, privately expressed support or opposition, answered a confidential poll, communicated with an organizer, or appeared in internal notes reflecting organizing sentiment does not by itself establish anything about Defendants' alleged unauthorized access.

The proposed order allows discovery of the first category of information while protecting the second.

**B. Necessity**

SkyWest cannot establish categorical necessity for all protected identities and organizing communications. SkyWest itself has taken the position in responding to Krithivas's discovery that communications concerning "ALPA, union organizing, or SAPA" may be unrelated to the unauthorized-access and data-misuse claims at issue. (Ex. F, SkyWest First Supp. Resp. to Krithivas's Second Set, Request for Production No. 16.) That position substantially undercuts any categorical assertion that the identity and views of every pilot who privately communicated with the campaign are necessary to adjudicate SkyWest's claims.

More importantly, the proposed order does not prevent SkyWest from seeking disclosure where it can demonstrate a particularized need. If a redacted identity becomes material because evidence shows that the individual personally possessed the underlying SkyWest-derived dataset or participated in its acquisition, alteration, transfer, or use, SkyWest may challenge that redaction. The Court can then conduct the information-specific balancing *Grandbouche* requires.

What SkyWest should not receive is a categorical census of non-public organizing participants merely because responsive technical material and protected associational information appear in the same device, database, or communication.

**C. Availability from Other Sources**

SkyWest possesses the technical sources which identify access to its own system, including SWOL records and its other server-side information showing what requests reached its systems and when. SkyWest also has Defendants' written discovery responses, declarations, productions, and technical explanations. Moussaron has produced the contact list uploaded to the SMS vendor for the December 2025 outreach, containing thousands of pilots' names and contact information. SkyWest therefore already knows the universe of pilots to whom the mass message was sent.

The information Defendants seek to protect is not the identity of persons to whom the mass message was sent. It is the subset of pilots who privately responded, expressed a view about representation, volunteered assistance, communicated privately with organizers, or became the subject of confidential internal campaign assessments.

Where remaining technical questions exist, SkyWest can pursue them through system records, Defendants' testimony, produced documents with protected identities redacted, and

targeted challenges to any specific redaction. Those are substantially less intrusive alternatives than wholesale disclosure of private organizing relationships. See *Grandbouche*, 825 F.2d at 1466–67; *First Nat'l Bank*, 701 F.2d at 119.

**D. Nature of Information**

The nature of the information weighs strongly in favor of protection. The identity of an employee who privately supports a union campaign, who communicates privately with organizers, or who privately answers a representation poll is paradigmatic associational information. *See NAACP*, 357 U.S. at 462–63. Confidential internal campaign strategy and internal assessments of employee sentiment likewise implicate the ability of persons to associate and deliberate privately. *Perry*, 591 F.3d at 1160–61, 1165 n.12.

The current record underscores that sensitivity. Rindfleisch states that pilots have demanded confidentiality because of fear of retaliation. Moussaron states that fear of disclosure impaired pilots' willingness to participate. Krithivas states that, following what occurred to him after SkyWest identified his alleged role, he is presently reluctant to identify nonparty pilots based merely on their private organizing association. (Ex. A, Krithivas Decl. ¶¶ 22–31.)

Even the anonymous pilot whose Facebook post SkyWest relied upon did not publicly attach his or her identity to the dispute. SkyWest has stated that it does not know that pilot's true identity. That circumstance further demonstrates that pilot sentiment concerning the organizing campaign is information participants may reasonably wish to keep private.

This factor strongly favors protection.

**IV. THE PROPOSED ORDER NARROWLY SEPARATES PROTECTED ASSOCIATION FROM DISCOVERABLE CONDUCT**

The requested order is modeled in significant part on the structure already used in the SkyWest flight-attendant litigation but adapted to the discovery record here in Dkts. 61, 63, 67,

69, 70, 71, and 72 according to the nature of the information sought, rather than the particular discovery request in which protected information appears.

First, it permits redaction of the identity and personal identifying information of a nonparty pilot or employee where disclosure would itself reveal non-public support for, participation in, assistance to, or private association with the organizing campaign.

Second, it protects individualized responses reflecting private employee sentiment concerning representation.

Third, it permits protection of confidential portions of non-public internal communications revealing campaign strategy, planning, assignments, or internal assessments of employee support where that information was not communicated outwardly as organizing outreach and is not independently relevant and necessary to SkyWest's claims or defenses.

Fourth, it prohibits Defendants from using associational protection to conceal independently discoverable technical or transactional evidence concerning the acquisition, storage, possession, transmission, use, or disposition of SkyWest information.

Fifth, no otherwise responsive document may be withheld solely on associational grounds. A responsive document is produced with the protected material redacted.

Sixth, SkyWest may challenge any particular redaction after meaningful conferral. If the dispute cannot be resolved, the Court may employ in camera review or another limited procedure allowing the Court to determine whether a particular identity or communication is sufficiently relevant and necessary to overcome the associational burden.

This is the type of accommodation contemplated by *First National Bank*, which expressly considered whether the requesting party could obtain the information it legitimately needed

through production with members' names deleted or by otherwise narrowing the demand. 701 F.2d at 119.

The same categories should apply to SkyWest's Rule 45 subpoena to ALPA. The parties have stipulated that resolution of the associational issue presented here is expected to resolve all or most of the privilege dispute relating to that subpoena. (Dkts. 106, 120.) The constitutional burden does not depend on whether the same protected association is revealed from Defendants' records or ALPA's. *See First Nat'l Bank*, 701 F.2d at 118.

## V. AEO TREATMENT DOES NOT ANSWER THE THRESHOLD QUESTION WHETHER DISCLOSURE IS NECESSARY

SkyWest has previously argued that sensitive organizing information can be adequately protected through an Attorneys' Eyes Only ("AEO") designation. AEO protection can be relevant, but it answers a different question.

There are two distinct inquiries: first, whether disclosure of the protected information is sufficiently relevant and necessary to overcome the associational protection; and second, if disclosure is warranted, who should be permitted to receive it. An AEO designation addresses the second inquiry. It does not eliminate the first.

Where the identity itself is the protected associational fact and SkyWest cannot establish a sufficient need for it, disclosure to litigation counsel remains disclosure. Although confidentiality safeguards may reduce the burden of compelled disclosure, *see Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 616 (2021), they do not eliminate that burden where the asserted concern is disclosure of private association to the adverse party or its representatives.

Defendants acknowledge that in Dkt. 77 they previously proposed an outside-counsel-only limitation for organizing identities and communications as an alternative safeguard if the

Court ordered disclosure through the proposed forensic protocol. That proposal was directed to the second question – who could see information once disclosure occurred. It was not a concession that every protected identity was relevant and necessary or that the First Amendment balancing test had been satisfied.

Dkt. 108 now squarely directs the parties to address the threshold associational-privilege question under *Motor Fuel* and *Grandbouche*. Under that framework and the evidentiary record now presented, Defendants submit that non-public identities should remain redacted unless SkyWest establishes a particularized need sufficient to overcome the associational burden. If the Court determines that a particular identity must be disclosed, the Court may then consider AEO or another limited-disclosure mechanism as an additional safeguard.

The distinction is particularly important because SkyWest has argued that its Legal VP, Todd Emerson, should personally be permitted to review AEO materials because he is managing this litigation. (Dkt. 63, pp. 7–8; Dkt. 95, p. 11 & n.9.) Emerson also appears throughout SkyWest's privilege log in connection with its investigation and response concerning the alleged SWOL access. Emerson was also personally involved in the 2007 dispute in which ALPA obtained the preliminary injunction addressed above: the court's findings record that, as SkyWest's General Counsel, he received the complaints about discriminatory enforcement of the lanyard policy and testified about the company's bulletin-board practices. Skywest Pilots, 2007 U.S. Dist. LEXIS 48316, at *5–6, *36. Thus, an AEO designation, as SkyWest interprets it, would not necessarily restrict disclosure to counsel wholly removed from the underlying events.

The same concern exists with respect to Hansen. Holland & Hart represents both SkyWest and Hansen. Hansen is SkyWest's General Counsel and is alleged in Krithivas's counterclaim to have transmitted the Complaint to Krithivas's subsequent employer, making him

a Counterclaim Defendant, a party to this action. Krithivas's declaration explains the employment consequences he experienced thereafter. (Ex. A, Krithivas Decl. ¶¶ 12–25.) Again, the Court need not determine whether those events establish retaliation to recognize why disclosure of anonymous organizing identities to the litigation team defending SkyWest and Hansen may itself contribute to a reasonable fear of association.

*Air Transport Ass'n of America v. Blissenbach*, No. 24-cv-04657 (JWB/ECW), 2026 U.S. Dist. LEXIS 78488, at *19–20 (D. Minn. Apr. 10, 2026) (Dkt. 97), provides persuasive support for the proposition that AEO treatment is not invariably sufficient where compelled discovery reaches sensitive internal union information. There, the court expressly considered whether AEO protection would adequately alleviate the burden and concluded that it would not under the circumstances presented. Defendants do not contend that *Blissenbach* involved identical facts. It illustrates instead the narrower proposition relevant here: Rule 26(c) requires the Court to consider whether confidentiality designations actually protect the interest being burdened, rather than treating "AEO" as an automatic substitute for the required balancing.

The AFA protective order likewise does not require a different result. That order used both redaction and AEO mechanisms. *Ass'n of Flight Attendants*, ECF No. 157, pp. 2–3. Defendants request that the Court employ the redaction component first for non-public pilot identities and individualized sentiment, while retaining authority to order limited disclosure under appropriate conditions if SkyWest establishes a particularized need for specific information.

That approach gives effect to both sides' interests. It prevents unnecessary disclosure of private association while preserving SkyWest's ability to obtain every technical and transactional fact genuinely necessary to litigate its claims.

## CONCLUSION

Defendants respectfully request that the Court grant this Motion and enter the accompanying proposed protective order.

The evidence before the Court establishes substantially more than a subjective concern about disclosure. Current and former participants have described a campaign in which confidentiality was necessary to obtain participation; organizers withdrew after SkyWest terminated Moussaron and commenced this litigation; Rindfleisch reports that current pilots are more afraid of identification than in any campaign he has previously handled; and Krithivas explains that his own experience has caused him presently to resist identifying nonparty pilots based solely on their private organizing association. (Ex. A, Krithivas Decl. ¶¶ 22–31.)

At the same time, the proposed order does not deprive SkyWest of evidence concerning the conduct it alleges. Technical and transactional facts remain discoverable, responsive documents are produced rather than withheld, and SkyWest retains the right to challenge any particular redaction on a showing of relevance and necessity.

That narrow accommodation satisfies Rule 26(c), protects the associational interests recognized by *NAACP, Motor Fuel, First National Bank,* and *Grandbouche* and permits this case to proceed on the merits without unnecessarily converting discovery into a roster of pilots who privately participated in or expressed views concerning union representation.

DATED this 14th day of September, 2026.

**SCHOLNICK THORNE HOLLAND**
/s/ Jonathan K. Thorne
Jonathan K. Thorne
Lauren I. Scholnick
Jack Holland
*Attorneys for Defendant and Counterclaim Plaintiff Daniel Moussaron*

**LAW OFFICES OF TIMOTHY D. DUCAR, PLC**
/s/ Scott C. Uthe (signed with permission)
Timothy D. Ducar
Scott C. Uthe
*Attorneys for Defendant and Counterclaim Plaintiff Vikaas Krithivas*

**CERTIFICATE OF COMPLIANCE**

This motion contains 5,757 words and complies with the 7,750 word limit of DUCivR 7-1(a)(4)(A).

**CERTIFICATE OF SERVICE**

I certify that on the 14th day of September, 2026, I electronically transmitted this pleading to the Clerk's Office using the CM/ECF system for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gregory M. Saylin, GMSayline@hollandhart.com
Zachary T. Burford, ZTBurford@hollandhart.com
Tyler S. Erikson, TSErickson@hollandhart.com
Tyson C. Horrocks, TCHorrocks@hollandhart.com
*Attorneys for Plaintiff and Counterclaim Defendant SkyWest Airlines, Inc.*

Scott Uthe, suthe@azlawyers.com
Tim Ducar, tducar@azlawyers.com
*Attorneys for Defendant Vikaas Krithivas*

/s/Jonathan K. Thorne