**Declaration of Ronald Rindfleisch**

I, Ronald Rindfleisch, declare as follows:

1. I was employed by the Air Line Pilots Association, International ("ALPA") from 1981 until I retired in 2022. From the mid-1990s until my retirement, my primary job responsibilities consisted of participating in and overseeing ALPA's union organizing work, assisting airline pilots in the United States and Canada to exercise their rights under federal labor law to choose ALPA as their exclusive collective bargaining representative. After retiring, I was retained by ALPA as a consultant. In that capacity, I continue to assist ALPA in matters related to pilot organizing. Over the course of my career, I have been involved in pilot union organizing efforts at more than twenty airlines in the United States and Canada. Except as otherwise noted, I have personal knowledge of all matters discussed in this Declaration. I offer this Declaration in support of the Motion for Protective Order of Defendants Daniel Moussaron ("Moussaron") and Vikaas Krithivas ("Krithivas") pursuant to the Court's August 18, 2026, Order (ECF No. 108) in *SkyWest v. Moussaron, et al*, No. 4:26-cv-00015-DN-PK (D. Utah) (the "2026 Lawsuit").

2. Free and open exchanges among employees are essential to a union organizing drive. Employees on an organizing committee who are advocating to elect a bargaining representative must feel comfortable expressing their support for the union, informing interested employees about the union, and engaging in frank discussion with employees who are interested in the issues raised by an organizing campaign. This is especially so where airline management actively opposes pilot organizing and collective bargaining. If pilots who support an organizing effort feel intimidated by their employer, or fear exposing themselves or their coworkers to discipline or harassment, they are less likely to discuss the issues with interested coworkers, undermining their ability to advocate for a union or elect the collective bargaining representative

of their choosing. Similarly, when management interferes with the ability to disseminate information about a union organizing campaign and employee organizers are prevented from effectively communicating with or educating their coworkers, employees' ability to advocate for and choose their preferred collective bargaining representative suffers.

3. Fear of employer retaliation can be a particularly strong deterrent to pilots' support of and involvement in union organizing efforts. In the airline industry, seniority systems are ubiquitous. Seniority at a pilot's airline directly controls their quality of life and career trajectory, including areas like compensation, upgrades, scheduling, and vacations. An airline pilot who leaves or is terminated from an airline generally forfeits all accumulated seniority and starts from scratch with the next airline employer, potentially sacrificing substantial lifetime earnings and quality of life. Because the consequences of employer retaliation are particularly great for airline pilots, the chilling effect of employer intimidation or harassment on organizing activity is also amplified. As a result, it is essential to the success of any airline pilot organizing effort that pilots be able to trust that their organizing activity, communications, participation, and expressions of union interest or support will remain confidential—particularly where the employer is known to oppose unionization and has a history of anti-union conduct, as does SkyWest Airlines, Inc. ("SkyWest").

**SkyWest's History of Anti-Union Conduct**

4. I have been involved in at least three union organizing efforts for pilots at SkyWest. These include one organizing effort in the mid-1990s, a second one in the mid-2000s, and the current organizing effort, which began in 2025. Over the past few decades, I have observed SkyWest management engage in a pattern of anti-union conduct and coercion to keep its pilots from electing ALPA as their collective bargaining representative.

5. In 2007, ALPA was obliged to filed suit in *SkyWest Pilots ALPA Organizing Committee, et al. v. SkyWest Airlines, Inc.*, 3:07-cv-02688-CRB (2007) (the "2007 Lawsuit"), to enjoin SkyWest's unlawful interference with SkyWest pilots' organizing efforts. The Court issued a preliminary injunction against SkyWest, finding a likelihood of success on the merits of ALPA's and the organizing committee's claims that SkyWest's conduct violated Section 2, Third and Fourth of the Railway Labor Act ("RLA"). A true and correct copy of the preliminary injunction decision in the 2007 Lawsuit, *SkyWest Pilots ALPA Organizing Committee, et al. v. SkyWest Airlines, Inc.*, 2007 WL 1848678 (June 27, 2007), is attached to this Declaration as Exhibit 1.

6. Specifically, the Court found that SkyWest management applied its policies in a discriminatory manner and interfered with its employees' RLA rights by threatening discipline for pilots who showed union support by wearing ALPA lanyards and by interfering with pilots' distribution of ALPA literature. Exhibit 1 at *2-3, *13. The Court also found evidence of carrier domination and support of a company union, an old employer technique to defeat union representation. The Court considered the SkyWest Airline Pilots' Association ("SAPA")—an entity that "purports to negotiate with SkyWest over rates of pay, rules, and working conditions," has "never been certified as the SkyWest pilots' official representative", and for which "SkyWest provides … 100 percent of its funding, including the salaries of all three SAPA officers and all SAPA expenses"—and found that "SkyWest's unlimited funding of SAPA appears, on its face, to violate the RLA." *Id.* at *3-4, *17.[1]

7. In the 2007 Lawsuit, ALPA collected and filed declarations from numerous SkyWest pilots who witnessed SkyWest management engage in discriminatory or harassing

---

[1] Section 2, Fourth of the RLA provides, in part, that "it shall be unlawful for any carrier …to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining …." 45 U.S.C. § 152, Fourth.

conduct toward union supporters, including pilots whose communication of union-related information and public displays of union affiliation or support were chilled as a result. True and correct copies of the following nine SkyWest pilot declarations filed in the 2007 Lawsuit are attached to this Declaration as Exhibit 2:

a. the Declaration of David Boehm In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 6 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct, its chilling effect on the pilot's outward expressions of ALPA support, and its effect of restricting dissemination of ALPA-related information);

b. the Declaration of Tracy Shrier In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 7 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct, its chilling effect on the pilot's outward expressions of ALPA support, and its effect of restricting his dissemination of ALPA-related information);

c. the Declaration of Diletta Martirano In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 8 (May 22, 2007) (describing SkyWest's discriminatory anti-union conduct and its effect of restricting the pilot's dissemination of ALPA-related information);

d. the Declaration of Riad Mansur In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 9 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct and its chilling effect on the pilot's outward expressions of ALPA support);

e. the Declaration of Marc Johnson In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 11 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct and its effect of restricting the pilot's dissemination of ALPA-related information);

f. the Declaration of Steve Dow In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 12 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct and its effect of chilling the pilot's outward displays of union support "because I do not want to 'get in trouble' with SkyWest management");

g. the Declaration of Frank Bowlin In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 13 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct and stating that the pilot "felt prevented from outward displays of my affiliation with ALPA …. for fear of a similar confrontation" with SkyWest management);

h. the Declaration of Andy Bharath In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 14 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct, its chilling effect on the pilot's public expressions of ALPA support, and its effect of restricting dissemination of ALPA-related information); and

i. the Declaration of Charles "Phil" Alford In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF No. 15 (May 22, 2007) (describing SkyWest's harassing and discriminatory anti-union conduct and its effect of restricting the pilot's dissemination of ALPA-related information).

8. In the 2007 Lawsuit, ALPA also filed a declaration from my former ALPA colleague, Jeffrey MacDonald, who at that time supervised ALPA's work to assist SkyWest pilots in their organizing efforts. A true and correct copy of the Declaration of Jeffrey MacDonald In Support of Temporary Restraining Order and Preliminary Injunction, filed in the 2007 Lawsuit at ECF. 10 (May 22, 2007) (the "MacDonald Declaration"), is attached to this Declaration as Exhibit 3. The MacDonald Declaration describes SkyWest's harassing and discriminatory anti-union conduct and its chilling effect on the organizing campaign, all of which are consistent with my own observations and experiences during that time.

9. Among other things, the MacDonald Declaration states:

> During this campaign, a number of [Organizing Committee ("OC")] members have told me about incidents they have had with management regarding their support for ALPA. Many OC members have been instructed to remove their ALPA lanyards and almost all of them permanently stopped wearing ALPA lanyards after being instructed by management to remove them, out of fear of adverse career consequences.

MacDonald Decl. ¶ 8.

10. The MacDonald Declaration further states:

> Throughout this campaign OC members have been open about their concern that active involvement in the union organizing campaign may result in disciplinary measures being taken against them by their employer, and they have expressed real concern that their long-term career prospects in the industry as a whole may suffer as a result. While one or two members have been willing to speak out, most of the OC have been reluctant to engage in conversations with their fellow pilots on the subject of union organizing in non-work areas of the crew room and other public areas in which their activities might be noticed by SkyWest management.

*Id.* ¶ 11.

11. The MacDonald Declaration further states, "The campaign has suffered from the atmosphere of fear and intimidation created by SkyWest because it has stripped pilots seeking to

elect ALPA as their collective bargaining representative of a potent tool for furthering their organizing goals." *Id*. ¶ 12.

12. As described by the Court and in declarations, SkyWest's in-house attorney had direct involvement in SkyWest's unlawful interference with SkyWest pilots' organizing efforts at that time. *See* Exhibit 1 at *2, *13; Exhibit 2 at 34, 37-38 (Bharath Decl. ¶¶ 5, 11-13).

**The Current SkyWest Pilot ALPA Organizing Effort**

13. The current pilot union organizing effort at SkyWest began in 2025, when several pilots contacted ALPA to request assistance in organizing the SkyWest pilot group to elect ALPA as their exclusive RLA collective bargaining representative. Since that time, ALPA has communicated with and supported SkyWest pilots in that unionization effort, including by helping them to form a SkyWest ALPA Pilot Organizing Committee (the "OC"), and by providing the OC with confidential organizing tools, strategies, tactics, training, advice, and other resources to further its organizing goals. In my capacity as a consultant for ALPA, I have been and continue to be the primary liaison between ALPA and members of the OC.

14. Beginning in mid-2025 until his termination from SkyWest in early 2026, Moussaron was a member of the OC. At the time of his termination, Moussaron was one of the OC's five pilot leaders.

15. As a general matter, communications between ALPA and OC members contain confidential internal ALPA organizing information, including but not limited to confidential internal organizing strategies, tactics, and systems. Such communications also include confidential internal ALPA information that identifies SkyWest pilots who associate with ALPA or the OC or have engaged in activity protected by federal labor law, including but not limited to OC members, trainees, volunteers, individuals who have expressed union interest, and individuals whose level

of union support has been gauged by the OC. Disclosure of that confidential information to SkyWest would imperil SkyWest pilots' ongoing ALPA organizing effort. Given the involvement of SkyWest's in-house counsel in the airline's past anti-union conduct, designating such confidential material "attorneys' eyes only" would not sufficiently protect against this harm.

16. Throughout the current ALPA organizing effort, and especially since SkyWest fired Moussaron and filed the 2026 Lawsuit against Moussaron and Krithivas, SkyWest pilots have repeatedly expressed concern that their involvement with ALPA or the OC remain confidential to protect them from retaliation by SkyWest management. I have personally heard more than half of the SkyWest pilots with OC involvement express concerns about management retaliation.

17. Within weeks after SkyWest fired Moussaron in January 2026, the four other OC pilot leaders resigned from their leadership positions. Several of those individuals specifically expressed to me that they were resigning out of fear of retaliation by SkyWest management.

18. Based on my observations of and interactions with SkyWest pilots over the past year, SkyWest's actions in firing an OC member and filing the 2026 Lawsuit have made SkyWest pilots more afraid to participate in union organizing activity and more afraid of being identified to SkyWest management as associated with ALPA or the OC.

19. The fear of retaliation among SkyWest pilots during the current organizing campaign is greater than in any other union organizing campaign I have been involved with during my career.

20. Any disclosure to SkyWest of confidential ALPA organizing communications and information, including information that identifies SkyWest pilots' confidential associational or organizing activity, would also harm future pilot organizing efforts to elect ALPA at other airlines, because the specter of disclosure to their own employers will chill free and open exchanges

between and among pilots and ALPA, as well as pilots' participation in, affiliation with, and expressions of support for ALPA and union organizing activity.

I declare under penalty of perjury that the foregoing is correct to the best of my knowledge and belief.

Ron Rindfleisch 9/8/26

Ronald Rindfleisch Date

# EXHIBIT 1

to the Declaration of Ronald Rindfleisch

Skywest Pilots ALPA Organizing Committee v. Skywest Airlines, Inc., No. C-07-2688 CRB (N.D. Cal. June 27, 2007) (Westlaw)

KeyCite Yellow Flag
Distinguished by Dula v. Calop Business Systems, Inc., C.D.Cal., July 6, 2010

2007 WL 1848678
United States District Court,
N.D. California.

SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, et al., Plaintiff,
v.
SKYWEST AIRLINES, INC., Defendant.

No. C-07-2688 CRB.
|
June 27, 2007.

**Attorneys and Law Firms**

Linda Lye, Altshuler Berzon LLP, Claire P. Prestel, Stephen P. Berzon, Altshuler Berzon LLP, Robert Spagat, Winston & Strawn LLP, San Francisco, CA, Elizabeth Ginsburg, Air Line Pilots Association, Herndon, VA, for Plaintiff.

John P. Bovich, Reed Smith LLP, Robert Spagat, Winston & Strawn LLP, San Francisco, CA, Douglas W. Hall, Ford & Harrison LLP, Washington, DC, Norman A. Quandt, Ford & Harrison LLP, Atlanta, GA, for Defendant.

**MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION**

CHARLES R. BREYER, United States District Judge.

***1** This lawsuit involves an effort by certain SkyWest Airlines pilots to obtain relief from what they perceive as their employer's interference with their union organizing efforts. The plaintiff pilots have organized a committee (the "Organizing Committee") to elect the Air Line Pilots' Association, International ("ALPA") as their official bargaining representative. Plaintiffs bring their claims under the Railway Labor Act (RLA), and contend that SkyWest has violated RLA section 2, Third and Fourth by interfering with their organizing campaign. 45 U.S.C. § 152, Third; 45 U.S.C. § 152, Fourth.

The employer's alleged misconduct falls into two categories: (1) discriminatory interference with the pilots' expressive rights in organizing, and (2) support for an allegedly sham pilots' union, SkyWest Airline Pilots' Association ("SAPA"). As to the first category, Plaintiffs seek a preliminary injunction ordering SkyWest: (1) to cease and desist from interfering with any pilot's expression of support for ALPA through lanyards and pins, and (2) to cease and desist from interfering with the distribution of ALPA-related material in non-work areas such as bulletin boards and crew lounges. As to the second category, Plaintiffs seek a preliminary injunction: (1) granting Plaintiffs equal access to the same channels of communication (particularly group email and new pilot training sessions) that SkyWest provides SAPA, and (2) ordering SkyWest to cease funding SAPA.

**FACTUAL BACKGROUND**

SkyWest is a regional air carrier serving 140 cities and employing approximately 10,000 employees, including 2,651 pilots. Plaintiffs are SkyWest pilots who formed the Organizing Committee to campaign to elect ALPA as the pilots' official bargaining representative. SkyWest has expressed opposition to unions through a Union Free Statement that is in the handbook provided to all new hires and through a 2006 letter Brad Holt, the Vice President of Flight Operations, distributed to all SkyWest pilots. Despite such opposition, the Organizing Committee has collected the requisite 35 percent support among pilots necessary to call for an election overseen by the National Mediation Board ("NMB"), but it has not yet applied to the NMB for certification and does not presently wish to seek an election.

**A. Interference Claims**

**1. Lanyards**

One of multiple ways the Organizing Committee seeks to communicate with pilots is by wearing ALPA lanyards, dark blue lanyards with the ALPA logo printed in white letters. Lanyards are cotton straps used to hang identification cards from a pilot's neck. All or most pilots wear some lanyard during work. The Organizing Committee and other ALPA supporters seek to wear ALPA lanyards to outwardly express their support for the Organizing Committee, build solidarity among supporters, and spark conversations among pilots about the merits of electing ALPA as the representative group. Plaintiffs allege that SkyWest has discriminatorily applied its uniform policy prohibiting non-company lanyards

by prohibiting ALPA lanyards while allowing pilots to wear other lanyards with non-company logos.

***2** SkyWest's Personal Appearance, Grooming and Uniforms Standard Practice Policy states that "the passenger's choice of an airline is greatly influenced by the crewmembers' level of professionalism and appearance." The policy contains twenty pages of detailed instructions regarding crewmembers' required appearance. With regards to lanyards, the policy states that "[l]ogo neck chains are not acceptable unless they say SkyWest Airlines." The policy also states that "[c]rewmembers that fall below the basic appearance standards or violate the uniform policy will be removed from their schedule until they meet the basic following requirements and/or face disciplinary action ....“

SkyWest management has repeatedly ordered pilots to remove ALPA lanyards at the threat of discipline. For example, a chief pilot's administrative assistant told Captain Steven Dow that he needed to remove his ALPA lanyard or he would "get in trouble." Captain Tracy Shrier was pulled from a flight by Chief Pilot Pfizer for refusing to remove his ALPA lanyard. Both Captain Bharath and Captain Kanuch stopped wearing ALPA lanyards after Chief Pilot Pfizer directed them not to wear the lanyards. The chief pilot in Palm Springs ordered Captain Boehm not to wear his ALPA lanyard.

SkyWest has not regularly enforced the lanyard policy against other lanyards with non-company logos. Captain Dow has seen lanyards with sports team logos, airplane manufacturer logos, ski area logos, and college logos as well as various non-company pins, including SAPA pins. He observed one pilot wearing a Dixie College lanyard while talking to two chief pilots who never asked the pilot to remove the lanyard. Captain Dow observed a chief pilot regularly wear such a non-standard lanyard as did a director of training. When Captain Shrier was pulled from his flight he had just come from the crew room where "the majority of pilots" did not have on the "standard uniform lanyard." In fact, prior to wearing his ALPA lanyard, Captain Shrier had only ever worn a Snowbird lanyard which SkyWest management had never asked him to remove. Captain Bharath sees noncompliant lanyards everyday.

After Todd Emerson, SkyWest's General Counsel, learned of complaints about the discriminatory enforcement of the lanyard policy, an email was sent to the chief pilot at each airport reminding them to enforce the policy against all non-standard lanyards. The email, sent from the Director of Flight Operations/Standards, highlights the "ALPA issue regarding ID lanyards" and states that all non standard lanyards, including ski area logos, sports teams, etc. "need to be purged from the system." Chief Pilot Pfizer has enforced the policy against ALPA and other non-conforming lanyards: since he joined management three years ago he has removed fifty lanyards, ten of which were ALPA lanyards. Pilots nonetheless continue to wear non-company lanyards; indeed the week prior to the preliminary injunction hearing Captain Bharath saw a pilot wearing a lanyard with various flag logos.

**2. Distribution of ALPA-Related Material**

***3** Plaintiffs also allege that SkyWest has interfered with their ability to organize by prohibiting distribution of ALPA-related material in non-work areas such as in crew lounges and other areas of airports, on crew lounge bulletin boards, and in crew mailboxes. SkyWest's written policy does not prohibit distribution of ALPA literature in crew rooms and other non-work areas. Nonetheless, a member of management suggested that Captain Bharath's distribution of ALPA-related material in the crew lounge violated the company solicitation policy and the same member of management also indicated that the company did not want Captain Bharath to provide ALPA information in a common area shared by SkyWest and Mesa pilots. Management also prohibited Captain Alford from distributing ALPA fliers to new pilots outside of a training session on publicly accessible property during non-work time.

The crew lounge bulletin boards are a "Turkish bazaar" of personal announcements and management generally does not remove such materials. When ALPA supporters post ALPA-related material on the bulletin boards, however, the material is nearly always removed soon after posting. The information Captain Dow has posted has been "routinely and promptly removed." Captain Alford posted ALPA flyers which came down "within a matter of a couple of days, maybe sometimes shorter time periods," while at the same time other non-work items remained on the board "for a very long time." Chief Pilot Glassey refused to give Captain Bharath permission to post ALPA material and another member of management, Chief Pilot Curry, admitted to Captain Bharath that he removed ALPA postings from crew longue bulletin boards.

Captain Dow has also stuffed pilot work mailboxes with ALPA-related material only to find that the material has been removed before the pilots could review it. Although pilot mailboxes are primarily for company communications

and the company has a policy and practice of limiting pilot mailboxes to work communications, pilots sometimes use the boxes for personal communications such as birthday cards or birth announcements.

**B. SAPA Claims**

Plaintiffs' remaining claims all involve SkyWest assistance to SAPA by granting access to certain communication channels or through company funding. SAPA was founded by SkyWest pilots in the mid-1990s, but has never been certified by the NMB as the SkyWest pilots' official representative. All SkyWest pilots are considered SAPA members. SAPA currently consists of three full-time officers who no longer fly commercial flights for SkyWest and are paid by SkyWest, as well as sixteen members of a Board of Representatives. SAPA also sponsors numerous committees of Board members and other pilots to address various pilot issues. SAPA operates according to the SkyWest Airlines Association bylaws, which the Board approved. The bylaws can be modified by a Board vote.

The Board of Representatives, as well as the three full time officers, are all elected by SkyWest pilots through secret balloting. The number of full time officers was increased to three from one in 1999 following an unsuccessful ALPA drive.

***4** SAPA purports to negotiate with SkyWest over rates of pay, rules, and working conditions upon which it reaches agreements which are then presented to the pilots for a vote. SAPA works with management in maintaining the crew member policy manual; the manual covers areas such as vacation time, compensation, training issues, employee discipline and more. It is not, however, binding on SkyWest as it includes a clause which states that no policy in the manual will remain in effect if it violates the company policy manual.

SAPA performs other routine tasks such as administering "PIC," which allows pilots to make complaints if they are not paid properly. SAPA also administers the ASAP program in partnership with the Federal Aviation Administration ("FAA"); ASAP allows pilots to self-report violations of air regulations, thus avoiding serious sanctions for such violations. An officer of SAPA meets with the FAA once every two weeks to "go over twenty to thirty of these reports."

SkyWest assists SAPA by granting SAPA access to certain channels of company communication to enable SAPA to advise the pilots regarding the results of its negotiations as well as to complete its more routine tasks. SAPA uses pilots' physical mailboxes as well as the company email system to email all pilots at once. Also, a SAPA representative makes an approximately thirty minute presentation at all new pilot training sessions. Finally, SkyWest allows pilots to wear SAPA insignia on their uniforms. ALPA does not have access to any of these forms of communication.

SkyWest provides SAPA with 100 percent of its funding, including the salaries of all three SAPA officers and all SAPA expenses. As a result, SAPA does not collect any dues from its members.

**PROCEDURAL HISTORY**

Plaintiffs filed this RLA action in May 2007 to enjoin SkyWest's alleged interference with their organizing efforts. Plaintiffs sought a temporary restraining order ("TRO"), as well as a preliminary injunction, on the ground that they are ramping up their organizational efforts in anticipation of the summer months. The Court granted, in part, Plaintiffs' application for a TRO and issued an amended TRO ordering SkyWest:

> (1) To cease and desist from interfering in any way with Plaintiffs, their members, and their supporters' outward expression of support for ALPA and the ALPA organizing campaign and association with like-minded pilots through, inter alia, the wearing of ALPA insignia on lanyards or pins, while in uniform or off duty.
>
> (2) To cease and desist from interfering in any way with Plaintiffs, their members, and their supporters' communication with fellow SkyWest pilots regarding ALPA and the ALPA organizing campaign through distribution of ALPA-related materials in non-work areas such as bulletin boards and crew lounges.
>
> (3) To cease and desist from discriminating in any way against Plaintiffs, their members, and their supporters with respect to the channels of communication they may use to communicate with fellow pilots, and to provide Plaintiffs and their members with access to the same channels of communication provided to SAPA at any point during the last year, including but not limited to a dedicated bulletin board in each crew lounge where SAPA had a dedicated bulletin board at any point in the last year, general bulletin boards in crew lounges, pilot mailboxes, SkyWest's email system, and newly-hired pilot classes.

***5** The Court declined, however, to provide all of the injunctive relief requested by the pilots and struck a provision from the proposed TRO that would have required SkyWest:

> (4) To cease and desist from funding, recognizing, bargaining or purporting to bargain with, or otherwise supporting in any fashion SAPA.

After denying a motion to transfer venue, the Court heard two days of live testimony for the purpose of deciding the motion for preliminary injunction. At the conclusion of the hearing, the Court modified the TRO pending the resolution of the motion for preliminary injunction by removing the paragraph granting Plaintiffs access to the same channels of communication as SkyWest provides SAPA.

## LEGAL STANDARD

A preliminary injunction is appropriate when a plaintiff demonstrates "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Lands Council v. Martin,* 479 F.3d 636, 639 (9th Cir.2007) (internal citation and quotation marks omitted). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.,* 204 F.3d 867, 874 (9th Cir.2000).

The Norris LaGuardia Act ("NLGA") mandates further requirements before the Court can issue a preliminary injunction in the context of labor disputes. Though the NLGA does not strip the district courts of jurisdiction in the RLA context, *see Brotherhood of R.R. Trainmen v. Howard,* 343 U.S. 768, 774, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), it does place specific procedural requirements on the courts and requires specific findings. 29 U.S.C. § 107 ("Section 7"); *see also Air Line Pilots Ass'n, Int'l v. Guilford Transp. Industries, Inc.,* 399 F.3d 89, 105 (1st Cir.2005) (holding that NLGA Section 7 "applies in connection with injunctions issued under the RLA").

The NLGA states that before issuing a preliminary injunction in any case involving a labor dispute the district court must hear testimony of witnesses in open court and must make findings to the effect:

> (a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, ...;
>
> (b) That substantial and irreparable injury to complainant's property will follow;
>
> (c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
>
> (d) That complainant has no adequate remedy at law; and
>
> (e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107. These requirements apply equally when employees seek an injunction against the employer as when an employer seeks an injunction against employees. *Int'l Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. LaSalle Machine Tool, Inc.,* 696 F.2d 452, 457 (6th Cir.1982). The Court has heard testimony in open court and the other NLGA requirements do not substantially change the Court's analysis. To grant Plaintiffs' motion, the Court must find that Plaintiffs have shown a substantial likelihood that they can prevail on their RLA claims and must also find that without a preliminary injunction Plaintiffs will suffer irreparable harm which outweighs any harm caused to SkyWest.

## DISCUSSION

### I. Jurisdiction

***6** Defendant first argues that the Court must deny the motion for preliminary injunction because the National Mediation Board ("NMB") has exclusive jurisdiction over this case pursuant to RLA section 2, Ninth. That section, entitled "Disputes as to identity of representatives; designation by Mediation Board; secret elections," provides in part:

> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations

> that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier....

45 U.S.C. § 152, Ninth. Defendant argues that Plaintiffs' claims must be categorized as representation disputes falling within the exclusive jurisdiction of the NMB. *General Comm. of Adjustment v. Missouri-Kansas-Texas R. Co.,* 320 U.S. 323, 337, 64 S.Ct. 146, 88 L.Ed. 76 (1943) ("If the present dispute falls within s 2, Ninth, the administrative remedy is exclusive.").

Plaintiffs, however, purport to bring their claims under RLA section 2, Third and Fourth. 45 U.S.C. § 152, Third; 45 U.S.C. § 152, Fourth. Those sections provide in part:

> Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives....

45 U.S.C. § 152, Third.

> Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining ....

45 U.S.C. § 152, Fourth (emphasis added). In particular, Plaintiffs contend that SkyWest's discriminatory enforcement of its uniform policy and its interference with Plaintiffs' distribution of ALPA-related material in non-work space constitutes interference with the employees' choice of representative. They also contend that SkyWest's funding of SAPA constitutes the use of "funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining ....“ 45 U.S.C. § 152, Fourth.

***7** District courts have jurisdiction of claims under RLA section 2, Third and Fourth. *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 881-82 (9th Cir.2002) (holding that the district court had jurisdiction when Hawaiian Airlines interfered with the plaintiff's attempts to organize a rival to a preexisting union); *Fennessy v. Southwest Airlines,* 91 F.3d 1359, 1363-64 (9th Cir.1996) (holding that "because [plaintiff's] claim is based on [45 U.S.C. § 152, Fourth] rather than on the collective bargaining contract ... it is a statutory claim that he may bring directly in district court."); *America West Airlines v. National Mediation Bd.,* 986 F.2d 1252, 1258 (9th Cir.1993) (holding that the district courts, not the NMB, have jurisdiction over unfair labor practices claims); *Burke v. Compania Mexicana de Aviacion, S.A.,* 433 F.2d 1031, 1032-34 (9th Cir.1970) (holding that 45 U.S.C. § 152 Fourth creates a private right of action).

The pivotal question, then, is regardless of how Plaintiffs characterize their claims, must they nonetheless be considered representational disputes within the exclusive jurisdiction of the NMB.

### A. The Interference Claims

Plaintiffs' claims concerning SkyWest's interference with the pilots' expressive rights do not fall within RLA section 2, Ninth. Plaintiffs do not ask this Court to declare that ALPA represents the pilots, nor do they contend that ALPA represents the pilots. *See America West,* 986 F.2d at 1256 ("[S]o long as the [NMB] is acting with the purpose of 'find[ing] the fact' as to who is the employees' representative, the courts are deprived of jurisdiction to review Board decisions."). Instead, they seek an order enjoining SkyWest from interfering with their organizing efforts; such a claim falls squarely within this Court's jurisdiction.

In *Fennessy,* for example, the plaintiff alleged that his employer fired him to stop him from organizing the labor union of his choice. 91 F.3d at 1360-61. The employer, Southwest Airlines, argued that the plaintiff's claims fell under the collective bargaining agreement with the established union and thus did not come within the jurisdiction of the district court. *Id.* at 1361. The Ninth Circuit, however, held that since the plaintiff's termination constituted an effort to interfere with organization efforts "it is a statutory claim that he may bring directly in district court." *Id.* at 1362; *see also Burke,* 433 F.2d at 1034 (holding that an employee claiming discharge for union organization efforts has a right of action in federal court). Plaintiffs here similarly allege that Defendant applied its policies in a discriminatory manner in an effort to interfere with Plaintiffs' organization campaign; such an allegation is a statutory claim that may be brought directly in federal court.

Defendant's attempt to distinguish *Fennessy* and *Burke* on the ground that they are wrongful termination cases is unpersuasive. There is nothing in the language of the RLA-or the case law-that suggests that a RLA section 2, Third or Fourth interference claim for wrongful termination can be heard in the federal courts, whereas any interference less than termination cannot. Nor does SAPA's presence convert Plaintiffs' claims into a representational dispute. In *Fennessy,* the existence of an incumbent union did not somehow transform the interference claim into a representational dispute.

**B. The SAPA Claims**

***8** The SAPA-related claims also do not necessarily fall within the exclusive jurisdiction of the NMB. When Plaintiffs first filed this lawsuit, they sought an order that SkyWest could not fund nor bargain with, nor otherwise recognize SAPA as the representative of the pilots. In other words, while they did not seek an order declaring that ALPA represents the pilots, they did seek an order declaring that SAPA did not represent the pilots and that SkyWest could not treat SAPA as though it did. Such a claim appears to involve a representation dispute; that is, a dispute over who represents the pilots.

Plaintiffs, however, have since dropped their challenge to SkyWest's bargaining with and recognizing SAPA. The issue, then, is whether their claim that SkyWest has violated RLA section 2, Fourth by funding SAPA is a representational dispute under the Ninth. To the extent Plaintiffs challenge only the support SkyWest provides to SAPA, and not SkyWest's recognition and treatment of SAPA as the pilots' representative, the claim does not fall within section 2, Ninth. Again, Plaintiffs do not contend that ALPA represents the pilots, or even that SAPA does not; rather, they challenge only SkyWest's use of SkyWest funds "in maintaining or assisting or contributing" to SAPA.

In *Barthelemey v. Air Lines Pilots Ass'n,* 897 F.2d 999 (9th Cir.1990), for example, the plaintiff airline employees filed suit in district court alleging that an agreement between the employees' union and a financier violated the prohibition in RLA section 2, Fourth as an employer assistance or contribution to a labor organization. The agreement required the financier to pay the fees of an investment banker hired by the union if the financier gained control of the airline. *Id.* at 1002. The Ninth Circuit ultimately decided that the payment did not violate the RLA. *Id.* at 1015. Importantly, the Ninth Circuit never suggested that the claim implicated RLA section 2, Ninth and the exclusive jurisdiction of the NMB; to the contrary, the Ninth Circuit accepted jurisdiction of the issue and decided it on the merits. Thus, district courts have jurisdiction of claims that a carrier violated the prohibition in RLA section 2, Fourth on employer support and assistance to labor organizations.

**C. Defendant's Citations are Unpersuasive**

The cases upon which Defendant relies are distinguishable. None involves claims that an employer was interfering with the employees right to organize before the employees had applied for NMB certification. Rather, all of Defendant's cases involve NMB-certified unions which contend that they represent certain employees. Several of the cases arise either in the context of a merger of two companies, *Air Lines Employees Ass'n., Int'l v. Republic Airlines Inc.,* 798 F.2d 967 (7th Cir.1986); *Int'l Bhd. of Teamsters v. Texas Int'l Airlines Inc.,* 717 F.2d 157 (5th Cir.1983), or in the context of a newly created company, *United Transp. Union v. Gateway Western R. Co.,* 78 F.3d 1208 (7th Cir.1996); *Air Line Pilots Ass'n., Int'l v. Texas Int'l Airlines, Inc.,* 656 F.2d 16 (2d Cir.1981); *see also United Transp. Union v. United States,* 987 F.2d 784 (D.C.Cir.1993) (plaintiffs challenged the Congressional designation of a rival union as the exclusive representative of employees).

***9** Other cases were brought concurrent with a NMB certification proceeding. *Int'l Fed. of Flight Attendants v. Cooper,* involved a dispute between two unions, the IFFA and IAM, who sought to represent employees at Trans World Airlines. One of the unions, IAM, filed for a representation election with the NMB. 141 F.3d 900, 902 (8th Cir.1998). During the course of that election, the IFFA filed "allegations of election interference" with the NMB. The NMB rejected the claims, counted the ballots, and certified the IAM as the employees' representative. *Id.* IFFA then brought suit against the IAM in a federal district court. Of the two remedies sought by IFFA, the court held that one "would be the functional equivalent of judicial review of [a NMB] conclusion, which is clearly prohibited," and the other, granting reimbursement to IFFA for its costs in defending against IAM's membership raid, "would reach into the exclusive power of National Mediation Board over the labor disputes of common carriers." *Id.* at 903. Another case, *Miller v. Norfolk S.R. Co.,* involved alleged misrepresentations during a decertification vote. 183 F.Supp.2d 996, 997-98 (N.D.Ohio 2002). In both cases, then, the NMB already had significant involvement in the proceedings before the district court ruled that the NMB had exclusive jurisdiction.

The case emphasized by Defendant at oral argument, *Delta Airlines Inc.,* 30 NMB 102 (2002), supports the conclusion that the Court has jurisdiction of Plaintiffs' claims. Upon the application of the Association of Flight Attendants ("AFA"), the NMB found that there was a representational dispute and ordered an election. The NMB a preliminary investigation of pre-election interference, but deferred future investigation until after the election. *Id.* at 103. The AFA did not prevail in the election and, as a result, the NMB continued its interference investigation. *Id.* at 104. One issue the NMB had to consider was whether it could consider allegations of interference that occurred before the AFA applied to the NMB for certification as the bargaining representative. Delta argued that the NMB could not consider pre-application conduct because the "AFA could have availed itself of the rights afforded employees through the federal courts, under 45 U.S.C. § 152, Third and Fourth, (Section 2, Third and Fourth) but failed to do so." *Id.* at 107. The NMB agreed because the "AFA could have sought the judicial relief available under Section Third and Fourth but failed to do so." *Id.* at 113. *Delta* thus holds that federal courts have jurisdiction of interference claims that arise before a party makes a NMB certification application. This holding is consistent with the Ninth Circuit's observation that "Section 152, Fourth has been viewed as addressing primarily the precertification rights and freedoms of unorganized employees." *Fennessy,* 91 F.3d at 1362 (internal quotation marks and citation omitted). "The reason is that, once a bargaining representative is certified, the RLA dispute-resolution system is put in place and judicial intervention is generally unnecessary and undesirable." *Id.* at 1363.

***10** Defendant responds that since Plaintiffs *could* register with the NMB for an election, the Court must treat this as a representation dispute. Unlike *Konop, Fennessy,* and *Burke,* the Plaintiffs here already have the requisite 35 percent pilot support necessary to call for a NMB-monitored election where the employees are currently unrepresented. 29 C.F.R. § 1206.2(b). Once the NMB has been enlisted to determine the true representative of employees, it has broad power to address employer interference in union campaigning. *Horizon Airlines,* 24 NMB 458, 498 (1997) ("When the Board has found carrier interference, it has employed a variety of special ballots and notices intended to eliminate the taint of interference on the employees' freedom of choice of representative.").

However, just because Plaintiffs *could* call for an election does not mean they *must* request an election to gain relief from alleged interference. The district court's statement in dicta in *Aircraft Mechanics Fraternal Ass'n v. United Airlines, Inc.,* 406 F.Supp. 492, 501-02 (N.D.Cal.1976)-that federal courts should only exercise jurisdiction where "the employer had so completely dominated the labor relations scene" such that "there might well be no recourse to the National Mediation Board"-does not persuade the Court otherwise. First, the district court's statement was unsupported by citation to any case law and has never been followed by any court. Second, that case clearly did fall under the NMB's exclusive jurisdiction since the plaintiffs had already brought the dispute before the NMB; even the plaintiffs agreed there was an existing representation dispute. The holding in *Summit Airlines, Inc. v. Teamsters Local Union No. 295,* 628 F.2d 787, 794 (2d Cir.1980)-that the union had an obligation to invoke the NMB process-does not apply in this case. *Summit Airlines* involved a union's attempt to force an airline to recognize it as the employees' representative through picketing rather than through the NMB process. *Id.* at 788. Here, the Organizing Committee does not currently seek recognition from SkyWest and thus has no obligation to invoke the NMB process.

In fact, such a requirement could cause irreparable harm to employees since it would force organizing groups with at least 35 percent support to call elections at potentially disadvantageous times to obtain protection from employer interference. Nothing in the RLA suggests that the federal courts cannot protect Plaintiffs' statutory rights simply because they have collected a certain amount of support from employees. Accordingly, the Court concludes that it has jurisdiction of the claims at issue on Plaintiffs' preliminary injunction motion.

**II. Interference with Pilots' Expressive Rights**

Plaintiffs allege that SkyWest has interfered with their expressive and associational rights by: (1) applying its uniform policy in a discriminatory way so as to prohibit only ALPA lanyards, and (2) prohibiting Plaintiffs from distributing ALPA-related material in non-work areas.

**A. Right to Wear ALPA Lanyards.**

**1. The RLA Protects Employees' Right to Wear Union Insignia**

***11** To demonstrate a likelihood of success on the merits of their claim that SkyWest has interfered with Plaintiffs'

wearing of ALPA lanyards, Plaintiffs must first establish that the RLA gives them the right to wear union insignia while at work. *INS v. Federal Labor Relations Authority,* 855 F.2d 1454, 1456, 1462 (9th Cir.1988) (holding that the INS did not violate the Federal Service Labor-Management Relations Act ("FSLMRA") by prohibiting union insignia while at times allowing other insignia because the FSLMRA does not protect the right to wear union insignia at work).

Plaintiffs argue that the language of RLA section 2, Third and Fourth, giving employees the right to organize and to engage in union activity without carrier interference, gives them the right to wear union insignia. *See Adams v. Fed. Express Corp.,* 470 F.Supp. 1356, 1362-63 (1979) (holding that under the RLA an employee has the right to wear a union button), *aff'd,* 654 F.2d 452 (6th Cir.1981). While the Supreme Court has never addressed the issue under the RLA, it is well established that the National Labor Relations Act, 29 U.S.C. §§ 151 ("NLRA"), gives employees such a right absent "special considerations" stemming from the employees' contact with the public. *Pay'n Save Corp. v. NLRB,* 641 F.2d 697, 700 (9th Cir.1981). Courts regularly rely on NLRA case law in interpreting and applying the RLA. *See, e.g., Konop,* 302 F.3d at 882 n. 10.

Defendant contends that the RLA does not provide a right to wear union insignia because it does not contain the "other concerted activities" language of the NLRA. In other words, it argues that the NLRA's right to wear union insignia derives from the statute's guarantee of employees' right to "engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157, language that is missing from the RLA. As support for its assertion Defendant relies on *INS,* 855 F.2d at 1454.

In *INS,* the plaintiffs argued that the INS had violated the FSLMRA by ordering its employees to remove union insignia while allowing other employees to occasionally wear non-union insignia in violation of its strict uniform policy prohibiting all pins. Plaintiffs argued that the language of the FLSMRA "granting employees the 'right to form, join, or assist any labor organization' g[ave] the INS employees the right to wear" the insignia.[1] 855 F.2d at 1458.

The Ninth Circuit disagreed. It observed that an earlier Ninth Circuit case, *NLRB v. Harrah's Club,* 337 F.2d 177, 179 (9th Cir.1964), held that the NLRA's right to wear union insignia emanates from its "other converted activities" language, and thus *Harrah's* implicitly rejected the assertion that the "to assist any labor organization" language in the NLRA gave rise to such a right. *INS,* 855 F.2d at 1459 (citing *Harrah's,* 337 F.2d at 179). It makes no sense, the court reasoned, for the "to assist labor organizations" language in the FSLMRA to create a right to wear union insignia, but for the same language in the NLRA to not give rise to such a right. *Id.* at 1459-60. As a result, the court reviewed the legislative history behind Congress' decision not to include the "other concerted activities" language in the FLSMRA, and concluded that in light of Congress's decision not to give FSLMRA employees the right to picket, Congress intended "to regulate the location or form of employee speech to a somewhat greater extent than under the NLRA." *Id.* at 1461. The court did not hold that the right to wear union insignia exists only if a statute gives an employee the right to engage in "other concerted activities."

***12** Defendant does not point to anything in the RLA or its legislative history that suggests that by omitting the words "other concerted activities" from the RLA Congress intended the RLA to provide less protection of free speech than the NLRA. Unlike federal employees, RLA employees, like their NLRA counterparts, have the right to picket and strike. *See, e.g., Burlington Northern R. Co. v. Brotherhood of Maintenance of Way Employees,* 481 U.S. 429, 429-31, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). Moreover, the RLA includes language that neither the NLRA nor the FSLMRA contain, language which suggests the protection of employees' right to wear union insignia. 45 U.S.C. § 152, Fourth (making it "unlawful for any carrier to interfere in any way with the organization of its employees" and protecting employees right to "assist in organizing the labor organization of their choice"). Though the Ninth Circuit held that the "assist any labor organization" language in the FSLMRA and NLRA does not include the right to wear union insignia, the RLA protects the right to "assist *in organizing* the labor organization" which implies the right to campaign and thus must protect the free expression of support through union insignia. Accordingly, the Court concludes that the RLA does not offer any *less* protection than the NLRA for employees attempting to organize a union; thus, it must offer at least the same protection.

**2. Special Considerations**

Having determined that the pilots have a right to wear union insignia absent special considerations, the Court must next determine whether such considerations exist here. In *Harrah's,* the Ninth Circuit found "special considerations" because "evidence shows that respondent has paid close attention to its public image by a uniform policy of long

standing against the wearing of jewelry of any kind on the uniform." *Harrah's,* 337 F.2d at 180. As with Harrah's, SkyWest has a longstanding uniform policy it has endeavored to enforce as to its pilots. Plaintiffs nonetheless argue that this case is closer to *Pay'n Save Corp.,* 641 F.2d 697, where the Ninth Circuit held special considerations did not exist. In *Pay'n Save,* the court distinguished *Harrah's* on the ground that the Pay'n Save had a significantly smaller interest in the appearance of its employees than Harrah's and because the plaintiffs had a greater interest in wearing their insignia because "an organizing drive was under way." *Id.* at 701 & n. 10.

The Court need not decide whether this case more closely resembles *Harrah's* or *Pay'n Save* because the parties agree that if SkyWest's lanyard policy is applied in a discriminatory fashion it does not warrant special considerations. *Id.* at 701. Infrequent instances of non-enforcement of the uniform policy against non-union insignia does not alone prove discrimination. If the Court finds that non-enforcement was merely a result of "problems in attempting to carry out its uniform policy effectively," it should not find discriminatory enforcement to defeat "special considerations." *Hertz Corp.,* 305 NLRB 487, 48 8 (1991). If, on the other hand, "the incidents, while few in number, involved more than isolated and chance remarks" then the Court should find discriminatory enforcement that negates any "special considerations." *NLRB v. Essex Wire Corp.,* 245 F.2d 589, 594 (9th Cir.1957).

***13** Based on the non-hearsay testimony in the record, the Court finds that SkyWest has enforced its lanyard policy in a discriminatory manner. While SkyWest has rigidly enforced its uniform policy against ALPA lanyards, pilots have consistently worn and continue to wear lanyards with other non-company logos without any negative consequences. And, although at least one member of management, Chief Pilot Pfizer, has attempted to enforce the policy equally for all non-company lanyards, the Court finds that the policy has not been enforced evenly. The incidents related by Plaintiffs' witnesses involve "more than isolated and chance remarks" by management.

The Court's finding that SkyWest applies its lanyard policy against ALPA lanyards in a discriminatory manner is supported by the undisputed fact that SkyWest permits its pilots to wear SAPA insignia pins; indeed, the pins are distributed to pilots at the new pilot training sessions. This discriminatory enforcement dispels any inference that SkyWest's uniform policy entitles it to "special considerations" that allow it to curtail its pilots' right to wear union insignia.

**B. Right to Distribute ALPA Material**

Plaintiffs also contend that Defendant interferes with their organizing efforts by preventing them from distributing ALPA material in non-work areas such as crew rooms, crew lounge bulletin boards, and pilot mailboxes. The law regarding union literature in non-work areas is not in dispute. Employers may not prohibit employees from distributing union literature on non-work time and in non-work areas. *See, e.g., Consolidated Diesel Co. v. NLRB,* 263 F.3d 345, 354 (4th Cir.2001); *NLRB v. Lummus Indus.,* 679 F.2d 229, 233 (11th Cir.1982). With regard to bulletin boards, "there is no statutory right of employees or a union to use an employer's bulletin board," however, if the employer allows any non-work related postings on the board it must also permit union-related postings and the employer's motivation in denying such postings is "irrelevant." *Honeywell, Inc.,* 262 NLRB 1402 (1982) (internal quotation marks omitted).

Defendant's General Counsel, Todd Emerson, candidly conceded that the crew room bulletin boards are a "Turkish bazaar;" that is, SkyWest allows non-work related postings on the boards. Defendant must therefore allow Plaintiffs to place ALPA material on the boards. The Court finds that Defendant has nonetheless removed ALPA material from the bulletin boards. Captain Bharath's testimony about a chief pilot admitting to have removed such material, together with the evidence of ALPA material disappearing from the bulletin boards within days or even hours of being placed, while non-ALPA material remains on the board, plus SkyWest's discriminatory enforcement of its lanyard policy, supports the finding that Defendant has likewise enforced its bulletin board policy in a discriminatory manner.

Defendant has also, at times, prohibited Plaintiffs from distributing ALPA material in crew rooms and other non-work areas, as testified to by Captain Bharath and Captain Alford. Defendant does not contend that such conduct is lawful; such prohibition violates its own policy which provides that "distribution of literature or goods of any type is restricted to cafeterias, lunch/break/crew rooms, restrooms and parking lots."

***14** The Court also finds, however, that Plaintiffs have not shown a likelihood of success on their claim that Defendant has applied its mailbox policy in a discriminatory manner.

The Court finds that Defendant has a policy of allowing only work-related material to be distributed in the pilots' mailboxes. The only exception is that it does allow pilots to place greeting cards, and similar sentiments, into the boxes. This minor, innocuous exception is not sufficient to show discriminatory enforcement, especially in light of the absence of any evidence that Defendant allows mass distribution of solicitation materials of any kind in the boxes.

**C. Balance of Harms**

Having concluded that Plaintiffs have demonstrated a likelihood of success on many of their interference claims, the Court must next consider the balance of harms. The Court finds that the balance of harms favors the Plaintiffs. Defendant's discriminatory enforcement of its lanyard policy has inhibited Plaintiffs' organizing efforts. Such interference constitutes irreparable harm. *See Arcamuzi v. Continental Air Lines, Inc.,* 819 F.2d 935, 938 (9th Cir.1987) (holding that the firing of an employee for organization activities had "coercive and inhibitory effects upon the employees' organizational rights secured by the RLA" which were "irreparable"). The harm from the discriminatory enforcement is demonstrated by the testimony as to the effect of the TRO; its issuance has "made a huge difference," allowing pilots to have open conversations about ALPA and leading to "a large spike in the request for cards" to authorize ALPA as the bargaining representative. As Captain Bharath testified, there has been "a renewed feeling of empowerment" since pilots are now "able to freely express [their] support for ALPA."

In contrast to the irreparable harm to Plaintiffs from not issuing an injunction, the Court finds that granting Plaintiffs a preliminary injunction on the above claims on which Plaintiffs have demonstrated a likelihood of success will not cause any harm to SkyWest. Although Defendant claims a strong interest in enforcing its uniform policy, allowing ALPA lanyards will not impact that interest since Defendant has allowed, and continues to allow, all manner of non-company lanyards. Indeed, SkyWest offers no evidence that at any time during the last two years it has reminded the pilots as a group of its lanyard policy, and it has not identified any harm from the wearing of ALPA lanyards; this is especially so given that to this day it allows pilots to wear SAPA pins. Moreover, the ALPA lanyards are similar to SkyWest lanyards: dark blue with white lettering. They are far more innocuous and professional appearing than many of the lanyards Defendant has allowed pilots to wear. In addition, Defendant admits that allowing ALPA-related material on non-work bulletin boards and in non-work areas causes it no harm; its written policy allows for such distribution.

***15** Accordingly, the Court will grant the preliminary injunction with respect to ALPA lanyards, distribution of ALPA-related material in non-work areas, and posting of ALPA material on crew lounge bulletin boards. However, the Court denies the injunction as to access to pilot mailboxes.

**III. SAPA Claims**

As the Court understands it, Plaintiffs make two claims against SkyWest regarding the airline's relationship with SAPA: (1) that SkyWest discriminates against Plaintiffs' organization effort by making some channels of communication with pilots available to SAPA but not to the Organizing Committee, and (2) that by supplying 100 percent of SAPA's funding, SkyWest violates RLA section 2, Fourth which prohibits using "the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining." 45 U.S.C. § 152, Fourth.

**A. Access to the Same Channels of Communications**

The RLA does not require airlines to allow distribution of union-related material through company channels of communication such as email, training sessions, and dedicated bulletin boards. *See, e.g., Lummus Indus.,* 679 F.2d at 233 (stating that "employers may lawfully regulate distribution of literature or solicitation of opinion concerning working conditions in work areas or during work time"). Plaintiffs argue, though, that by allowing SAPA access to these channels of communication, SkyWest has discriminatorily advantaged one representative group, SAPA, over another, ALPA, and thus must grant the same access to the Organizing Committee. The law, however, does not support this assertion.

A carrier may provide an incumbent labor representative greater access to channels of communication than a competitor, so long as those channels are not used for campaign purposes. *See, e.g., United Air Lines,* 1995 NMB LEXIS 111 (1995) (finding that the incumbent representative inevitably would have greater access to employees); *Northwest Airlines, Inc.,* 19 NMB 94 (1991) (finding no violation where the incumbent representative had "distinctly greater access"); *see also Webco Indus. v. NLRB,* 217 F.3d 1306, 1311-12 (10th Cir.2000) (holding that employer violated the NLRA by allowing one representative

group to campaign on work property while prohibiting another from campaigning).

The Court finds that SAPA has not routinely used any of the above forms of communication to campaign against ALPA or for SAPA. There is no evidence in the record that SAPA has ever used the group email function to campaign.[2] Similarly, there is no evidence that dedicated bulletin boards-to the extent there are any-are used for campaigning.

Plaintiffs' evidence as to the SAPA training sessions is not persuasive. While the Court has considered Plaintiffs' hearsay testimony, it finds that it is not entitled to much weight. Rumors as to what was said at particular meetings are highly unreliable, as is demonstrated by Captain Alford's testimony as to the alleged firing of Mike Eisenstat. Captain Nolin's testimony is similarly unpersuasive. He merely testified that the SAPA representative, Captain Black, admitted to "saying things that were inappropriate," but Captain Nolin did not inquire as to what Captain Black had said. Moreover, in response to Captain Nolin's order, Captain Black agreed to stop making any inappropriate comments, whatever they were.

***16** Plaintiffs argue in the alternative that SkyWest must grant Plaintiffs access to company communication channels regardless of whether SAPA has actively campaigned through those channels because SAPA is a "company union." Plaintiffs do not cite any case in which a court has granted equal access to channels of communication in such circumstances. All of Plaintiffs' cases involve competing unions granted unequal access to communications for campaigning. *See, e.g., In re Duane Reade, Inc.,* 338 NLRB 943 (2003) (finding unequal access where an employer denied one union access to employees, while facilitating meetings between employees and another union for the purposes of organizing); *Katz's Deli,* 316 NLRB 318, 333 (1995) (finding unequal access where an employer evicted a representative of the incumbent union from the premises while allowing a rival union to hold organization meetings with employees during work hours).

Moreover, Plaintiffs have not demonstrated that the Court has jurisdiction of this claim. Plaintiffs' argument can be characterized as a challenge to SkyWest's authority to treat SAPA as the pilots' representative, a claim that may fall within RLA section 2, Ninth. Accordingly, even if this Court found that SAPA is a "company union," which it does not do at this stage, granting Plaintiffs equal access to company channels of communication is not an appropriate remedy.

**B. SkyWest Funding of SAPA**

Plaintiffs also contend that SkyWest's 100 percent funding of SAPA violates the RLA's prohibition on using "the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining ...." 45 U.S.C. § 152, Fourth. In *Barthelemy,* the Ninth Circuit explained the prohibition:

> Obviously, the line between cooperation and support is not an obvious one. Permissible cooperation becomes prohibited support once the union's independence is compromised. This is a subjective inquiry: the question is whether the assistance provided the union is in fact depriving employees their freedom of choice. It is not the potential for but the reality of domination that these statutes are intended to prevent.

*Barthelemy,* 897 F.2d at 1016. The Ninth Circuit identified four factors relevant to deciding whether company financial support has stifled employee free choice: (1) whether the employer assistance occurred in response to an outside effort to organize, (2) evidence of the union becoming beholden to the employer, (3) employee approval of agreements between the union and employer, and (4) whether the employer assistance is sustained or simply a onetime payment. 897 F.2d at 1017.

Plaintiffs have not subjectively demonstrated that SkyWest's 100 percent funding of SAPA has deprived the pilots of their freedom of choice. First, SAPA was not created in response to any outside effort to organize. Even if the Court does accept the hearsay evidence that SAPA was altered in direct response to a previous ALPA campaign, a modification of a group's practices in response to employees' desires *after* a failed campaign does not raise the same concerns as creating an entirely new organization to quell support for a union *during* a campaign. Second, Plaintiffs ask the Court to infer that SAPA must be beholden to SkyWest because of its funding without producing any evidence that SAPA actually has altered its practices or demands in response to management influence. Finally, pilots vote on and approve the agreements SAPA enters into with SkyWest, and the pilots even refused to ratify one agreement without certain modification. Moreover, the President of SAPA is an ALPA supporter and the record reflects that the relative merits of ALPA versus SAPA are actively debated at SAPA Board meetings.

***17** On the other hand, SkyWest's unlimited funding of SAPA appears, on its face, to violate the RLA and SkyWest does not contend that there are any cases in the courts or even the NMB that have placed their blessing on such unfettered financial support.

In any event, assuming, without deciding, that SkyWest's complete and unlimited funding of SAPA violates RLA section 2, Fourth, the Court finds that the balance of hardships strongly counsels in favor of denying a preliminary injunction prohibiting such funding. SAPA has represented the pilots and been fully funded by SkyWest for over ten years without legal challenge. Though the length of SAPA's existence is not relevant to whether the funding is lawful, it does speak to the amount of "irreparable" harm Plaintiffs will suffer without a preliminary injunction. Plaintiffs' challenge could have been brought at any time during these past ten years; nothing of significance has changed. Also, given that the Organizing Committee had been campaigning for well over a year before seeking a preliminary injunction, it is unreasonable to grant the requested relief without the benefit of a full record. Moreover, SAPA serves several important administrative functions for SkyWest and its pilots, such as facilitating the FAA amnesty program and addressing employee complaints about pay errors and other issues. By prohibiting all SkyWest funding of SAPA, a preliminary injunction would threaten the completion of these activities which would harm both the airline and its pilots.

## CONCLUSION

For the reasons explained above, Plaintiffs' motion for a preliminary injunction is GRANTED in part and DENIED in part. SkyWest, its officers, agents, servants, employees, and attorneys, and all persons acting by, through, under, or in concert with Defendant, pending a final ruling by the Court on the merits:

1) Are enjoined from prohibiting SkyWest pilots from wearing the dark blue ALPA lanyard with white lettering, and

2) Are enjoined from interfering with SkyWest pilots' oral communications with fellow SkyWest pilots regarding ALPA and the ALPA organizing campaign in non-work areas and on non-work time, and from interfering with SkyWest pilots' communication with fellow SkyWest pilots regarding ALPA and the ALPA organizing campaign through distribution of ALPA-related materials in non-work areas such as bulletin boards and crew lounges.

All other claims for preliminary injunction are denied. The parties are directed to appear for a case management conference on Friday, August 3 at 8:30 a.m. and shall meet and confer on the need, if any, for a bond and the amount of such bond. The hearing on Defendant's motion to dismiss is VACATED pending the Case Management Conference.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1848678, 182 L.R.R.M. (BNA) 2485

Footnotes

1 The FLSMRA, 5 U.S.C. § 7102, provides that: "Each employee shall have the right to form, join, or assist any labor organization, or to refrain from such activity, freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right. Except as otherwise provided under this chapter, such right includes the right-(1) to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities, and (2) to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter."

2 The Court has not and will not consider the declaration of Diletta Martirano, filed without permission after the close of evidence since Plaintiffs could have submitted the evidence during the hearing. Moreover, the Court is not persuaded that the email constitutes campaigning.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

to the Declaration of Ronald Rindfleisch

2007 pilot declarations, No. C-07-2688 CRB (N.D. Cal.), ECF No. 6 (May 22, 2007)

ORIGINAL FILED
07 MAY 22 AM 9:38
RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO.: C 07 2688<br><br>**DECLARATION OF DAVID BOEHM IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**Declaration of David Boehm**

1. My name is David Boehm. I reside in Placentia, California. I have been an airline pilot employed by SkyWest Airlines since November 2004. I currently serve as an RJ captain based in Salt Lake City, UT.

2. I have been and remain an open and active member of the SkyWest Pilots ALPA Organizing Committee [the "OC"], which was formed to encourage the pilots of SkyWest to elect ALPA as their collective bargaining representative. The pilots of SkyWest are not represented by a labor union for collective bargaining purposes.

3. My first conflict with management was over my wearing of an ALPA lanyard. ALPA, the Air Line Pilots Association, Intl., provided the OC with dark-colored lanyards with the phrase "Air Line Pilots Association, Int'l." stamped on them with white ink. When the campaign began, ALPA handed out lanyards to OC members and other pilot supporters who wanted to show support for ALPA and the OC. The lanyards also served as a way to identify like-minded pilots.

4. In the summer of 2006, I was wearing my ALPA lanyard at Palm Springs International Airport when I was confronted by Capt. Tony Hoetker, Chief Pilot for the Western Region. Capt. Hoetker requested that I remove my ALPA lanyard.

5. In December of 2006, I attended upgrade training at SkyWest's training facility near Salt Lake City International Airport. During the training, SkyWest Director of Flight Training Dave Faddis visited the class. Mr. Faddis reports directly to Brad Holt, SkyWest Vice-President for Operations.

6. Approximately an hour after Mr. Faddis departed class, my instructor, Jason Meister, approached me and pulled me aside. Mr. Meister told me that Mr. Faddis saw that I was wearing an ALPA lanyard. Mr. Meister said that wearing an ALPA lanyard is a "slap in the face" to SkyWest, and that if I wanted to be an ALPA member I "should fly for an ALPA airline". He also told me that Mr. Faddis wanted me to remove the lanyard and not wear it at any time in the training center.

7. Shortly after my conversation with Mr. Meister, I sought out Verdeen Heiner, SkyWest's Manager for Flight Training, to inform him of this incident. Mr. Heiner told me that SkyWest management did not want me to wear an ALPA lanyard in the training center, did not want me to discuss ALPA while in the training center, and did not want ALPA to become an issue in the training center at all.

8. Mr. Heiner told me that I would not be allowed to wear my ALPA lanyard or discuss ALPA while on the training center property. He said that he meant no personal offense and has had this conversation with other ALPA supporters that have gone through training.

9. During the entire training session, two of my classmates continued to wear lanyards that were also in violation of the SkyWest uniform policy on logo lanyards. One wore a lanyard emblazoned with the logo for "LA Fitness" and the other wore a "Bombardier" lanyard. To my knowledge they were not confronted about their non-conforming lanyards or given other lanyards to wear.

I declare under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief.

5/7/07

Date

David Boehm

ORIGINAL FILED
07 MAY 22 AM 9:45
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO.: C 07 2688 JL<br><br>**DECLARATION OF TRACY SHRIER IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

DECLARATION OF TRACY SHRIER

1. I have been employed as an airline pilot at SkyWest Airlines since February, 1998. I have flown in various seats and airplanes, and currently fly as a captain on the Canadair Regional Jet. I have also worked as a ground instructor for SkyWest.

2. I have been an open and public member of the SkyWest Pilots ALPA Organizing Committee since the spring of 2006. The SkyWest Pilots ALPA Organizing Committee (the "OC") was formed in 2005 to encourage SkyWest pilots to petition to the National Mediation Board for a representation election and to elect the Air Line Pilots Association, Intl. ("ALPA") as their representative. The SkyWest pilots are currently unrepresented.

3. At the beginning of the campaign, ALPA provided all members of the OC with dark colored lanyards with "Air Line Pilots Association, Int'l" written on them in white ink. Wearing an ALPA lanyard is intended as a show of our support for the campaign and as a method by which other pilots can identify ALPA supporters.

4. Most members of the OC, including myself, started regularly wearing ALPA lanyards while on duty in July or August of 2006. Soon after I started wearing mine, I had an incident with Capt. Tony Fizer, at the time Chief Pilot in Salt Lake City.

5. I was on my way to the plane I was assigned to fly at Salt Lake City International Airport when I encountered Captain Fizer by the concourse door leading to the airplane. This doorway is on the ground level and is the door by which all crew members and passengers access the airplane. Capt. Fizer was waiting for me at the door, which is not in the same area of the airport as the SkyWest crew room.

6. Capt. Fizer instructed me to take off the ALPA lanyard I was wearing. I asked him why I should. Capt. Fizer informed me that the lanyard was not compliant with the SkyWest uniform policy prohibiting lanyards that display a logo other than the SkyWest logo. I responded that if we went back to the crew room, we would both see that a large percentage of the pilots wear non-conforming lanyards. I told him I would not remove the lanyard and suggested that he put a copy of the policy in my mailbox back in the crew room, and that I would review the policy upon my return, as the flight I was assigned to fly was going to be departing soon.

7. Capt. Fizer then commanded me, in those words, to take off the lanyard. Again I declined to remove the lanyard. He then told me that he was taking me off the trip and instructed me to follow him into his office in the crew room.

8. As instructed, I followed him to the crew room. Prior to inviting me into his office, he had me wait outside while he made a phone call. While waiting, I noticed a number of other pilots in the crew room wearing non-compliant lanyards, including lanyards for various airplane manufacturers, lanyards with logos of various sports teams and other colored lanyards. Prior to my affiliation with the OC, I always wore a "Snowbird Ski Area" lanyard and had never been asked to remove it or been informed that it violated SkyWest uniform policy.

9. When Capt. Fizer invited me into his office, he showed me two different computer screens. One computer showed the lanyard policy from the Operations Manual and the other showed the company policy on insubordination. I told him that I noticed the uniform policy was not normally enforced so I was not sure why he was making an issue of it today. Capt. Fizer was not pleased with my response and we continued the conversation. I told him that I felt singled out and that I was not being treated fairly.

10. After a continued exchange on the topic, Capt. Fizer told me that he was prepared to seek disciplinary proceedings in response to my behavior that day. I again told him I felt singled out and Capt. Fizer began to raise his voice. He again instructed me to wait outside and made another phone call. As before, while waiting I surveyed the crew room and noticed an assortment of non-compliant lanyards similar to the ones present during my previous stint outside Capt. Fizer's office.

13. Although I was not ultimately disciplined for wearing the ALPA lanyard, since my encounter with Capt. Fizer, I have worn a standard black lanyard with no logos on it. While I have seen others continuing to violate the policy, I do not wear my ALPA lanyard while on duty and would not feel comfortable doing so in light of my encounter with Capt. Fizer.

14. In another incident, on April 2, 2007, Capt. Phil Alford, Capt. Marc Johnson and I went to the training center to hand out fliers advertising an ALPA information session to be held at a local restaurant that night. The training center is a facility maintained by SkyWest near Salt Lake City International Airport in which newly hired pilots and current pilots seeking an upgrade attend classes. Upon our arrival at the training center, we parked in the parking lot and positioned ourselves on the sidewalk outside the building, near the front entrance. As classes dismissed for the day, we handed out

fliers to the pilots who were returning to their hotels. Because of the nature of pilots' jobs, pilots rarely convene in a single location. The training center is therefore one of the only locations where we can make personal contact with a large number of pilots.

15. Approximately 45 minutes after we arrived at the training center, we were confronted by Capt. Shane Losse, a SkyWest manager at the training center. Capt. Losse rounded up the three of us and told us he had received a call from Capt. Dave Faddis, SkyWest's Director of Flight Training, and that Capt. Faddis told him to remove us from the area because solicitation was not allowed on SkyWest property. Capt. Losse suggested that we remove ourselves to a sidewalk in front of a fire station, roughly half a mile up the road and out of the way of the training pilots' standard route back to their hotels.

16. Since that time, we have restricted our efforts at handing out fliers at local hotels in which we know SkyWest houses pilots while they are in training. Attendance at the information sessions has not been as high since our removal from the training center. In my experience, the event held the night we handed out fliers at the training center was the best attended meeting we have had at the restaurant. I believe our brief access to the pilots was a main reason that meeting was so well attended and that our subsequent inability to reach out to them has lowered the attendance at later meetings.

Under penalty of perjury, I swear that the information contained herein is complete and accurate to the best of my ability and recollection.

Tracy Shrier

19 May 07

Date

ORIGINAL FILED
07 MAY 22 AM 9:44
RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO.: C 07 2688<br><br>**DECLARATION OF DILETTA MARTIRANO IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF DILETTA MARTIRANO

1. My name is Diletta Martirano. I reside in Del Mar, California. I am a first officer with Sky West Airlines based in San Diego. I have been a Sky West pilot since November 20, 2002. I am also a member of the Sky West Airlines ALPA Organizing Committee, the purpose of which is to secure enough support for representation by the Air Line Pilots Association (ALPA) among Sky West pilots to bring about a Railway Labor Act representation election conducted by the National Mediation Board. I have participated in this Committee since August of 2006.

2. There is an organization called the Sky West Airlines Pilot Association (SAPA) which represents us in discussions with management concerning rates of pay, rules, and working conditions. The Sky West pilots never chose this organization to represent them in an NMB conducted election, nor has the organization ever presented Sky West management with a showing of majority support. Nevertheless, in my orientation class the entire class was addressed by a SAPA representative who discussed the representation that was provided by SAPA and also urged us not to support outside unions such as ALPA.

3. In between July and September of the summer of 2006 SAPA representatives met with Sky West management concerning rates of pay, rules, and working conditions and reached an agreement which was eventually presented to the Sky West pilots for a vote in October of 2006. During the course of these discussions

SAPA representatives were allowed to discuss the Company's offer, take suggestions for a possible counter offer, and describe the terms of the eventual agreement in crew lounges and on Company property. SAPA leaflets and informational material was distributed in crew lounges in San Diego and Carlsbad and left there without being removed or otherwise interfered with by Company officials or designees. In addition, the Company has reserved a bulletin board in San Diego for the Sky West Inflight Association and has provided bulletin boards for pilots to post personal literature relating to matters such as "crash pads", cars or motorbikes for sale, or charitable organizations.

4. During the same time, the Company has refused to allow ALPA supporters such as myself to post material soliciting support for ALPA on any bulletin board on Company property or to leave such material in crew lounges to be read by pilots. Any such material either posted or left out in the lounges has been swiftly removed by Sky West representatives.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

5-5-2007
Date

Diletta Martirano
Diletta Martirano

ORIGINAL
FILED
07 MAY 22 AM 9:43
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C 07 2688

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO.:<br><br>**DECLARATION OF RIAD MANSUR IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**Declaration of Riad Mansur**

1. My name is Riad Mansur. I have been an airline pilot employed by SkyWest Airlines since January, 2005. I currently serve as an RJ captain based in Chicago, Illinois.

2. I have been and remain an open and active member of the SkyWest Pilots ALPA Organizing Committee (the "OC"), which was formed to encourage the pilots of SkyWest to elect ALPA as their collective bargaining representative. The pilots of SkyWest are not represented by a labor union for collective bargaining purposes.

3. In early spring of 2006, we made ALPA literature available to other pilots in the crew room. We heard a rumor that management had been told to remove ALPA literature from the crew rooms. Soon after that, Kelly Riley, Chief Flight Attendant in Chicago, approached the table where I was sitting in the front portion of the crew room at O'Hare International Airport and chatted briefly with me and another crew member sitting nearby. At the same time, ignoring the

pile of newspapers on the table, Ms. Riley picked up the ALPA flier that was next to them, crumpled it up and threw it away.

3. My first conflict with management was over my wearing of an ALPA lanyard. ALPA, the Air Line Pilots Association, Intl., provided the OC with dark-colored lanyards with the phrase "Air Line Pilots Association, Int'l." stamped on them with white ink. When the campaign began, ALPA handed out lanyards to OC members and other pilot supporters who wanted to show support for ALPA and the OC. The lanyards also served as a way to identify like-minded pilots.

4. Soon after pilots began wearing the ALPA lanyards, I began hearing from fellow pilots that they had been asked by management representatives to remove ALPA lanyards when they were in uniform. In May of 2006, I walked into the SkyWest crew room at O'Hare International Airport to check in for work. Upon entering the crew room, Capt. Roy Glassey, Chief Pilot at O'Hare, tapped my shoulder and told me to come into his office. He also instructed another pilot to join us. Once both pilots were in the office, he said he

had something for us and handed each of us a plain, black lanyard to wear. Before we left the office, we switched our identification from our own lanyards to the ones provided by Capt. Glassey.

5. As a result of this encounter with Capt. Glassey, I have stopped wearing my ALPA lanyard. I still regularly see pilots in the crew room with logo lanyards representing various sports teams, colleges, and so forth.

6. I have also worked with Capt. Marc Johnson to place fliers on message boards in the crew room at O'Hare to inform other pilots of ALPA informational sessions being held elsewhere in the airport. Whenever we have placed a flier on the SAPA (SkyWest Airlines Pilot Association) message board, it has been removed within a day or two. SAPA is an organization of pilots, developed and supported by the company, which purports to speak on behalf of the pilots to management. As a general matter, signs posted on the common message boards open to all ads and solicitations have not been removed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

5-5-2007
Date

Riad Mansur

ORIGINAL FILED
07 MAY 22 AM 9:40
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

E-filing

JL

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,

Plaintiffs,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

CASE NO. C 07 2688

**DECLARATION OF MARC JOHNSON IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Declaration of Marc Johnson**

1. My name is Marc Johnson. I have been an airline pilot employed by SkyWest Airlines since February, 2005. I currently serve as an RJ captain based in Chicago, Illinois.

2. I have been and remain an open and active member of the SkyWest Pilots ALPA Organizing Committee [the "OC"], which was formed to encourage the pilots of SkyWest to elect the Air Line Pilots Association, Int'l ("ALPA") as their collective bargaining representative. The pilots of SkyWest are not represented by a labor union for collective bargaining purposes.

3. On March 22, 2007, Capt. Roy Glassey, Chief Pilot in Chicago, noticed that someone had put up fliers in the crew lounge advertising an ALPA informational session to be held later that day. Capt. Glassey pulled me into his office and asked me if I knew who had been putting the fliers up. I informed him that I had done it myself. Capt. Glassey stated that all postings in the crew room, even on the public message

boards open to all solicitations, had to be approved by the company. I asked him who was in charge of giving such approvals and he stated that he was. He indicated to me that he would not approve ALPA fliers for posting in the crew room at Chicago.

4. Capt. Glassey went on to say that posting fliers makes people feel strong-armed about joining the union and that it was his job to maintain the status quo. He said that allowing me to put up fliers would make that job more difficult.

5. Capt. Glassey concluded the conversation by asking me how the campaign was going. I have not seen Capt. Glassey confront any pilots about non-ALPA related items posted on the general message board or otherwise attempt to determine which pilots have put up non-ALPA related messages without his approval.

6. As a result of my conversations with Capt. Glassey I have not attempted to post ALPA-related fliers again on the general bulletin board.

Case 3:07-cv-02688-CRB Document 132-2 Filed 09/05/2007 Page 18 of 54

Under penalty of perjury, I affirm that the information herein is complete and accurate to the best of my ability and recollection.

5-17-07

Date

Marc Johnson

ORIGINAL FILED 07 MAY 22 AM 9:40 RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO.: C 07 2688<br><br>**DECLARATION OF STEVE DOW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

DECLARATION OF STEVE DOW

1. I have been employed as an airline pilot at SkyWest Airlines since January 6, 2003. I have flown in various seats and airplanes, and currently fly as a captain on the Canadair Regional Jet.

2. SkyWest presently bases its pilots in 17 locations including nine (9) in California and the rest throughout the Western and Midwestern United States. I have been based in Colorado Springs, Colorado since March of 2005.

3. In the course of my flying duties I pass through several different airports in a typical month, including San Francisco International Airport. SkyWest maintains crew lounges inside the secure area in the airports in which the company has pilot domiciles. Pilots may eat in the crew lounges, and crew lounges are available to pilots for non-work activities between flights. In several bases (including my home base of Colorado Springs) the company maintains computers for our use. We are permitted to use those computers for non-work purposes. The crew lounges contain chairs and tables that are routinely used for non-work activities.

4. SkyWest also maintains bulletin boards in each airport that is also a crew base. There is in each location a bulletin board that is for operational purposes only and a bulletin board for general, non-operational purposes. The general

bulletin board typically is covered with a variety of notices for services and sales, including ads for crash pads, massages, real estate agents, mortgage brokers, motorcycles for sale, and river rafting trips. In addition, SkyWest maintains a bulletin board at most bases that is dedicated exclusively for the use of the SkyWest Airline Pilots Association, known as SAPA.

5. SAPA is a group of pilots created by the company to provide a method for talking to the pilots as a whole. SAPA is considered by the company to cover all pilots who are not in management. There are no dues or membership requirements to be a member of SAPA, other than employment as a non-management pilot at SkyWest. Its activities are wholly financed by the company, which pays SAPA officers to serve full time as SAPA representatives. The company claims to recognize SAPA as the "true and only" representative of the pilots, but it is not a true labor union, has no financial or functional independence from the company, and has never been recognized or certified as a collective bargaining representative. SAPA's Bylaws are posted on a website created for SAPA communications. I have attached as Exhibit 1 to this Declaration a true and correct copy of a document printed from that website that is titled "SAPA Bylaws".

6. SAPA is routinely invited to speak to training classes of newly-hired pilots. When I was hired, a SAPA representative came to my class to describe

SAPA and gave out SAPA pins. We are permitted to wear SAPA pins on our uniforms by company policy.

7. In October of 2005, I helped create the SkyWest Pilots ALPA Organizing Committee with the mission of organizing our pilots to elect ALPA as the exclusive bargaining representative of our pilot group under the Railway Labor Act. We have attempted to distribute information about ALPA in a number of ways, but frequently company representatives have prevented us from doing so. This has made it very difficult to communicate with other pilots about the Organizing Committee and the benefits of representation by ALPA.

8. For example, I have posted fliers advertising ALPA meetings on the general bulletin boards, but they have been removed within 24 hours each time I have done so. I have never known any other postings to be removed from these bulletin boards.

9. I have also tried to leave material in pilot mailboxes, which are located inside the crew lounges. The mailboxes are regularly used by management and SAPA to distribute information to pilots by leaving fliers or notices for pick-up whenever the pilots come through their base during the month. However, when I have left ALPA material in pilot mailboxes it has been removed from all mailboxes within 24 hours.

10. The company's removal of the materials placed on bulletin boards and in mailboxes has had a significant impact on our ability to communicate with the pilot group. The nature of pilots' jobs is such that they rarely congregate in a single location, except during periodic intensive training. Face-to-face contact therefore normally occurs only if our individual schedules overlap and we are in the same airport at the same time. Without the ability to post and leave materials we must rely on individual contact, and it is difficult to reach all of the pilots scattered through 17 bases through this individualized approach, which depends entirely on scheduling luck.

11. SkyWest has posted a statement on its web site and elsewhere for as long as I can recall that expresses its belief that there should be no union on the SkyWest property. This "Union Free Statement" is posted, among other places, on the door of Susan Brown's office in the crew lounge in Colorado Springs. Ms. Brown is the Administrative Assistant for SkyWest in Colorado Springs.

12. Throughout my time at SkyWest many pilots have worn lanyards to hold their identification cards. SkyWest issues dark blue lanyards with its logo to pilots, and some pilots use these. Other pilots wear logos that reflect the logo of their favorite sports team, an aircraft manufacturer, a college or university, a branch of the military, or a favored hobby such as sailing. The Organizing Committee distributed dark blue lanyards with the ALPA logo to pilots as part

of its effort to encourage pilots to talk about and support ALPA as their collective bargaining representative. As a result of my position on the Organizing Committee I have received several reports of management representatives asking or directing pilots to remove ALPA logo lanyards as violative of company policy. Management continues to allow pilots to wear lanyards with other non-SkyWest logos. When I wore my ALPA lanyard Ms. Brown advised me to remove it because I would "get in trouble" if I wore it. I no longer wear an ALPA logo lanyard because I do not want to "get in trouble" with SkyWest management. As a result it is more difficult to communicate to other pilots my support for the ALPA organizing campaign.

13. As discussed above, SkyWest has erected a number of roadblocks that have interfered with the Organizing Committee's ability to communicate our message about the organizing campaign. The Coordinating Team of the Organizing Committee met on May 17, 2007 and decided that we need to stage a carrier-wide action as soon as possible at SkyWest to build excitement for the campaign and show that we have strong support – despite SkyWest's opposition to our campaign. This action is part of a plan to reenergize the campaign before the usual summer problems of Organizing Committee member availability begin. We believe it is essential to have this action as soon as possible, but certainly within the next few weeks, to maintain the momentum of our

organizing campaign. We are concerned about the negative impact on our campaign if the Organizing Campaign does not keep up visibility and is unable to engage in some kind of solidarity building event.

14. As part of the carrier-wide action that the Coordinating Team of the Organizing Committee wants to conduct, pilots would be asked to show their support for the organizing campaign by wearing their ALPA lanyards. But because SkyWest has prohibited ALPA supporters from wearing ALPA lanyards, the members of the Organizing Committee cannot stage this action. As a result, the Organizing Committee is being severely chilled in its ability to conduct a normal organizing campaign and build support among SkyWest pilots.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

5-18-2007
Date

Steve Dow

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

ORIGINAL FILED
07 MAY 22 AM 9:39
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,

Plaintiffs,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

CASE NO. C 07 2688

**DECLARATION OF FRANK BOWLIN IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Declaration of Frank Bowlin**

1. My name is Frank Bowlin. I have been employed by SkyWest Airlines since September, 2002. I am a resident of Aptos, California. I currently serve as a regional jet captain for SkyWest based in Denver. In the course of my flying duties, I pass through several different airports in a typical month, including San Francisco International Airport.

2. I am currently an open and public member of the SkyWest Pilots ALPA Organizing Committee [the "OC"]. The OC was formed to campaign among the SkyWest pilots for a representation election and selection of the Air Line Pilots Association, International ["ALPA"] as the exclusive collective bargaining representative for the SkyWest pilot group. The SkyWest pilots are currently unrepresented.

3. I attended training at SkyWest's training facility in Salt Lake City in December of 2006. At that time, I had not yet joined the OC. As part of the standard training program, Capt. Dave Faddis, the SkyWest manager in charge of training, gave a talk to the pilot group about being the best pilots we could be. He did not discuss ALPA during his presentation.

4. After the session with Capt. Faddis adjourned, I retired to the hallway outside of the classroom. In the hallway, I saw and overheard Capt. Faddis aggressively addressing one of the instructor pilots. Capt. Faddis was telling the instructor that he saw some pilots wearing ALPA lanyards and that he did not want to see those kinds of things around the training facility. Those wearing ALPA lanyards before the meeting with Capt. Faddis removed them shortly after.

5. I decided to join the OC toward the end of my training period. Due to the incident I witnessed with Capt. Faddis, I have felt prevented from outward displays of my affiliation with ALPA. I do not wear an ALPA lanyard or ALPA pin for fear of a similar confrontation with Capt. Faddis or other management official.

I swear under penalty of perjury that the statements included herein are complete and accurate to the best of my ability and recollection.

17 MAY 2007
Date

F. Bowlin
Frank Bowlin

ORIGINAL FILED
07 MAY 22 AM 9:37
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,

Plaintiffs,

vs.

SKYWEST AIRLINES, INC.,

Defendant.

CASE NO. C 07 2688

**DECLARATION OF ANDY BHARATH IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Declaration of Andy Bharath**

1. My name is Andy Bharath. I reside in Newport Beach, California. I have been an airline pilot employed by SkyWest Airlines since July, 1998. I currently serve as an RJ captain based in Denver, Colorado. In the course of my flying duties, I pass through several different airports in a typical month, including San Francisco International Airport.

2. I have been and remain an open and active member of the SkyWest Pilots ALPA Organizing Committee [the "OC"], which was formed to encourage the pilots of SkyWest to elect ALPA as their collective bargaining representative. The pilots of SkyWest are not represented by a labor union for collective bargaining purposes.

3. My first conflict with management was over my wearing of an ALPA lanyard. ALPA, the Air Line Pilots Association, Intl., provided the OC with dark-colored lanyards with the phrase "Air Line Pilots Association, Int'l." stamped on them with white ink. When the campaign began, ALPA handed out lanyards to OC members and other pilot supporters who

wanted to show support for ALPA and the OC. The lanyards also served as a way to identify like-minded pilots.

4. In August or September of 2006, Capt. Tony Fizer, regional Assistant Chief Pilot for the bases including Salt Lake City, approached me and asked why I was wearing an ALPA lanyard. Capt. Fizer then informed me that I could not wear an ALPA lanyard. I asked why not and he told me that I was not represented by ALPA and that company policy states that pilots cannot wear lanyards that have any logo or decoration other than the name "SkyWest". I pointed out to him what we both already knew: many pilots wear lanyards with non-SkyWest logos. He requested that I drop the issue, and gave me a plain, black lanyard to wear instead. A few days later, Capt. Fizer again spotted me wearing the ALPA lanyard and again requested that I remove it. I told him that by asking only me to remove my logo lanyard he was discriminating against me as a union supporter and he again requested that I follow his order to remove the lanyard and drop the issue. I removed the lanyard, and since that time I have worn my ALPA logo lanyard only when dressed in civilian clothes.

5. Following these two conversations with Capt. Fizer, I contacted Todd Emerson, SkyWest General Counsel for Operations, who I knew from a previous experience when I was asked to be a possible witness in litigation against SkyWest. In the course of the organizing campaign he had invited me to contact him if I felt that I was being treated improperly in any way. I informed Mr. Emerson of Capt. Fizer's actions and of my objection to the company targeting pilots who wore ALPA lanyards. Nevertheless, non-SkyWest logo lanyards remain a common sight around SkyWest crew rooms and facilities, and yet ALPA supporters are still regularly confronted when they wear ALPA lanyards.

6. In late 2006, I contacted Capt. Roy Glassey, Chief Pilot in Chicago, to complain that ALPA fliers -- alone among the many kinds of fliers and notices posted -- had been removed from the crew room message boards at O'Hare International Airport. Crew rooms, also known as crew lounges, are areas where pilots may relax, eat, and take breaks between flights. Pilots post many different fliers and notices on crew room message boards, including many fliers and notices that are not work related -- for example, I have seen notices for services and sales and

solicitations for charitable organizations. Pilots are also permitted to leave general interest materials, such as newspapers, on tables or elsewhere in crew lounges.

7. In response to my inquiry, Capt. Glassey stated that in order to post something on a message board in a crew lounge one must first obtain company consent. I sought clarification from Capt. Glassey about exactly what the policies are for management approval of posted literature and he said he would have to ask upper management. He never replied to my question. ALPA postings continue to be removed.

8. In late February or early March 2007, I asked Capt. Jeff Curry, Chief Pilot in Denver, about what privileges the OC has to post fliers and other information in the crew area at Denver International Airport. Capt. Curry stated that putting materials out in the crew lounge was solicitation and therefore violated company policies against solicitation on company property. Capt. Curry said he had personally removed ALPA fliers put up by the OC in the Denver crew room. When I asked him what the policy was

that allowed him to pull down ALPA fliers and leave all others up, he said that he would ask his superiors.

9. The SkyWest Airlines Pilots Association ["SAPA"], an organization of pilots developed and completely financed by the company which supposedly speaks on behalf of the pilots, regularly posts and distributes materials in the crew room and these materials are not removed.

10. In addition, roughly three months ago I spoke with Capt. Jim Black about SAPA's practice of addressing new hire classes. Capt. Black is a Vice-President of SAPA and is not a management pilot. I spoke with him because I learned that Capt. Black was deliberately spreading misinformation about ALPA to the new hire class. I called him to clarify the misstatements and to seek the right to talk to the new hires. Capt. Black responded that "Brad would never go for that", referring to Brad Holt, SkyWest Vice-President of Flight Operations, and told me that I could attend the meeting but not speak or address the pilots.

11. On March 15 the OC sent a letter to Brad Holt asking that the company give the OC the rights to which it is

entitled by the law; namely to communicate with the pilot group without interference from the company, in the same way that SAPA is allowed to communicate with the pilot group. We did not receive a reply, and on April 12, 2007 I called Brad Holt to request a meeting to discuss the letter. My message requesting that he call back was later returned by Todd Emerson.

12. Mr. Emerson and I spoke for about 30 minutes. Mr. Emerson acknowledged that Mr. Holt had received the letter in question and informed me that Mr. Holt's response was a "polite no" on all counts. I asked about a number of issues outlined in the letter and Mr. Emerson again responded that the answer was a "polite no".

13. Mr. Emerson went on to inform me that SkyWest management recognizes SAPA as the official representative of the pilot group. He also expressed the view that a lot of people do not want to see a union here. He did not specify to whom he was referring in the last statement. Mr. Emerson also stated that, as the management did not want a union on the property, they are not obligated to cooperate with ALPA, members of the OC or supporters. Mr. Emerson also informed me that the "open door" policy he has

Case 4:06-cv-01268-CRB Document 132-14 Filed 09/05/24 Page 61 of 74

previously described to me is still available as to any issues that might arise - except for discussion of ALPA organizing-related issues.

14. SAPA also is allowed to use pilot email addresses to communicate electronically with the pilot group, but the OC has not been allowed to use these addresses or to communicate through company email.

15. SkyWest's practice of removing any ALPA-related material from its bulletin boards and crew rooms and its refusal to allow the OC to use company email has made it extremely difficult to reach the entire pilot group. Unlike SAPA, which has free access to these lines of communication, the OC has been unable to present its views to the pilots who are affected by this organizing drive.

Under penalty of perjury, I affirm that the information herein is complete and accurate to the best of my ability and recollection.

05/17/07
Date

Andy Bharath

ORIGINAL FILED
07 MAY 22 AM 9:36
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO. C 07 2688<br><br>**DECLARATION OF CHARLES "PHIL" ALFORD IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**Declaration of Charles "Phil" Alford**

1. My name is Charles "Phil" Alford. I have been an airline pilot employed by SkyWest Airlines since January, 1983. I currently serve as an RJ captain based in Salt Lake City, UT.

2. I have been an open and active member of the SkyWest Pilots ALPA Organizing Committee (the "OC") since August 2006. The OC was formed to encourage the pilots of SkyWest to elect ALPA as their collective bargaining representative. The pilots of SkyWest are not represented by a labor union for collective bargaining purposes.

3. On December 22, 2006, at around 2:00 PM local time, I took a series of pictures in the crew lounge at Salt Lake City International Airport. The pictures are of various bulletin boards in the crew lounge. The crew lounge is an area of the crew room that contains a number of couches and tables at which pilots relax and eat meals.

4. The pictures demonstrate the wide variety of solicitations that are commonly posted in the crew lounges. Clear in the pictures are solicitations for crash pads, motor vehicles, dogs for adoption, and others. Many pilots also use the boards to advertise side businesses that they operate.

5. One of the photos shows a file cabinet on which communications from SAPA regularly are made available to the pilot group. SAPA is the SkyWest Airlines Pilots Association, a group formed and funded by SkyWest management that claims to represent pilot interests before management. SAPA is not certified by the National Mediation Board and does not have the right to collectively bargain on behalf of the pilots. One of the documents shown here is a "Pilot Pay Package" offered by the company to the pilots in November 2006 through SAPA and put out to the pilots for their consideration and ratification. Copies of that document were left in the crew room routinely with the apparent approval of management.

6. On April 2, 2007, fellow OC member Tracy Shrier and I, along with other pilots who are ALPA

supporters, went to the SkyWest hangar at Salt Lake City International Airport to hand out fliers advertising an ALPA information session to be held that evening. The hangar is where SkyWest conducts all of its training classes. We arrived at the hangar at around 3:30 PM and began to hand out fliers to pilots who were exiting their classes for the day. We remained on the sidewalk and did not attempt to enter the building.

7. At around 4:00 on that afternoon, Capt. Shane Losee, SkyWest Director of Training, came out of the hangar and approached us. Capt. Losee said that he had been ordered by Capt. Dave Faddis, SkyWest Director of Flight Standards, to tell us to leave the property. He informed us that we would not be allowed to distribute information to pilots while on SkyWest property.

8. The combined effect of these actions by management representatives has been to prevent me from freely expressing my view that the pilots of SkyWest would benefit from electing ALPA as their collective bargaining representative, and to discourage me from

attempting to provide information to other pilots or encourage them to inquire about the benefits of representation.

Under penalty of perjury, I affirm that the information herein is complete and accurate to the best of my ability and recollection.

May 11, 2007 — Charles Alford

Date — Charles "Phil" Alford

# EXHIBIT 3

to the Declaration of Ronald Rindfleisch

Declaration of Jeffrey MacDonald, No. C-07-2688 CRB (N.D. Cal.), ECF No. 10 (May 22, 2007)

ORIGINAL FILED
07 MAY 22 AM 9:41
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

STEPHEN P. BERZON (#46540)
sberzon@altshulerberzon.com
LINDA LYE (#215584)
llye@altshulerberzon.com
CLAIRE P. PRESTEL (#235649)
cprestel@altshulerberzon.com
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064

ELIZABETH GINSBURG
(Application for Admission *Pro Hac Vice* Pending)
elizabeth.ginsburg@alpa.org
Air Line Pilots Association, International
535 Herndon Parkway
Herndon, VA 20172-1169
Telephone: (703) 481-2424
Facsimile: (703) 481-2478

Attorneys for Plaintiffs

E-filing

JL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYWEST PILOTS ALPA ORGANIZING COMMITTEE, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>SKYWEST AIRLINES, INC.,<br><br>Defendant. | CASE NO.: C 07 2688<br><br>**DECLARATION OF JEFFREY MACDONALD IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**Declaration of Jeffrey MacDonald**

1. My name is Jeffrey MacDonald. I am a Manager in the Representation Department for the Air Line Pilots Association, International ("ALPA") with responsibility, among other matters, for the effort to assist the pilots of SkyWest Airlines ("SkyWest") in organizing to elect ALPA as their collective bargaining representative. I have been employed by ALPA since 1999.

2. Prior to my time at ALPA, I served as an associate professor on the graduate faculty of the Michigan State University School of Labor and Industrial Relations for approximately 10 years. During my career I have worked or consulted with most of the unions currently affiliated with the AFL-CIO. I spent seven years as the Deputy Director of the George Meany Center. As Deputy Director of the George Meany Center, I supervised the organizing curriculum of the AFL-CIO, which typically includes 10 to 20 one week organizing schools per year, training hundreds of organizers annually. I also served for twelve years as the Meany Center's representative on the AFL-CIO's National Organizing Task Force, which consisted of the Organizing Director for each of the affiliated unions of the AFL-CIO. During that time there was a lively and ongoing debate within the group concerning effective methods for organizing employees, and most unions were actively seeking new models for expanding their membership through grass roots organizing.

3. From 1996 to 1999, I served as Assistant Chief of Staff for the National Mediation Board, the federal agency that oversees labor relations in the airline and railroad industries. In that role, I oversaw the mediation of conflicts between labor and management in the context of collective bargaining.

4. ALPA is certified or recognized to represent pilots at commercial airlines throughout the United States pursuant to the Railway Labor Act. It currently is seeking to organize and represent the pilots employed by SkyWest. For the past year, I have been supervising ALPA's work with the SkyWest Pilots ALPA Organizing Committee (the "OC"). The OC was formed by SkyWest pilots in an effort to organize the pilot group through an authorization card campaign and to elect ALPA as the exclusive collective bargaining representative for the pilots at SkyWest. The pilots at SkyWest are currently unrepresented.

5. My experience has taught me that free and open exchanges among employees are essential to an organizing drive. Employees on the organizing committee who are advocating for electing a bargaining representative must feel comfortable expressing their support for the union, informing interested employees about the union, and engaging in frank discussion with employees who are interested in the issues raised by an organizing campaign. In my experience, this type of expressive activity and communication is necessary for interested employees to learn about an organizing effort and to have their questions answered. If members of an organizing committee feel intimidated by their

employer, they are less likely to discuss the issues with interested co-workers and less likely to be active or effective advocates, and the campaign suffers.

6. Similarly, I have observed that when the ability to disseminate information about the campaign is hindered by management interference, employee organizers are not only prevented from educating co-workers who seek information, they also begin to feel intimidated and isolated by management. Once the impact of such intimidation sets in, employee organizers become less vocal in their support because they fear running afoul of various management directives and exposing themselves or co-workers to potential discipline. When that occurs, the energy and momentum of the campaign begin to dwindle. It is extremely difficult to restore the same level of interest and intensity. During an organizing campaign, it is therefore critical to have events regularly that maintain excitement and momentum and that show growing support for the union. If a campaign proceeds for too long without maintaining visibility, there is a danger that support for the union will wane.

7. I have worked with and personally met almost every member of the SkyWest Pilots ALPA Organizing Committee. The OC members come from a range of prior aviation and other career experiences and reflect a wide range of tenure at SkyWest. Active members of the OC have worked at SkyWest for anywhere from two years to twenty years. Some members of the OC have been ALPA members in the past at other airlines.

8. During this campaign, a number of OC members have told me about incidents they have had with management regarding their support for ALPA. Many OC members have been instructed to remove their ALPA lanyards by management officials and almost all of them permanently stopped wearing ALPA lanyards after being instructed by management to remove them, out of fear of adverse career consequences. Wearing an ALPA lanyard allows OC members to show their support for the organizing effort, and allows fellow pilots to identify those that could be a source of information about that campaign. I have found in other organizing campaigns that the wearing of union insignia, such as lanyards or pins, by union supporters is a highly effective method of demonstrating support for the campaign and building solidarity. By forcing the OC members to remove their ALPA lanyards, SkyWest management has blocked this public signal to non-affiliated pilots and the public presence of the OC is diminished substantially. OC members have thus been denied the opportunity to engage in a basic kind of expressive activity that occurs in normal organizing campaigns to show and build support for the union. In addition, SkyWest pilots who support the ALPA organizing campaign have felt singled out because management has allowed its pilots to continue to wear lanyards with the logos of other non-SkyWest organizations such as sports teams, charities and commercial enterprises.

9. OC members have also seen ALPA fliers posted in crew rooms and on general message boards removed by management officials and as a result have ceased distribution of such materials in those crew rooms, especially when management pilots are present. Distribution of materials in crew rooms and on message boards is one of the

few means of communicating with the entire pilot group. Given the nature of pilots' jobs, they rarely congregate or meet in a single location, and virtually the only occasions when they meet face to face is if they are on the same crew or their schedules happens to overlap such that they are in the same airport at the same time. Without the ability to post fliers on bulletin boards and distribute materials elsewhere in crew rooms, the OC has almost no ability to expand its outreach beyond those who have made an effort to seek out information from the OC.

10. The OC has also stopped distributing information in pilot V-files (mailboxes) after early attempts to distribute information in that manner were immediately removed by management. V-files are the only method by which the OC can reach out to each pilot directly. Without access to these files, OC members cannot successfully reach out to all members of the pilot group.

11. On numerous occasions, I have requested that OC members talk about ALPA in non-work areas. Throughout this campaign OC members have been open about their concern that active involvement in union organizing may result in disciplinary measures being taken against them by their employer, and they have expressed real concern that their long-term career prospects in the industry as a whole may suffer as a result. While one or two members have been willing to speak out, most members of the OC have been reluctant to engage in conversations with their fellow pilots on the subject of union organizing in non-work areas of the crew room and other public areas in which their activities might be noticed by SkyWest management.

12. Historically, in other ALPA organizing drives, pilot-to-pilot interaction in the crew room has been an extremely effective tool for engaging with individual pilots and advocating for ALPA representation. In this respect, SkyWest has been unique within ALPA organizing experience. The campaign has suffered from the atmosphere of fear and intimidation created by SkyWest because it has stripped pilots seeking to elect ALPA as their collective bargaining representative of a potent tool for furthering their organizing goals. Written materials are an important complement to pilot-to-pilot interaction. This is so because written or electronic materials, if distributed to the entire pilot group, reach a wider audience than one-on-one conversations, and do not depend on scheduling luck. As discussed above, because of the nature of their jobs, all pilots are rarely in the same location and thus have few opportunities to speak directly to each other. In addition, each day that SkyWest's coercive course of action persists, the danger grows that support for the organizing campaign will irreversibly wane.

Under penalty of perjury, I affirm that the information contained herein is complete and accurate to the best of my ability and recollection.

MAY 18, 2007
Date

[signature]
Jeffrey MacDonald