Gregory M. Saylin, #9648
Tyson C. Horrocks, #12557
Zachary T. Burford, #19771
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101-2194
Telephone: 801.799.5800
GMSaylin@hollandhart.com
TCHorrocks@hollandhart.com
ZTBurford@hollandhart.com

*Attorneys for Plaintiff and Counterclaim Defendant SkyWest Airlines, Inc. and Counterclaim Defendant Dale Hansen*

---

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH – SOUTHERN DIVISION**

| | |
|---|---|
| SKYWEST AIRLINES, INC.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>and DALE HANSEN,<br><br>Additional Counterclaim Defendant,<br><br>vs.<br><br>DANIEL MOUSSARON,<br><br>Defendant and Counterclaim Plaintiff,<br><br>and VIKAAS KRITHIVAS,<br><br>Defendant and Counterclaim Plaintiff. | **PLAINTIFF SKYWEST AIRLINES, INC.'S OPPOSITION TO JOINT MOTION FOR PROTECTIVE ORDER**<br><br>Civil No. 4:26-cv-00015-DN-PK<br><br>Senior District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

Plaintiff SkyWest Airlines, Inc. ("SkyWest") responds in opposition to Defendants' Joint Motion for Protective Order ("Motion") (Dkt. No. 132) as follows:

## INTRODUCTION

On January 30, 2026, SkyWest filed this action to learn who took its confidential pilot data, what was taken, how it was used, and who else has it now. Dkt. No. 1. Days later, it sought a temporary restraining order and expedited discovery directed at those same questions. Dkt. Nos. 5, 8. Eight months later, SkyWest still does not know where its data is and is no closer to recovering it—its central goal in this litigation. The reason is simple: Defendants have refused to produce the key documents responsive to six categories of discovery aimed at those questions.

Defendants admit the core conduct. They admit that they extracted confidential pilot contact information from SkyWest Online ("SWOL"), loaded it into a Data Management System ("DMS") hosted on a remote server, used it to send a mass text to a majority of SkyWest's pilots, and gave others—including a group of unnamed individuals and the Air Line Pilots Association ("ALPA")—access to that data. But those incomplete admissions are Defendants' own say-so, unsupported by underlying data. There are dozens of people who have had SkyWest's data for eleven months and may have forwarded it to others—as Defendants block SkyWest's attempt to stem the leak and retrieve it. With every day that passes, SkyWest is injured, as it is harder to trace and retrieve this data. SkyWest cannot test or verify the Defendants' representations, cannot confirm the scope of what was taken, and cannot identify the individuals who have its data today. Simply put, unidentified individuals have, or have had, access to SkyWest's data, and SkyWest does not know who they are.

Defendants' Motion should be denied for three reasons. **First**, Defendants waived the privilege they now assert. Their initial responses rested on the Railway Labor Act ("RLA"), which Defendants now concede does not create "a freestanding evidentiary privilege." Dkt. No.

132, at 6. Defendants did not assert a First Amendment associational privilege until July 2026—weeks after their responses were due, and only after SkyWest conferred on the deficiency of those responses and began moving to compel. The privilege is therefore waived as to every request where it was not timely asserted, and Defendants should be ordered to produce all responsive documents to those requests.

**Second**, Defendants' *prima facie* showing fails as a matter of law. The Tenth Circuit requires "objective and articulable facts" showing a reasonable probability of chill, not generalized fear. *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 489 (10th Cir. 2011). Defendants offer only secondhand accounts of unnamed pilots' worries and their declarants' own impressions of the workplace. The only concrete consequences they identify fall on individuals accused of misconduct: Defendants themselves, who face this lawsuit for taking SkyWest's data, and flight attendants who admitted using stolen credentials to log into a labor election (three years ago) to further their campaign to form a union. None of that shows retaliation for supporting a union. Meanwhile, SkyWest has known the identities of ALPA's organizers since the 2007 campaign, and Defendants cannot point to a single one who was disciplined, demoted, or terminated for their support.

**Third**, even if Defendants could make a *prima facie* showing, the *Grandbouche* factors require disclosure. The identities Defendants seek to redact are inseparable from the conduct SkyWest is entitled to discover. Defendants concede the point, admitting that "[i]f a particular person actually obtained, possessed, transferred, or used SkyWest-derived information in a manner relevant to a pleaded claim or defense, that conduct may present a legitimate discovery issue." Dkt. No. 132, at 16. Defendants stole and unlawfully distributed SkyWest's pilot data.

They cannot now hide that conduct behind the shield of the First Amendment. Stripping names, affiliations, and organizational roles would deprive SkyWest of the precise information it needs to trace the chain of custody of its own data from SWOL. Redaction of that information would be no different in effect from withholding it entirely.[1]

Defendants' own concessions confirm that much of what they have withheld is not privileged at all. They admit they "do not seek a blanket prohibition on union-related discovery," that "responsive documents would not be withheld merely because they contain protected information," and that "no otherwise responsive document may be withheld solely on associational grounds." *Id*. at 2–3, 19. That non-objectionable information should have been produced months ago, and the redaction-challenge procedure Defendants now propose is no substitute for production.

SkyWest cannot answer the questions that drive this case without the information Defendants are suppressing to shield evidence of their own wrongdoing. The Court should deny the Motion.

## BACKGROUND

### I. SkyWest's Complaint.

SkyWest maintains a secure intranet portal, SWOL, that stores sensitive employee data, including names, addresses, personal phone numbers, and other employment information. Compl. ¶¶ 12–13. SWOL employs role-based access controls that limit what information each employee can view based on the employee's position and job duties. *Id.* ¶ 14. Certain data fields,

[1] At a minimum, Defendants should have initially produced the requested information with the redactions they now propose. Dkt. No. 132, at 2. They still have not done so.

including the personal contact information of other employees, are not displayed to line pilots like Defendants. *Id.* ¶¶ 14–15. Both Defendants signed Non-Disclosure Agreements acknowledging that employee records constitute "Confidential and Privileged Information" and agreeing not to disclose such information. *Id.* ¶¶ 16–18; Dkt. No. 1-1, Ex. A. SkyWest's Code of Conduct further limits access to personnel with a specific business need. Dkt. 153, at 4–5.

From August to December 2025, Defendants devised and executed a scheme to extract the personal, private contact information of more than 5,000 SkyWest pilots from SWOL. Compl. ¶¶ 22–33. Defendants used browser developer tools to remove or bypass the blocks that SkyWest had implemented in SWOL's user interface, thereby exposing data fields that were not rendered in their standard user view. *Id.* ¶¶ 22–23. They deployed an automated TamperMonkey script to systematically extract and save this information in bulk. *Id.* ¶¶ 33–34. Defendants then transmitted the extracted data to persons outside SkyWest for the purpose of facilitating union-organizing communications. *Id.* ¶¶ 29–32, 36. SkyWest suffered concrete harm from the loss of control over its confidential data and disruption to its operations, including the costs of investigating the breach, conducting a damage assessment, and implementing additional security measures. *Id.* ¶¶ 39–44, 60. And it does not know who else has its information and how else it has been used.

The Complaint asserts seven causes of action: contract actions based on breach of their NDAs (Counts I–II); violation of the Computer Fraud and Abuse Act (Count III); violation of the Utah Computer Abuse and Data Recovery Act (Count IV); breach of fiduciary duty (Count V); conspiracy (Count VI); and declaratory judgment (Count VII). *Id.* at 12–22.

## II. Defendants' Admissions and Undisputed Facts.

The following facts are not disputed:

- Moussaron admits that he led the Organizing Committees' ("OC") information-technology work during the relevant period and that the DMS supported the OC's outreach. Ex. A, Moussaron's Resps. to SkyWest's Second Set of Reqs. ("Ex. A"), ROG No. 7, at 4–5; Ex. B, Moussaron's Resps. to SkyWest's Third Set of Disc. Reqs. ("Ex. B"), ROG No. 26, at 21; *see also* Dkt. No. 47, Moussaron Countercl., ¶¶ 8–20.

- Moussaron admits he and Krithivas accessed SWOL and "saved names, employee number, phone numbers, and addresses of various pilots sequentially based on seniority." Dkt. No. 47, Moussaron Ans. ¶¶ 27, 30. Krithivas similarly admits he "coordinat[ed] with Moussaron during the authorized access to directory data on September 3, 2025," logged into SWOL on September 3, 2025, and accessed directory data for approximately 5,000 pilots. Dkt. No. 48, Krithivas Ans. ¶¶ 15–17, 19.

- Moussaron admits "the Defendants used a script to access and save pilot contact information" (Dkt. No. 47, Moussaron Ans. ¶ 33), provided the pilot contact information to someone outside SkyWest, and used the data to send a mass text to a majority of SkyWest pilots. Dkt. No. 47, Moussaron Ans. ¶ 36; Countercl. ¶¶ 46–47. Krithivas also admits "[t]he data was forwarded to a remote server, as directed by Moussaron." Dkt. No. 48, Krithivas Ans. ¶ 17.

- Moussaron admits that he stored, organized, and used the data extracted from SWOL in a DMS on a remote server hosted by GreenHost (a Dutch company). Ex. A, ROG No. 6, at 3–4. He further admits that the Remote Server "remains active" and that "SWOL-derived data resides on the Remote Server." Ex. B, ROG No. 27, at 21–22.

- Moussaron admits he sent an export of the DMS to a third party, ALPA representative Ron Rindfleisch. Ex. A, Resp. to ROG No. 7, at 5.

- Moussaron has identified DMS source categories containing thousands of records but refuses to produce the underlying row-level data in those tables. Dkt. No. 78-1, at 5–6.

Moussaron's discovery responses also obscure who else had access. He first claims he is the only individual with "direct access" to the Remote Server throughout its lifecycle, but later admits that other OC members had access to the DMS without explaining who they are, how they retrieved it, or what that access entailed. Ex. A, ROG Nos. 6–7, at 3–5. He states that the OC "had access limited to pilot phone numbers, as displayed through the DMS call queue," and that "two other members of the organizing committee previously had administrative-level access

to the DMS[.]" *Id.* at 5. Yet he refuses to identify these members or what they could access. *Id.*; *id.*, ROG No. 16, at 15. And he has not produced the user-access logs and administrative records that would show what those members could see and what they did in the system. *See* Ex. A, RFP No. 22, at 31; *see also* Dkt. No. 78-1, at 5–6. Worse, Moussaron admits that in December 2025 he replaced the DMS "staging tables that had contained pilot-provided contact information and associated logs." Ex. H, ROG No. 11, at 10.

Defendants have not produced the underlying information that would allow SkyWest to trace its data, test these statements, or confirm the scope of what was taken or how it has been used and altered. SkyWest's SWOL logs show the requests that reached its servers, but not what Defendants' scripts captured or what was loaded into the DMS. Only the DMS tables, Remote Server records, and SQL database dump[2]—which Moussaron admits exist—can answer that question. Krithivas, for his part, admits that his personal desktop computer ran the TamperMonkey script that "processed" SkyWest's pilot data and transmitted it to the Remote Server. Dkt. No. 48, Krithivas Ans. ¶ 17; Ex. C, Krithivas's Resp. to SkyWest's Expedited Disc. ("Ex. C"), ROG Nos. 2, 3, & 5, at 3–5. Yet he claims that the same computer holds no browser history, extension logs, script files, or Remote Server records. Ex. F, Krithivas's First Suppl. Resp. to SkyWest's Second Set of Requests ("Ex. F"), RFP Nos. 6, 10, at 11, 14. Only a forensic image of that computer can test that claim. Dkt. Nos. 61, 63. And Moussaron's account of what

[2] A SQL database dump is a single file containing a complete copy of a database (its table structures and every row of data) that can be used to recreate the database as it existed when the dump was made. Moussaron identifies the "SkyProxy.sql.zip" as a "full dump/extract of the SkyProxy database," which he created to preserve a copy of the ALPA server SQL database for possible litigation. Ex. Q, Moussaron's Resps. to Expedited Disc., Ex. 1, row 4; Ex. R, Moussaron's Resp. to Expedited Disc.

he transmitted to ALPA has already proven incomplete. *See infra* Background Section IV. SkyWest cannot test Defendants' say-so without the withheld information.

## III. Defendants' Refusal to Respond to Discovery.

SkyWest served discovery requests targeting six categories of information central to its claims, including: (1) row-level DMS data and database tables (Dkt. 70); (2) communications with the OC and ALPA concerning pilot outreach and the use of SkyWest's data (Dkt. 69); (3) the identities of people who possessed, used, or participated in activities involving SkyWest's data (Dkt. 71); (4) the identity of a nonparty associated with an August 30, 2025 communication (Dkt. 72); (5) organizing-related responses tied to SkyWest's data (Dkt. 67); and (6) forensic examination of Defendants' devices (Dkt. Nos. 61, 63).

In all, Defendants have withheld information on the basis of their RLA and/or First Amendment objections in response to at least the following requests:[3] Moussaron's responses to Interrogatory Nos. 6, 7, 9–13, 15, 16, 21, and 28 and Request for Production Nos. 6–8, 10, 12–22, 24–29, 35, 36, and 40; Krithivas's responses to Interrogatory Nos. 10 and 22 and Request for Production Nos. 8, 9, 24, 26, and 30.[4] Moussaron served initial discovery responses on June 5, 2026, and Krithivas served responses on May 21, 2026. Ex. A; Ex. G, Krithivas's Resp. to SkyWest's Second Set of Requests ("Ex. G"). Both relied on boilerplate objections based on relevance, proportionality, overbreadth, and the Railway Labor Act. *See generally id.* **Neither**

---

[3] For the Court's convenience, SkyWest has attached as Exhibit D a chart identifying each disputed request and the objections Defendants asserted in their initial and supplemental responses.

[4] *See* Ex. E, SkyWest's July 31, 2026 Meet-and-Confer Letter, at 2; Ex. F, RFP Nos. 8–9, at 12–14; Ex. N, Krithivas's Resp. to SkyWest's Third Disc. Reqs. ("Ex. N"), RFP No. 30, at 43.

**<u>asserted a First Amendment associational privilege.</u>** *Id.* Moussaron did not raise the First Amendment privilege until his July 17 supplemental responses, and Krithivas first raised it the same day but only in Dkt. 76—and only after SkyWest challenged their RLA objections and began moving to compel.[5] Neither Defendant explained the delay.

Notwithstanding their waiver, Defendants' productions were minimal. Moussaron produced limited technical information about the unauthorized SWOL access, but withheld entire categories of responsive documents, including the DMS data and tables, the Remote Server records and SQL dump, his communications with Rindfleisch and the OC members concerning SkyWest's data, and the identities of the individuals who accessed, used, or received that data.[6] He also:

- refused to produce the DMS row-level data, objecting that the request "seeks information that is not relevant, overbroad, vague, compound, unduly burdensome, and requests confidential union organizing information that is protected by the Railway Labor Act." Ex. A, RFP No. 18, at 27.
- refused to identify the individuals who accessed or received SkyWest's information, stating only that "[t]he individuals who participated in outreach calling are among the Organizing Committee members." Ex. A, ROG No. 16, at 15.
- withheld all communications about data dissemination, conditioning production on "a protective order with attorneys/expert eyes only designation, and with the express agreement that no union organizing information will be reviewed by, provided to, shared with, or communicated to SkyWest or any of its employees." Ex. A, RFP No. 22, at 31.

---

[5] *See* Ex. J, SkyWest's June 24, 2026 Meet-and-Confer Letter to Moussaron; Ex. I, SkyWest's June 24, 2026 Meet-and-Confer Letter to Krithivas; Ex. H, Moussaron's Suppl. Resp. to SkyWest's Second Set of Requests (July 17, 2026) ("Ex. H"). Krithivas in fact never raised the First Amendment associational privilege in objecting to SkyWest's Expedited Discovery or Second Set of Requests, even after supplementing the latter. *See generally* Exs. C and F. Krithivas did not raise it in his discovery responses until objecting to SkyWest's Third Set of Requests. *See* Ex. N, Gen. Obj. No. 5, at 2–3 & RFP No. 30, at 42–43.

[6] *See, e.g.*, Dkt. No. 67, 69–72; Ex. A, ROG No. 8, at 6; *see also* Ex. J, at 3–7.

Krithivas's responses were similarly deficient. He objected that "SkyWest's request to name all employees involved with union formation efforts is prohibited under the Railway Labor Act." Ex. G, ROG No. 10, at 7. He also claimed he had no responsive records concerning his access to and transmittal of SkyWest's data to Moussaron, despite the fact that he admitted to doing so. *Id.*, RFP No. 6, at 11. With his initial responses, Krithivas produced only 33 pages and claimed to not know who received or possessed SkyWest's pilot data. *Id.*

Defendants' privilege logs further compound the problem. Krithivas logged a single document for a four-month campaign involving multiple participants and at least six confirmed transmissions involving ALPA. Dkt. No. 72. That entry describes an August 30, 2025 text message as a "discussion of nonparty person who introduced Vikaas and Daniel." *Id.* Moussaron's log includes only three entries consisting of: (1) a blanket description for text messages between himself and Rindfleisch at ALPA; (2) the EZ Texting spreadsheet that he provided to the platform; and (3) the DMS. Ex. K, Moussaron Priv. Log. His stated justifications are the Railway Labor Act, the First Amendment, and relevance. Shockingly, neither Defendant logs any communications with the OC or with others at ALPA. Clearly, Defendants have not identified all responsive communications they are withholding.

## IV. Discovery from Third Parties and Ongoing Obstruction from Defendants.

SkyWest has attempted, with little success, to seek the discovery Defendants have refused to produce from other sources. For example, SkyWest served a subpoena on ALPA, but ALPA produced only a limited set of documents while asserting the same associational privilege. Ex. L, ALPA Objections and Response to SkyWest Subpoena (Aug. 13, 2026) ("Ex. L, ALPA Resp."). However, even ALPA's partial production has revealed that Moussaron's account of

what he shared with ALPA is incomplete. Moussaron represented in his discovery responses that he sent SkyWest's data to ALPA only one time. Ex. A, ROG No. 7, at 5. However, ALPA's production reveals at least six separate transmissions of SkyWest data over a three-month period: (1) October 13, 2025, Moussaron sent a spreadsheet to Rindfleisch (ALPA00001); (2) October 24, 2025, Rindfleisch forwarded it to ALPA employee C. Yeager (ALPA00002); (3) December 4, 2025, Rindfleisch re-transmitted it to Moussaron and "OC members," whose names are redacted (ALPA00003); (4) December 15, 2025, Moussaron sent Rindfleisch another "updated" spreadsheet titled "SkyWest_ALPA_OC_Members.xlsx" (ALPA00004); (5) January 8, 2026, Moussaron emailed Rindfleisch two additional spreadsheets, with a cover email describing detailed campaign metrics including approximately 1,350 pilot responses within 24 hours of SMS outreach (ALPA00005); and (6) January 9, 2026, Rindfleisch forwarded both files to Yeager with the password for the spreadsheets (ALPA00017). *See* Ex. M, ALPA Production 1 to SkyWest. Moussaron neither produced nor identified any of these communications aside from the January 8 message. Moussaron's account of what he did with SkyWest's data is thus inaccurate and incomplete, and Defendants' objections have kept SkyWest from obtaining the full picture.

SkyWest has also sought records from EZ Texting, the SMS platform Moussaron used for the December 9, 2025 outreach, which holds the uploaded contact information. Ex. A, ROG No. 10, at 8–9; Ex. H, RFP No. 12, at 24–25; Ex. Q, row 6. EZ Texting's records would show, among other things, (a) what data he specifically transmitted to them and in what form, (b) whether any protections were placed on the information, and (c) how the data was used to reach

out to pilots. Moussaron himself has acknowledged that the EZ Texting platform holds pilot names, numbers, employee IDs, and poll responses. Ex. H, RFP No. 12, at 24–25.

On September 22, 2026, SkyWest served notice of its intent to issue Rule 45 subpoenas to both EZ Texting and GoFundMe. Dkt. No. 151-1. When Defendants objected that the subpoenas violated the Court's August 18 order, SkyWest offered a compromise. It proposed that the producing party could initially designate information AEO,[7] and that any AEO material "be simultaneously produced as Confidential" with the very redactions Defendants request in their Motion. *See* Dkt. No. 151-2 (Sept. 24, 2026 email from T. Horrocks); *see* Dkt. No. 132, at 2.

Defendants did not respond to SkyWest's proposal. Nor did they permit the third parties to produce information that was either not subject to the First Amendment objection or redacted in alignment with Defendants' current request to the Court. Instead, Moussaron moved the next day to block both subpoenas. Dkt. Nos. 151, 152. Defendants' refusal to accept production in the very form they ask this Court to order confirms that their objective is not protecting associational interests, but delaying SkyWest from obtaining the information as long as possible.

Finally, Defendants have both represented that they would assert the same First Amendment objections at depositions and refuse to answer questions implicated by the privilege. Ex. O, Aug. 14–15, 2026 Emails. As a result, every avenue of discovery sought by SkyWest has been blocked through Defendants' RLA and First Amendment objections.

---

[7] While SkyWest contends that Todd Emerson, SkyWest's in-house counsel, should be permitted to see AEO materials as set forth in its protocol motion and reply (Dkt. No. 63, at 7–8), it offered that it was willing to agree that Todd Emerson would not be shown the AEO documents until the Court rules on the issue.

## V. Current Posture and What Defendants Are Asking.

On September 14, 2026, Defendants filed the present Motion, proposing for the first time a framework that would let them redact the identities of pilots who "supported, opposed, participated in, or communicated about union organizing activities," subject to SkyWest's ability to challenge a redaction on a showing of "particularized need." Dkt. No. 132-11, at 3–5. Defendants never raised that proposal during seven months of conferral or in response to SkyWest's motions to compel. They withheld entire categories of information outright, and they redacted only on an ad hoc basis when it suited them.[8]

## LEGAL STANDARD

The First Amendment protects the "freedom to engage in association for the advancement of beliefs and ideas[.]" *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). That protection can sometimes extend to private civil litigation. *Grandbouche v. Clancy*, 825 F.2d 1463, 1465–67 (10th Cir. 1987). A party may invoke a qualified associational privilege to resist discovery that would reveal its members' identities or associational choices. *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 479–81 (10th Cir. 2011). But the privilege is qualified, not absolute. *Grandbouche*, 825 F.2d at 1466.

[8] Defendants' prior offers were narrower and conditional. They offered to produce certain documents only under an attorneys'/experts'-eyes-only designation "with the express agreement that no union organizing information will be reviewed by, provided to, shared with, or communicated to SkyWest or any of its employees," Ex. H, RFP No. 6, and proposed an outside-counsel-only limitation that would apply only "if the Court ordered disclosure through the proposed forensic protocol," Dkt. No. 132 at 20–21. Defendants themselves now disclaim that earlier proposal as "not a concession" on relevance. *Id.* at 21. In any event, Defendants never produced the withheld identities, DMS row-level data, or organizing communications under any of those offers.

The party invoking the privilege bears the initial burden of making a *prima facie* showing that compelled disclosure will result in a chilling effect on protected association. *In re Motor Fuel*, 641 F.3d at 488 ("[T]he burden shifts to the party seeking discovery only after the party claiming the privilege makes this prima facie showing."). The Tenth Circuit has refused to dispense with "this traditional allocation of burdens . . . simply because the claimed privilege implicates the First Amendment." *Id.* The invoking party must, "through objective and articulable facts[,] make an evidentiary showing of a reasonable probability of chill on an association right." *Id*. at 489 (quotation omitted). That showing may be made, for example, through "affidavits which describe harassment and intimidation of [a group's] known members, and the resulting reluctance of people sympathetic to the goals of [the group] to associate with [it] for fear of reprisals." *Id.* at 491. But a chill cannot simply be "inferred," and the Tenth Circuit has "not held that one single unsworn statement is sufficient." *Id.* at 490–91.

Only if that initial threshold is met, does the court balance four factors to determine whether the information should be disclosed: (1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information being sought. *Grandbouche*, 825 F.2d at 1466. That second step "is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010).

## ARGUMENT

On August 18, 2026, the Court denied SkyWest's motions to compel without prejudice and directed the parties to brief the associational privilege. Dkt. No. 108. The Motion fails for

three reasons. First, Defendants waived the privilege. Second, Defendants fail to make the requisite *prima facie* showing. Third, the *Grandbouche* factors strongly favor disclosure. The Court should deny the Motion and order production.

## I. DEFENDANTS WAIVED THE FIRST AMENDMENT PRIVILEGE.

Neither Defendant asserted the First Amendment privilege in their initial responses to SkyWest's Second Set of Requests. Both relied instead on the RLA as the basis for withholding organizing-related information.[9] *See supra* Background Section III. That omission is dispositive. "Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure." Fed. R. Civ. P. 33(b)(4); *see Pingree v. Univ. of Utah*, 2024 U.S. Dist. LEXIS 101104, at *6 (D. Utah June 5, 2024); *KCI Auto Auction, Inc. v. Ephrem*, 2019 U.S. Dist. LEXIS 185410, at *8 & n.25 (D. Kan. Oct. 22, 2019). The First Amendment privilege is subject to the same waiver rules as any other privilege. *X Corp. v. Media Matters for Am.*, 2024 U.S. Dist. LEXIS 184000, at *12–18 (N.D. Tex. Sept. 27, 2024) (privilege waived where defendants did not assert it in their operative responses); *Mi Familia Vota v. Fontes*, 344 F.R.D. 496, 519–20 (D. Ariz. 2023) ("[T]he same waiver standards that apply to the attorney-client privilege also apply to the First Amendment privilege").

Defendants' RLA objection did not preserve the privilege. The RLA is a substantive statute that creates no evidentiary privilege. *NetJets Aviation, Inc. v. NetJets Ass'n of Shared Aircraft Pilots*, 2017 U.S. Dist. LEXIS 129354, at *14 (S.D. Ohio Aug. 15, 2017); *Hernandez v. Off. of the Comm'r of Baseball*, 331 F.R.D. 474, 478 (S.D.N.Y. 2019). Defendants now concede

---

[9] Ex. A, General Obj. No. 5, at 3; *id.*, ROG Nos. 6–13, 15 16; RFP Nos. 6–29; Ex. G, ROG No. 10, at 7; Ex. H; *id.*, RFP Nos. 8, 9.

the point. Dkt. No. 132, at 6. The First Amendment privilege is a distinct constitutional doctrine with its own framework, and Defendants' own supplemental responses list the two as separately enumerated grounds. Ex. K; Ex. H, ROG No. 6, at 3–4. A party cannot preserve one privilege by asserting another, least of all one it has since abandoned.

Nor is there good cause. Nothing changed between Defendants' initial and supplemental responses except that SkyWest challenged the RLA objection as legally baseless. Ex. J, at 2; Ex. I, at 2. Only then did Defendants switch to the First Amendment. *See* Dkt. No. 78-1, at 2; Ex. H. That was a litigation pivot, unsupported by inadvertence or a response to newly discovered facts.

The Court should therefore, at a minimum, deny the Motion as to Moussaron's Interrogatory Nos. 6–13, 15 and 16 and Request for Production Nos. 6–29, and Krithivas's Interrogatory No. 10 and Request for Production Nos. 8 and 9, and order immediate production of all responsive documents.

## II. DEFENDANTS HAVE NOT MADE THE REQUIRED PRIMA FACIE SHOWING.

Even if not waived, the associational privilege independently fails on the merits.

### A. <u>The Standard Requires Objective Evidence of Actual Harassment or Intimidation.</u>

As set out above, the invoking party must make its *prima facie* showing "through objective and articulable facts." *In re Motor Fuel*, 641 F.3d at 489, 491. Conclusory assertions do not suffice. *See Buckley v. Valeo*, 424 U.S. 1, 74 (1976) (requiring "specific evidence of past or present harassment of members due to their associational ties. . . ."); *Petteway v. Galveston Cnty.*, 2023 U.S. Dist. LEXIS 84369, at *45 (S.D. Tex. May 15, 2023) (Declarations that forcing disclosure "would have a chilling effect" are "a textbook example of a legal conclusion"

insufficient to satisfy the prima facie burden); *Am. Resort Dev. Ass'n v. Wesley Fin. Grp. (In re Documents)*, 2024 U.S. Dist. LEXIS 59577, at *18–19 (E.D. Tenn. Apr. 1, 2024) (The party "must go beyond conclusory statements and demonstrate through proofs a basis for the assertions made"); *DoorDash, Inc. v. City* of *New York*, 754 F. Supp. 3d 556, 578 (S.D.N.Y. 2024) (rejecting privilege claim where "fear of retaliation claim rests on mere speculation" rather than "objective and articulable facts"). "[O]ne single unsworn statement" is not enough. *In re Motor Fuel*, 641 F.3d at 491. Courts in the labor context have applied these standards with equal rigor. *See Amaya v. Bregman*, 2016 U.S. Dist. LEXIS 63588, at *36 (D.N.M. May 13, 2016) (party "failed to produce any evidence whatsoever" of chilling effect).

Here, the only specific incidents Defendants identify involve consequences for the two Defendants accused of misappropriation, nineteen-year-old lanyard and posting disputes, or conduct by fellow pilots and SAPA representatives rather than SkyWest. *See* Dkt. No. 132-2, Ex. B, Rindfleisch Decl. ¶¶ 7–11, 17–18; Dkt. No. 132-8, Ex. H, Naqvi Decl. ¶¶ 5–10. None shows that SkyWest harasses pilots for supporting ALPA.

**B. Defendants' Declarations Rest on Secondhand Accounts and Fail to Identify Actual Retaliation.**

None of Defendants' declarants is a current SkyWest pilot attesting that disclosure would deter his or her own association. Instead, they largely relay what unnamed others told them. Rindfleisch Decl. ¶¶ 16–17; Dkt. No. 132-4, Moussaron Decl. ¶¶ 4, 7–10; Naqvi Decl. ¶ 14. That falls short. *See Petteway*, 2023 U.S. Dist. LEXIS 84369, at *43–45 (declarations fell "woefully short of a prima facie showing" where declarants did not state "that they personally would be less inclined to take a leadership position or to speak freely if these documents were disclosed").

Defendants' declarations offer nothing like the "specific evidence of past or present harassment of members" the privilege demands. *Buckley*, 424 U.S. at 74:

- Moussaron Declaration—Moussaron offers only hearsay statements from unidentified pilots. He avers that "about ten" of over 100 pilots told him they wanted to join the organizing effort but would not because of perceived risk, and that "about 45" more expressed caution. Moussaron Decl. ¶¶ 3–11. These out-of-court statements are hearsay. Fed. R. Evid. 801(c), 802. At most, they could show that some unnamed pilots *felt* afraid. They cannot establish the reasons for that fear, which rest on what the pilots "understood had happened to pilots involved in earlier organizing efforts." Moussaron Decl. ¶ 4; *see* Fed. R. Evid. 803(3). He provides no names, no specific threats, and points to ***no adverse actions*** taken against ***any pilot*** for union activity. Courts reject this type of evidence. *See In re Documents*, 2024 U.S. Dist. LEXIS 59577, at *18–19 (Party "must go beyond" conclusory statements and demonstrate through proofs a basis for the assertions made"); *DoorDash*, 754 F. Supp. 3d at 578 ("Mere general opposition to or aggravation from mandated discovery is not enough to demonstrate the chilling effects that the First Amendment seeks to avoid.").

- Krithivas Declaration—Krithivas's declaration adds nothing to the chilling-effect analysis and merely recounts his employment consequences at American Airlines and his decision to resign. Krithivas Decl. ¶¶ 12–25. Those are consequences of being named as a defendant in a data-theft lawsuit; not evidence of retaliation against uninvolved pilots who simply support ALPA.

- Rindfleisch Declaration—Rindfleisch asserts his personal opinion that fear is "greater than in any other organizing campaign" he has encountered. Rindfleisch Decl. ¶¶ 16–19. He identifies no pilot other than the Defendants, who suffered an adverse employment action, describes no comparative baseline, and names no other campaigns. His declaration is merely a professional organizer's subjective impression of workplace sentiment with no specific instances of adverse conduct other than Moussaron's termination for the wrongdoing alleged in this case. *See Hispanic Leadership Fund, Inc. v. Walsh*, 2014 U.S. Dist. LEXIS 192506, at *4 (N.D.N.Y. June 9, 2014) (rejecting as "speculative and remote" an organization president's unsupported claim that disclosure would chill the organization's ability to engage in "open and honest" discussions).

- Doe Declaration—The Doe declaration deserves no weight. Defendants have not disclosed Doe's identity to SkyWest or the Court. He is allegedly a former SkyWest pilot who left voluntarily and in good standing. SkyWest therefore cannot confirm that Doe is a SkyWest pilot, test the basis for Doe's assertions, probe for bias, or respond with contrary evidence. Even taken at face value, the declaration describes his perception of a workplace atmosphere without identifying a single specific instance of retaliation against any pilot for supporting ALPA. Dkt. No. 132-9, Doe Decl. ¶¶ 4–14. *See Ward v. Thompson*, 2022 U.S. Dist. LEXIS 171807, at *8 (D. Ariz. 2022) (privilege claim

rejected where party did not explain, "beyond conclusory allegations," how enforcement "will have a deterrent effect of the exercise of protected activities").

- Naqvi Declaration—Naqvi left SkyWest in December 2023, before the current campaign began and is not a pilot whose associational rights are at stake. Naqvi Decl. ¶ 2. The conduct he describes is attributed to other pilots and SAPA representatives, not SkyWest. *Id.* ¶¶ 5–8 (describing how a former SAPA representative "publicly targeted him on Facebook"). He offers no evidence connecting SkyWest to the anonymous FAA complaint he received. Much of his account rests on what others told him. *Id.* ¶¶ 5–9. One former uncorroborated account of conduct by non-employer actors does not establish the employer-directed harassment the *prima facie* standard requires. *See United States v. Town of Colo. City*, 2014 U.S. Dist. LEXIS 153308, at *5–6 (D. Ariz. 2014) (affidavit was "self-serving, speculative and conclusory").

The critical, unrebutted fact is this: although ALPA has been trying to organize SkyWest's roughly 5,100 pilots since at least the mid-1990s, Rindfleisch Decl. ¶ 4, Defendants cannot identify ***a single pilot*** who was terminated, demoted, reassigned, or otherwise disciplined for supporting ALPA, nor any retaliation claim filed with the EEOC, the National Mediation Board, or any court since the 2007 campaign. Ex. P, Declaration of Todd Emerson ("Emerson Decl.") ¶¶ 3–5. That absence is fatal. *See Gueye v. Mike Bloomberg 2020, Inc.*, 2021 U.S. Dist. LEXIS 168439, at *6–7 (N.D. Tex. Mar. 12, 2021) (No prima facie showing where party offered "no evidence before the Court" that any person "would be deterred from exercising their First Amendment rights"); *Sherwin-Williams Co. v. Spitzer*, 2005 U.S. Dist. LEXIS 18700, at *16 (N.D.N.Y. Aug. 24, 2005) ("Speculating that the document demands may cause a withdrawal of membership does not bolster [the] claim of a First Amendment infringement.").

Importantly, multiple events Defendants point to involve consequences directed at individuals accused of specific data misappropriation. A person accused of stealing proprietary data, or of helping hack a union election, who then faces professional consequences is in an entirely different posture than an ordinary pilot who signs an authorization card. Defendants'

conflation of the two does not satisfy the objective evidentiary standard the privilege demands. *Amaya,* 2016 U.S. Dist. LEXIS 63588, at *40 & n.11 (allegation of retaliation against a defendant accused of wrongdoing "does not suggest that [his] ability or desire to associate with others . . . has been or would be chilled"); *Perry*, 591 F.3d at 1162 (prima facie case "turns . . . on whether disclosure of the information will have a deterrent effect on the exercise of protected activities").

## C. <u>Defendants' Historical and Comparative Evidence Is Likewise Insufficient.</u>

### *1. SkyWest Pilots ALPA Organizing Comm. v. SkyWest Airlines, Inc.*

Defendants rely heavily on the 2007 *SkyWest Pilots ALPA Organizing Committee* ruling, but that case undermines their position. The court granted a narrow preliminary injunction concerning ALPA lanyards and the distribution of ALPA materials in non-work areas; it denied ALPA's requests that SkyWest stop funding SAPA—the pilots' in-house bargaining association—or give ALPA equal access to pilot email, mailboxes, and new-hire training. *SkyWest Pilots ALPA Organizing Comm. v. SkyWest Airlines, Inc.*, 2007 U.S. Dist. LEXIS 48316, at *35–47 (N.D. Cal. June 27, 2007). The court made no finding that any pilot was terminated or demoted for supporting ALPA. It was a preliminary ruling on access policies, not retaliation, and the case later settled before final judgment.

The 2007 case is significant for another reason. ALPA filed declarations from numerous pilots who identified themselves as ALPA supporters, Rindfleisch Decl. ¶ 7, and gave SkyWest a full list of its organizing committee members. Ex. P, Emerson Decl., ¶ 3. SkyWest thus knew ***exactly*** who the organizers were. *Id.* Yet in the 19 years since that ruling, those pilots either continued their careers at SkyWest or left voluntarily, and no retaliation claim was ever filed. *Id.*

The historical record refutes any claimed fear of retaliation from disclosure of ALPA supporters' identities.

*2. AFA Litigation*

The AFA litigation is equally irrelevant. That case involves a different workforce (flight attendants, not pilots), different parties, and different claims. *See Ass'n of Flight Attendants-CWA v. SkyWest Airlines*, *Inc.*, No. 2:23-cv-00723-DBB-DBP (D. Utah). The order Defendants cite resolved a motion to compel filed by the SkyWest Inflight Association—not SkyWest—and a cross-motion for protective order, with the court's reasoning stated on the record rather than in a written analysis. *Id.*, Dkt. No. 157 at 1 & n.1. Nothing in the order reflects a finding that the invoking party made a prima facie showing under *Grandbouche*. *See id.* More importantly, the order did not permit wholesale withholding. It expressly provided that it "does not permit Plaintiffs to withhold any documents that are otherwise responsive to a party's discovery request," but "only permits Plaintiffs to redact the name and personal identifying information of certain individuals." *Id.* at 2 n.2. It required the union to disclose, under AEO designation, the identities of non-public supporters named in any party's Rule 26 disclosures, and it permitted any party to seek disclosure of redacted identities on a document-by-document basis. *Id.* at 2. In other words, the AFA order required exactly what Defendants have refused to do here—produce responsive documents, subject to targeted safeguards, rather than withhold them.

The facts of the AFA case also undercut Defendants' position. The only individuals SkyWest terminated were those who admitted to impersonating flight attendants and using stolen credentials to log into a labor election—conduct analogous to what Defendants are accused of here. Ex. P, Emerson Decl., ¶¶ 7–9. Other AFA supporters remain employed, continue to

organize, and allege no retaliation. *Id.* As in this case, employment consequences flowed from specific misconduct, not from protected association. *See Amaya*, 2016 U.S. Dist. LEXIS 63588, at *22 (rejecting associational privilege where the party seeking protection was itself accused of wrongful conduct).

### *3. NAACP v. Alabama*

Defendants' reliance on *NAACP v. Alabama* is inapt. That case involved a State's demand for a membership list amid documented violent reprisals against civil rights activists in the Jim Crow South. 357 U.S. at 462–63. This is a commercial dispute between a private employer and two former employees, and Defendants offer no comparable record. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 627 (2021) (Sotomayor, J., dissent) (explaining that the Court has "consistently required at least some record evidence demonstrating a risk of such objective harms"); *Sherwin-Williams*, 2005 U.S. Dist. LEXIS 18700, at *15–16 ("The association privilege cannot be used to circumvent general and legitimate discovery where the specter of intimidation and reprisal is not present").

Defendants have assembled inapposite authority and asked the Court to find a pattern that does not exist. The Motion should be denied for this reason alone.

## III. THE *GRANDBOUCHE* FACTORS OVERWHELMINGLY FAVOR DISCLOSURE.

Even if Defendants had made a *prima facie* showing, the *Grandbouche* balancing test requires disclosure. The court weighs four factors: "(1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information." *Grandbouche*, 825 F.2d at 1466. Each weighs heavily in SkyWest's favor.

### A. <u>**The Information Goes to the Heart of SkyWest's Claims.**</u>

SkyWest's claims require proof of who accessed its data, how it was used, who received it, and how it was distributed. *See* Compl. at 12–22. To that end, SkyWest has sought Remote Server and DMS records, Defendants' communications with the OC and ALPA concerning SkyWest's data, and the identities of the individuals who accessed, used, or received that data. *See supra* Background Section III.

The first Grandbouche factor asks simply whether the evidence is relevant. *Grandbouche*, 825 F.2d at 1466. Information bearing directly on the conduct at the center of a plaintiff's claims satisfies that factor and weighs in favor of compelled disclosure. *See Amaya*, 2016 U.S. Dist. LEXIS 63588, at *21 (information was "highly relevant" to the claims and defenses and "goes to the heart of the case and weighs in favor of compelled disclosure"). SkyWest readily satisfies that standard. *See Farmland Partners Inc. v. Fortunae*, 2020 U.S. Dist. LEXIS 260126, at *12–14 (D. Colo. May 18, 2020) (holding that "identity of others allegedly involved" in "scheme" were "clearly relevant" to the plaintiff's claims); *AFT Michigan v. Project Veritas*, 2020 U.S. Dist. LEXIS 259422, at *24–27 (E.D. Mich. 2020) (compelling disclosure over First Amendment claims where case involved infiltration and wrongful conduct); *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 2018 U.S. Dist. LEXIS 91336, at *35 (N.D. Cal. 2018) (ordering discovery over First Amendment objections in case involving fake identities, illegal taping, and theft of confidential documents).

The evidence SkyWest seeks is undoubtedly critical to those claims. SkyWest does not know who—other than Moussaron and Krithivas—accessed the DMS. Ex. A, ROG No. 7, at 5 (admitting that "Moussaron and two other members of the organizing committee previously had

administrative-level access to the DMS" but refusing to identify them). SkyWest does not know who made the outreach calls using its data. *Id.*, ROG No. 16, at 15 (stating only that "[t]he individuals who participated in outreach calling are among the Organizing Committee members"). SkyWest does not know who received the DMS exports beyond ALPA. *Id.*, ROG No. 7, at 5 (confirming Rindfleisch received "encrypted CSV and XLS documents" but refusing to identify further recipients). And SkyWest does not know whether the data was further copied, modified, retransmitted, or stored on systems beyond the Remote Server, or who among the OC discussed, planned, or directed the extraction from SWOL. Each of these questions goes directly to the elements of SkyWest's claims.

In fact, Defendants concede as much. They admit that they "do not seek a blanket prohibition on union-related discovery," and that "responsive documents would not be withheld merely because they contain protected information." Dkt. No. 132 at 2–3. Similarly, Defendants concede that "communications conveyed outwardly for purposes of persuasion or recruitment do not become categorically privileged merely because they concern organizing." *Id.* at 6. Most significantly, Defendants admit that "[i]f a particular person actually obtained, possessed, transferred, or used SkyWest-derived information in a manner relevant to a pleaded claim or defense, that conduct may present a legitimate discovery issue." *Id.* at 16. That is ***precisely*** what SkyWest seeks: the identities and conduct of the individuals who accessed the DMS, made outreach calls using SkyWest's data, and received or transmitted that data.

To the extent SkyWest seeks the identity of certain individuals, they are not mere bystanders or "nonparty pilots or employees whose identities have not been publicly disclosed as supporting, participating in, assisting, or privately communicating with the organizing

campaign." Dkt. No. 132 at 2. Rather, they are the people who received the data, loaded it into the DMS, made outreach calls using that data, compiled the campaign metrics Moussaron reported to ALPA, and distributed SkyWest's information to third parties. To the extent they were participating in union organizing, they were doing so with misappropriated data.

The information is equally relevant to SkyWest's defense of Defendants' counterclaims. Moussaron alleges that SkyWest violated 45 U.S.C. § 152, Third and Fourth, by interfering with pilot organizing and terminating him in retaliation for it. Dkt. No. 47, Countercl. ¶¶ 69–85. Krithivas likewise pleads that this suit is part of a "broader campaign of retaliation against pilots associated with union organizing activities" that was "intended to chill, deter, punish, and interfere with pilot union organizing efforts." Dkt. No. 114, Krithivas Countercl. ¶¶ 1, 30–31. Having placed the organizing campaign, its participants, and their asserted fear at the center of their affirmative claims, Defendants cannot simultaneously withhold the evidence by which those allegations would be tested. *Grandbouche* squarely addresses this. While the Tenth Circuit declined to adopt a per se rule that a party waives the privilege by filing suit, it held that "the fact that Grandbouche has placed certain information into issue by his complaint is a factor that the trial court should consider under the *Silkwood* balancing test," and it observed that Grandbouche conceded "he has no basis for refusing to produce information concerning persons who he claims were harassed or intimated by the IRS." 825 F.2d at 1467. The court endorsed the principle that "[w]hen such associational activities are directly relevant to the plaintiff's claim, and disclosure of the plaintiff's affiliations is essential to the fair resolution of the lawsuit, a trial court may properly compel such disclosure." *Id.* (quoting *Britt v. Superior Court*, 574 P.2d 766, 775 (Cal. 1978)). Moussaron cannot claim that dozens of OC members resigned in fear while invoking the

privilege to conceal who they are, and Defendants cannot seek damages for a chilled campaign while blocking SkyWest from testing whether any chill occurred.

Ultimately, courts have refused to let the privilege shield conduct that cannot be severed from association. *See Perry*, 591 F.3d at 1162 (The privilege "certainly does not apply to documents or messages conveyed to . . . individual voters for purposes such as persuasion, recruitment or motivation."); *Farmland Partners*, 2020 U.S. Dist. LEXIS 260126, at *15–18; *Planned Parenthood*, 2018 U.S. Dist. LEXIS 91336, at *33. This factor weighs heavily in favor of disclosure.

### B. SkyWest Cannot Determine the Scope of Misappropriation Without the Withheld Information.

The chain of custody of SkyWest's stolen data resides exclusively with Defendants. SkyWest does not know—and cannot know without the withheld information—how many copies of the DMS exist, who has access to those copies, whether additional exports were made beyond the transmissions reflected in the ALPA production, or whether the data has been reproduced, transmitted, or stored on external systems. Each confirmed transmission of SkyWest's data represents a discrete link in a chain that SkyWest cannot reconstruct because Defendants continue to withhold the identities of individuals at each link.

Defendants' proposed redaction regime creates a Catch-22. Under their proposal, SkyWest could challenge a specific redaction only by demonstrating "particularized need" for the redacted identity. Dkt. No. 132, at 17. But SkyWest cannot demonstrate particularized need for an identity it does not know exists. A redacted name reveals nothing about whether the person behind it accessed the DMS, received an export, or simply received an outreach text—the very distinction that determines whether a challenge is warranted. Because Defendants' privilege

logs describe entire categories of material in single, generic entries (*see supra* Background Section III), SkyWest would have no roadmap for identifying which redactions to challenge. Consider a communication showing that [Redacted Pilot A] accessed the DMS on a particular date, loaded SkyWest data, and transmitted it to [Redacted Pilot B]. SkyWest could not depose the author, trace the data, determine whether the author had authorization, or subpoena third parties. The document would be technically "produced" but functionally useless.

The second *Grandbouche* factor—necessity—weighs decisively in SkyWest's favor.

**C. <u>The Information Is Not Available from Other Sources</u>.**

SkyWest has exhausted every reasonable alternative. Through direct discovery to Defendants, SkyWest received blanket objections across all six categories. *See supra* Background Section III. Through the Rule 45 subpoena to ALPA, SkyWest obtained partial information limited to what ALPA possessed, but Defendants moved to quash that subpoena (Dkt. 106), and SkyWest's enforcement efforts have been stayed pending resolution of this Motion. Dkt. Nos. 120, 121. SkyWest served notice of subpoenas to EZ Texting and GoFundMe to obtain records of how its data was used in the outreach campaign. Dkt. No. 151-1. Defendants moved to block those subpoenas as well. Dkt. Nos. 151, 152. SkyWest sent multiple conferral letters and participated in video conferences with opposing counsel. Ex. J; Ex. I; Ex. E. None produced meaningful progress.

The need for nonparty discovery is especially acute because Defendants themselves claim that much of the relevant evidence is no longer in their possession. Moussaron admits that he deleted his text messages with Krithivas and the email transmitting the DMS export to Rindfleisch, that he did not retain the TamperMonkey script after its last use on December 9,

2025, and that he migrated the database on or about December 16, 2025. Ex. H, ROG No. 11, at 10–11. He states that the Teams chat used to transmit the script "is no longer available," *id.*, RFP No. 8, at 21; that the exported files sent to Rindfleisch "existed only as attachments to the transmittal email" and that the email account "is no longer accessible," Dkt. No. 78-1 at 8; and that his EZ Texting account "has been locked by the provider" so that he cannot export further records, Ex. H, RFP No. 12, at 24–25. Moussaron further represents that ALPA "assumed administration of organizing communications on November 1, 2025." Dkt. No. 78-1 at 4. Krithivas, for his part, admits that he "removed posts and comments related to SkyWest en masse" and that he cannot access the Teams chat history from September 3, 2025. Ex. F, ROG No. 14, at 9–10; RFP No. 19, at 19–20.

Thus, by Defendants' own account, the only remaining sources for much of this evidence are the recipients and platforms on the other end of those communications—Rindfleisch and ALPA, EZ Texting, and the OC members who accessed the DMS and made outreach calls. Yet Defendants have moved to quash or stay every effort to obtain that evidence from those very sources. Dkt. Nos. 106, 151, 152. Defendants cannot have it both ways. They cannot tell SkyWest that the evidence is no longer available from them while simultaneously invoking the same privilege to block SkyWest from obtaining it anywhere else. Where, as here, the information "is not available other than from" the Defendants and those acting with them, this factor weighs decisively in favor of disclosure. *Amaya*, 2016 U.S. Dist. LEXIS 63588, at *21–22. The Court should therefore permit SkyWest to proceed with nonparty discovery from ALPA, EZ Texting, and the individuals who accessed or received SkyWest's data.

Nor can SkyWest fill the gap through depositions because Defendants have indicated they would assert the same First Amendment objections there. *See supra* Background Section IV. Until this Motion is resolved, discovery is effectively frozen. SkyWest has made that showing. *See Farmland Partners*, 2020 U.S. Dist. LEXIS 260126, at *20. The third *Grandbouche* factor weighs in its favor.

**D. <u>SkyWest Seeks Evidence of Conduct, Not Associational Activities.</u>**

The fourth *Grandbouche* factor examines the nature of the information. *Grandbouche*, 825 F.2d at 1466-67. Courts treat evidence sought from a party as different from evidence sought from nonparties. *Amaya*, 2016 U.S. Dist. LEXIS 63588, at *16 ("There is a difference when . . . discovery is sought from a defendant newsperson versus when it is sought from a non-party."). Database changelogs showing who accessed the DMS and when, access logs showing which SWOL endpoints were queried and from what devices, communications about data transmissions and campaign logistics, and records of transmissions to ALPA and other third parties are evidence of conduct. This is simply not evidence of political belief or associational preference. A pilot who privately favors ALPA but never touched SkyWest's pilot data has nothing to fear from this discovery. SkyWest is not asking who supports unionization; it is asking who took its data, who received it, and what was done with it.

Moreover, "communications with third-party organizations are not protected by the First Amendment privilege of association." *La Union del Pueblo Entero v. Abbott*, 2022 U.S. Dist. LEXIS 222064, at *34 (W.D. Tex. Dec. 9, 2022). "[A]n expansive view of the associational privilege would swallow the discovery process altogether." *Id.*; *see Mi Familia Vota*, 344 F.R.D. at 513–14 (privilege does not extend to external communications with third parties, only internal

communications and membership identities). Communications conveyed outwardly for "persuasion, recruitment or motivation" are not privileged. *Perry*, 591 F.3d at 1160-61.

*Amaya v. Bregman* is instructive. There, defendants affiliated with a political action committee received and used emails that a former campaign manager had intercepted, then invoked the associational privilege to resist discovery of their communications about them. 2016 U.S. Dist. LEXIS 63588, at *3–4, *25–26. The court compelled disclosure. In applying the *Grandbouche* factors to a related First Amendment privilege claim, it found that information about who "intercepted, disclosed, or used" the emails "goes to the heart of the case," was "not available other than from" the defendants, and that it mattered that the privilege's proponents were "Defendants, ***who are accused of wrongdoing***, rather than undisputedly innocent non-parties." *Id.* at *10, *21–22 (emphasis added). The same is true here. SkyWest's claims turn on who accessed, disclosed, and used its data. That information resides with Defendants. And the parties invoking the privilege are the individuals accused of taking it. Defendants cannot convert evidence of their alleged misconduct into protected association simply because it occurred in service of a cause.

Accordingly, the information Defendants seek to withhold—including spreadsheets of pilot contact information extracted from SkyWest's systems, accompanied by campaign metrics and response rates—consists of external recruitment communications built on allegedly misappropriated data, not internal deliberations about policy or strategy. It therefore falls outside any associational privilege. Defendants cannot launder evidence of unlawful conduct through the First Amendment by labeling it associational activity. *See AFT Michigan*, 2020 U.S. Dist. LEXIS 259422 (compelling disclosure over First Amendment claims where case involved infiltration

and wrongful conduct); *Planned Parenthood*, 2018 U.S. Dist. LEXIS 91336, at *33. The final factor weighs in SkyWest's favor.

## IV. AEO TREATMENT PROVIDES ADEQUATE SAFEGUARDS.

The existing Standard Protective Order already provides the safeguards Defendants claim are absent. Under an Attorneys' Eyes Only ("AEO") designation, the identities of union supporters, organizers, and SAPA representatives would be disclosed only to outside counsel—not to SkyWest management, human resources personnel, or any individual with supervisory authority over the pilots whose information is at issue. Other courts have recognized that protective order protections are adequate to balance legitimate confidentiality interests against a litigant's need for relevant evidence. *See Planned Parenthood*, 2018 U.S. Dist. LEXIS 91336, at *40 (ordering AEO production under protective order, which "the Ninth Circuit has held limits the potential for First Amendment infringement.") (cleaned up); *X Corp.*, 2024 U.S. Dist. LEXIS 184000, at *31 ("[A]s a safeguard to protect Defendants' associational rights, Plaintiff must ask the Court before using any information beyond the 'Attorney's Eyes Only' designation."). Defendants offer no explanation for why the existing protective order framework is insufficient.

Defendants' concerns about Todd Emerson are entirely speculative. SkyWest has not provided AEO material to Mr. Emerson; it has asked only that he be permitted to receive it, Dkt. No. 63, at 8, and has agreed he will not see it until the Court rules. If Defendants believed AEO treatment was insufficient, they should have proposed specific modifications during seven months of conferral rather than withholding critical evidence. It is Defendants' burden to show the existing protections are inadequate, and they have not met it.

Notwithstanding Defendants' alleged concerns, Mr. Emerson, SkyWest's Vice President of Legal, should not be excluded from seeing AEO material. Mr. Emerson is the in-house attorney managing this litigation for SkyWest, and he must be able to review the discovery to make informed litigation decisions and guide outside counsel; SkyWest has represented that he would not share AEO documents with others at the company. Dkt. No. 70 at 2–3. Outside counsel cannot evaluate much of the withheld information without SkyWest's institutional knowledge—for example, whether a given individual had legitimate access to SWOL, whether a particular data field could only have come from SWOL's restricted views, or whether a recipient holds a position that would give SkyWest's data additional reach. Courts reject efforts to exclude in-house counsel based on status alone. *See U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468–69 (Fed. Cir. 1984) (holding that "status as in-house counsel cannot alone create that probability of serious risk to confidentiality and cannot therefore serve as the sole basis for denial of access"). Defendants offer nothing beyond Mr. Emerson's role as SkyWest's counsel in the 2007 litigation nearly two decades ago. Dkt. No. 132 at 21.

At a minimum, if the Court concludes that Mr. Emerson should not receive AEO material, it should require Defendants to produce responsive documents in two forms: an unredacted version designated AEO for outside counsel and a simultaneously produced redacted version designated Confidential that SkyWest's in-house team may review. That approach—which SkyWest proposed in connection with the EZ Texting and GoFundMe subpoenas, and which Defendants answered by moving for a protective order the next day—would protect any legitimate associational interest while permitting SkyWest's client representatives to help counsel identify what SkyWest does not yet know. *See* Dkt. No. 151-2; Dkt. Nos. 151, 152.

Defendants' reliance on *Blissenbach* is misplaced. There, the court denied a motion to compel ALPA—a *nonparty* amicus—to produce eight years of internal collective-bargaining strategy in a challenge to Minnesota's sick-leave law. *Air Transp. Ass'n of Am. v. Blissenbach*, 2026 U.S. Dist. LEXIS 78488, at *2–3 (D. Minn. Apr. 10, 2026). ALPA was accused of no wrongdoing. The court rested its ruling on Rule 26(c)'s undue-burden protections, giving "special weight" to ALPA's nonparty status and to the fact that opposing counsel were "longtime counsel to Delta in matters adverse to ALPA"—not on the associational privilege or *Grandbouche*. *Id.* at *19–20, *24–25. This case is the opposite. Defendants are parties accused of misappropriating SkyWest's data, and SkyWest seeks evidence of who accessed its systems, who received its data, and what they did with it. *See Amaya*, 2016 U.S. Dist. LEXIS 63588, at *22.

## V. DEFENDANTS' PROPOSED REDACTION REGIME IS UNWORKABLE AND UNTIMELY.

Defendants' proposed redaction regime is too little, too late. Defendants never proposed targeted redactions during seven months of conferral or in response to six motions to compel. The proposal surfaced only after the Court intervened (Dkt. No. 108). Had Defendants proposed redactions at the outset, SkyWest could have evaluated them and avoided months of fighting. Instead, SkyWest has been forced to litigate in the dark while Defendants held their cards.

The proposed regime is also unworkable for the reasons explained above. *See supra* Section III.B. The fundamental problem is that Defendants have failed to produce critical information—in any form, under any designation, subject to any safeguard. The Federal Rules required them to state what they were withholding and to "permit inspection of the rest." Fed. R. 34(b)(2)(C). Raising a privilege does not shift that burden to SkyWest. *In re Motor Fuel*, 641

F.3d at 488 (declining to dispense with "traditional allocation of burdens . . . simply because the claimed privilege implicates the First Amendment.").

Defendants could have produced redacted documents months ago and let SkyWest evaluate whether the redactions were workable. They could have produced documents under AEO designations while reserving the right to seek further protection. They could have produced the technical and transactional information they concede is discoverable with associational identifiers redacted. Dkt. No. 132 at 15–16. They did none of those things.

SkyWest cannot assess whether a redaction regime is workable without seeing what is being redacted. The time for proposals has passed. The Court should order production.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion (Dkt. No. 132), grant SkyWest's discovery motions (Dkt. Nos. 61, 63, 67, 69, 70, 71, 72), and order Defendants to produce, within fourteen (14) days, the information and documents sought in those motions, subject to the Standard Protective Order.

Dated this 13th day of October, 2026.

HOLLAND & HART LLP

*/s/ Tyson C. Horrocks*
Gregory M. Saylin
Tyson C. Horrocks
Zachary T. Burford

*Attorneys for Plaintiff and Counterclaim Defendant SkyWest Airlines, Inc. and Counterclaim Defendant Dale Hansen*

**CERTIFICATION OF WORD COUNT**

Pursuant to DUCivR 7-1(a)(6)(C), I, Zachary T. Burford, certify that this Opposition contains 10,134 words and complies with DUCivR 7-1(a)(4) and the Court's order granting SkyWest's Motion for Overlength (Dkt. No. 172).

*/s/ Zachary T. Burford*

39675044