Jonathan K. Thorne (Utah Bar No. 12694)
Lauren I. Scholnick (Utah Bar No. 7776)
Jack Holland (pro hac vice)
**SCHOLNICK THORNE HOLLAND**
40 South 600 East
Salt Lake City, Utah 84102
Telephone: (801) 359-4169
Facsimile: (801) 359-4313
Email: jonathan@utahjobjustice.com
lauren@utahjobjustice.com
jack@laborwest.com
*Attorneys for Defendant and Counterclaim Plaintiff Daniel Moussaron*

Timothy D. Ducar (Utah Bar No. 13423)
Scott C. Uthe (pro hac vice)
**LAW OFFICES OF TIMOTHY D. DUCAR, PLC**
9280 E. Raintree Drive, Suite 104
Scottsdale, AZ 85260
Telephone: (480) 502-2119
Facsimile: (480) 452-0900
Email: orders@azlawyers.com
*Attorneys for Defendant and Counterclaim Plaintiff Vikaas Krithivas*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH – SOUTHERN DIVISION**

| | |
|---|---|
| SKYWEST AIRLINES, INC.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>and DALE HANSEN,<br><br>Additional Counterclaim Defendant,<br><br>vs.<br><br>DANIEL MOUSSARON and VIKAAS KRITHIVAS,<br><br>Defendants and Counterclaim Plaintiffs. | **DEFENDANTS' REPLY IN SUPPORT OF JOINT MOTION FOR PROTECTIVE ORDER (DKT. 132)**<br><br>Civil No. 4:26-cv-00015-DN-PK<br><br>Senior District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

## TABLE OF CONTENTS


**INTRODUCTION** ... 3

**ARGUMENT** ... 5

**I. THE PRIVILEGE WAS NOT WAIVED** ... 5

**A. Defendants' Privilege Objection Was Timely.** ... 5

**B. Non-Parties' Associational Privilege Is Not Subject to Waiver.** ... 8

**II. DEFENDANTS MADE THE PRIMA FACIE SHOWING OF A REASONABLE PROBABILITY OF CHILL** ... 9

**A. SkyWest's Contemporaneous Statements and Actions Establish an Objective Basis for Employee Concern.** ... 10

**B. SkyWest's Written Agreements and Organizing History Corroborate Present Concerns.** ... 11

**C. SkyWest's objections to the declarations.** ... 12

**D. The Emerson declaration confirms the showing.** ... 13

**III. THE GRANDBOUCHE FACTORS SUPPORT THE PROPOSED ORDER** ... 14

**A. SkyWest's own authorities ordered the relief Defendants request.** ... 14

**B. Relevance and necessity: the order produces the conduct and withholds the census.** 15

**C. The counterclaims do not waive the privilege of pilots who are not parties.** ... 17

**D. The information is available from other sources.** ... 18

**IV. THE INFORMATION SKYWEST CALLS "CONFIDENTIAL" IS INFORMATION IT GIVES TO ITS OWN IN-HOUSE ASSOCIATION** ... 19

**V. AEO DOES NOT ANSWER THE THRESHOLD QUESTION, AND SKYWEST'S IN-HOUSE LAWYERS ARE THE REASON** ... 20

**VI. THE GOFUNDME SUBPOENA SHOWS WHAT SKYWEST ACTUALLY SEEKS** 21

**CONCLUSION** ... 22

## INTRODUCTION

Defendants seek to protect the identities of pilots who privately supported a union organizing campaign against SkyWest, and the individual answers those pilots gave when asked whether they wanted a union. In February SkyWest agreed that this information should be protected, and that they were not interested in unionizing information.[1] SkyWest's Opposition[2] now claims the opposite and presents the Court with a false choice: either SkyWest receives unrestricted access to the identities/communications of employees engaged in union organizing, or it cannot investigate Defendants' alleged conduct. However, SkyWest's rationale falls short. Learning which of its roughly 5,300 pilots joined the Organizing Committee ("OC"), answered the December 9 poll, submitted an interest form, talked to an organizer, and gave money to the pilots' legal-defense fund would not provide any context to SkyWest's asserted claims – what contact information was downloaded from SWOL, how it was used, and who now has it.

SkyWest contends that "[e]ight months later, SkyWest still does not know where its data is,"[3] though SkyWest attached as Exhibit Q the inventory Moussaron served on February 20, 2026, which lists the datasets and files identified as derived from SWOL, its custodian, location, the parties with access, and the transmissions identified by Moussaron: to ALPA, to EZ Texting to send the poll, and to a SQL dump to preserve evidence.[4] Moussaron's sworn answers add that he alone had direct access to the server and DMS that he created.[5]

---

[1] Dkt. 35, pg. 6 (Feb. 11, 2026): "SkyWest has no interest in obtaining access to Defendants' unionizing information. To the extent there is union information intermixed with SkyWest's confidential … a protective order with attorneys'-eyes only restrictions or a redaction procedure is more than capable of addressing those concerns."
[2] Dkt. 174
[3] *Id.*, pg. 2.
[4] Dkt. 174-17, pgs. 2–3.
[5] Dkt. 174-1, pg. 5.

SkyWest also incorrectly claims Defendants produced nothing "in any form, under any designation."[6] Moussaron produced the names and contact information of the 5,019 pilots he and Krithivas downloaded, and that he later uploaded to EZ Texting – the total number of pilots contacted – but withheld any pilot responses to that text;[7] the DMS schema and intake source code, so that SkyWest could see every field and how data entered the system;[8] the text messages transmitting the files to Rindfleisch;[9] the email provider correspondence showing the email account was purged before this lawsuit was initiated;[10] and a sworn account of how SWOL was accessed by him and Krithivas in February.[11] The only information Defendants withheld is: a limited number of texts between Moussaron and Rindfleisch, poll responses and group assignments from the December 9 text; from DMS the row-level tables coupling pilot identities with poll responses and interest assessments; interest-form submissions; the identities of Committee members and callers (Krithivas only withheld the name from one text) – "the associational core,"[12] Defendants maintain that they have no additional responsive documents/information.

The basis for refusing the above production is that union organizing information is protected by the First Amendment associational privilege, and similarly applies to third party subpoenas. In response, SkyWest offers three principal arguments: Defendants waived the associational privilege; Defendants failed to establish a reasonable probability of chilling effects; and SkyWest's discovery needs outweigh the constitutional interests involved. As detailed

---

[6] Dkt. 174, pgs. 33–34.
[7] Dkt. 78-1, pg. 8; Dkt. 174-8, RFP No. 12 response, pg. 25; Dkt. 132, pg. 17.
[8] Moussaron_000252–000259; Dkt. 174-8, RFP No. 18 response, pg. 30; RFP No. 22 response, pg. 35.
[9] Moussaron_000260–000261.
[10] Moussaron_000239–000244.
[11] Dkt. 34-1 ¶¶ 9–20.
[12] Dkt. 174-8, RFP No. 12, pg. 25; RFP No. 18, pg. 30; RFP No. 27, pg. 39; Interrog. No. 16, pg. 16.

below, none of SkyWest's arguments justify denying the asserted privilege. Nor does SkyWest establish that the Court should grant SkyWest's seven previously denied discovery motions.[13]

## ARGUMENT

### I. THE PRIVILEGE WAS NOT WAIVED

#### A. Defendants' Privilege Objection Was Timely.

SkyWest argues that Defendants waived the associational privilege because they did not specifically identify the name of the privilege – First Amendment associational privilege – until July 17. However, since the beginning of the lawsuit, Defendants repeatedly raised privilege concerns by specifically objecting to disclosure of union organizing information. On February 10, Defendants argued that device imaging would chill organizing, citing the Ninth Circuit's recognition of the "harmful effect that an employer's demand for information has on all workers."[14] Moussaron's February 20 responses objected that the requested data "contains confidential union organizing information protected from disclosure under the Railway Labor Act," and his June 5 responses objected to every request "seeking confidential union organizing information that is protected under the Railway Labor Act."[15] Krithivas similarly raised this privilege in his February 20 discovery responses identifying redactions of labor-organizing communications on privilege grounds – he redacted the name of a nonparty organizer in a text message and then logged the redaction as "protected under statutory rights under RLA to prevent further retaliation and interference by SkyWest." The RLA establishes the statutory context in

[13] (Dkt. 108)
[14] Dkt. 34, pgs. 7–9 (citing *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 785 (9th Cir. 2017)).
[15] Dkt. 174-18 (Moussaron Resp. to SkyWest First Set of Expedited Discovery), RFP No. 1 response, pg. 6; Dkt. 174-1, pg. 4 (Gen. Obj. No. 5).

which those concerns arise, while the First Amendment supplies the qualified associational privilege governing compelled disclosure.

While Defendants did not originally provide the case law or the specific name of the privilege in the discovery objections – those objections clearly provided SkyWest notice that Defendants would not produce organizing information as it was privileged. When SkyWest sent a meet-and-confer letter on June 24 pushing back on the objections,[16] Moussaron responded on July 10 providing specific case law explaining how union organizing information was privileged and provided the specific name of the privilege – "First Amendment associational privilege" – citing *NAACP v. Alabama* and *Grandbouche*.[17] SkyWest filed Dkts. 67 and 69–72 on July 10 between 2:39 p.m. and 3:29 p.m.; Moussaron simultaneously emailed the letter at 4:17 p.m. that day (Counsel previously told SkyWest he'd provide a response to the meet and confer by July 10), while those discovery disputes remained pending. On July 17 Moussaron supplemented his responses providing additional information about his union organizing information objection – listing the name of privilege in each response.[18] SkyWest admits in Dkt. 72 that Krithivas sought to protect the identity of a nonparty involved in union organizing based on concerns about retaliation and interference – which is the basis of the privilege.[19] Krithivas's July 17 response expressly invoked the First Amendment associational privilege and the controlling Tenth Circuit authorities.[20]

On July 31, SkyWest demanded Moussaron withdraw the associational privilege as "waived" while conceding that Moussaron had raised this very privilege in February: Moussaron

---

[16] Dkt. 174-10
[17] Dkt. 78-1, pgs. 1–2.
[18] Dkt. 174-8, e.g., pgs. 25, 30, 35, 38, 39.
[19] Dkt. 72, pgs. 2–3.
[20] Dkt. 76, pg. 1.

"had already objected that this discovery would deter protected organizing activity well before the supplement – in his June 5 responses and even earlier in his February 10, 2026 opposition to device imaging..."[21]

The Ninth Circuit decision from which SkyWest's waiver test comes rejected "a per se waiver rule" and warned that "the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts."[22] A supplement that "reassert[s] and expand[s] upon objections asserted in timely served" responses, before any motion is filed, leaves "all objections … timely"; waiver is "reserved … for only those cases where the offending party committed unjustified delay."[23] This District agrees: Judge Oberg found good cause where the objection was made "when the dispute … became apparent" and the initial response "was consistent with" the local rule on which the later objection rested, and Judge Warner declined to find waiver where there was no bad faith, no alleged prejudice, and the objections had been discussed in conferral.[24] Here, prior to any motions being filed, Defendants objected that union organizing information was privileged. And when SkyWest raised concern about the basis of the RLA supporting the privilege, Moussaron promptly provided case law and the privilege name. Not only have Defendants raised this privilege from the beginning, "when the dispute … became apparent," Defendants provided additional information supporting the objection that was completely consistent with original objection. Furthermore, SkyWest has failed to argue any prejudice or reliance.

---

[21] Horrocks Letter (July 31, 2026), pgs. 1–2 (Ex. A); Thorne Email (Aug. 5, 2026) (Ex. B).
[22] Burlington N. & Santa Fe Ry. v. U.S. Dist. Court, 408 F.3d 1142, 1148–49 (9th Cir. 2005).
[23] Hopkins v. Bd. of Cnty. Comm'rs, 2018 U.S. Dist. LEXIS 122356, at *9–10 (D. Kan. July 23, 2018); White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc., 586 F. Supp. 2d 1250, 1266–67 (D. Kan. 2008); Zuniga v. Bernalillo Cnty., 2013 U.S. Dist. LEXIS 94288, at *24–26 (D.N.M. Mar. 21, 2013).
[24] Eagle View Techs., Inc. v. Nearmap US, Inc., 2023 U.S. Dist. LEXIS 88303, at *7–9 (D. Utah May 18, 2023); *See* Strand v. USANA Health Scis., Inc., 2020 U.S. Dist. LEXIS 765, at *4–5 (D. Utah Jan. 2, 2020).

Where the privilege is constitutional, "a trial court possesses the discretion not to find waiver," and "[t]his is particularly true … when the alleged waiver is accomplished by inaction rather than action."[25] In *Apple v. Match*, the associational privilege was first asserted six months after the responses, prompted by a conferral letter; the party "did promptly assert it once the specific discovery dispute that implicated this privilege crystallized," which "was good enough to avoid a waiver of a constitutional privilege," and "[t]here was certainly no prejudice."[26]

The cases SkyWest cites involved twenty-one months of non-compliance through two court orders, an objection dropped from superseding responses coupled with refusal to obey an order, an objection omitted from the responses and first raised later, and pro-se debtors who served nothing;[27] and *NetJets*, credited the First Amendment chilling concern and ordered the union's records produced "with all identifying information redacted."[28] Finally, the relief SkyWest requests – an order compelling production on waiver grounds[29] – should not be granted as good cause excuses any defect in Defendants' original privilege objections under Rule 33(b)(4).

**B. Non-Parties' Associational Privilege Is Not Subject to Waiver.**

Lastly, even if Defendants failed to timely raise this privilege, which they did not, they cannot waive the associational privilege for non-parties who are not a part of this litigation –

---

[25] *Apple Inc. v. Match Grp., Inc.*, 2021 U.S. Dist. LEXIS 161373, at *19 (N.D. Cal. Aug. 19, 2021) (internal quotation marks omitted) (quoting In re DG Acquisition Corp., 151 F.3d 75, 81 (2d Cir. 1998)), motion to vacate denied, 2021 U.S. Dist. LEXIS 217072 (N.D. Cal. Nov. 8, 2021).
[26] Id. at 21.
[27] *See Mi Familia Vota*, 344 F.R.D. at 502–03, 525–26; *See X Corp. v. Media Matters for Am.*, 2024 U.S. Dist. LEXIS 184000, at *8, *16–18 (N.D. Tex. Sept. 27, 2024); *See Pingree v. Univ. of Utah*, 2024 U.S. Dist. LEXIS 101104, at *6–7, *10–12 (D. Utah June 5, 2024); *See KCI Auto Auction, Inc. v. Ephrem*, 2019 U.S. Dist. LEXIS 185410, at *4–8 (D. Kan. Oct. 22, 2019).
[28] *NetJets Aviation, Inc. v. NetJets Ass'n of Shared Aircraft Pilots*, 2017 U.S. Dist. LEXIS 129354, at *13–14 (S.D. Ohio Aug. 15, 2017). *Hernandez v. Off. of the Comm'r of Baseball*, 331 F.R.D. 474 (S.D.N.Y. 2019), does not mention the RLA.
[29] Dkt. 174, pg. 34.

including ALPA and all the non-Defendant pilots who participated in protected union organizing and associational activity. Indeed, in response to SkyWest's subpoena to ALPA, ALPA asserted First Amendment Associational Privilege objections to comparable SkyWest requests that encompass documents or communications that identify current/former SkyWest employees (other than Defendants) who have associated with ALPA or the OC, or that evince or reflect those individuals protected associational activities.[30] As such, ALPA's counsel has represented to Moussaron's attorney that – should the Court find Defendants themselves unable to maintain a privilege objection with respect to the production of protected associational material (whether in response to discovery requests to Defendants, ALPA, or any other third party) – ALPA is prepared to move to intervene in this matter to the extent necessary to assert and protect its own rights and interests in that regard.[31]

## II. DEFENDANTS MADE THE PRIMA FACIE SHOWING OF A REASONABLE PROBABILITY OF CHILL

SkyWest correctly identifies the governing standard but improperly transforms it into a requirement that Defendants produce "objective evidence of actual harassment or intimidation" for supporting ALPA. That is not the test. The Tenth Circuit describes the required showing as "affidavits which describe harassment and intimidation of [a group's] known members, and the resulting reluctance of people sympathetic to the goals of [the group] to associate with [it] for fear of reprisals."[32] The proponent "need not make a showing of harm or other coercion," and the burden "is not difficult when supported by available evidence."[33] "The risk of a chilling effect on

---

[30] *See* Dkt. 174-12 at 3, 6, 8-11, 13-16.

[31] ALPA's also objects on the basis of Fed. R. Civ. P. 26(c)(1)(G) ("ALPA's confidential commercial information… internal organizing strategies, methodologies, tactics, and systems."). *Id*, pg. 4.

[32] *In re Motor Fuel Temp. Sales Pracs. Litig.*, 641 F.3d 470, 491 (10th Cir. 2011) (quoting *In re First Nat'l Bank*, 701 F.2d 115, 116–17 (10th Cir. 1983)) (internal quotation marks omitted); Dkt. 108, pg. 2; Dkt. 174, pg. 16.

[33] 641 F.3d at 488 (quoting *New York State NOW v. Terry*, 886 F.2d 1339, 1355 (2nd Cir. 1989), 492 (Kelly, J., concurring)

association is enough"; the evidence "need show only a reasonable probability" of reprisal; and "[t]here is no requirement that an actual chill experienced by a union be objectively based."[34]

**A. SkyWest's Contemporaneous Statements and Action Establish an Objective Basis for Employee Concern**.

On January 11, 2026, SkyWest Senior Vice President of Flight Operations Tracy Gallo stated:

> "If a pilot or anyone else is hacking our system and we find out who it is it will be automatic termination without question."[35]

That statement preceded completion of any investigation into the alleged unauthorized access. Fifteen days later, SkyWest terminated Moussaron. Four days later SkyWest filed this action, publicly characterized Defendants' conduct to all of its pilots as theft and unlawful access, and transmitted the Complaint to Krithivas's new employer, American Airlines,[36] and to United Airlines, whose pathway program Moussaron was in, "to make you aware of the initiation of litigation against Mr. Moussaron."[37] SkyWest repeatedly attempts to downplay these actions claiming Defendants were accused of misconduct rather than disciplined solely for supporting a union.[38] That distinction does not eliminate the objectively reasonable chilling effect on employees who fear that disclosure of their organizing relationships could expose them to investigation, allegations of misconduct, or adverse employment consequences. The question is not whether SkyWest has a legitimate right to investigate actual misconduct. It is whether

---

[34] *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021); *Buckley v. Valeo*, 424 U.S. 1, 74 (1976); *Dole v. Serv. Emps. Union, Local 280*, 950 F.2d 1456, 1460 (9th Cir. 1991).
[35] Dkt. 134-1 (SkyWest_0000538); Dkt. 132, pg. 9.
[36] Dkt. 132-1 ¶¶ 9–10; Dkt. 134-2 (SkyWest_0000475).
[37] Suppl. Moussaron Decl. ¶ 5 (Ex. C) (describing SkyWest_0000600 and SkyWest_0001357).
[38] Dkt. 174, pgs. 17–21.

compulsory disclosure of otherwise private organizing associations presents a reasonable probability of discouraging protected participation.

Meanwhile, Naqvi (former SkyWest pilot who helped launch the 2025 campaign), was unmasked to SAPA, who then sent a demand to his new employer; a former SAPA representative publicly targeted him; and after he reported harassing SkyWestOnline messages to SkyWest HR, a fake mental health complaint was sent to the FAA.[39] SkyWest attempts to distance these actions as coming from SAPA not SkyWest. However, SkyWest's funding of and institutional relationship with SAPA provide relevant context that SAPA is not an independent party whose conduct is separate/apart from SkyWest.

An employee deciding whether to participate confidentially in organizing could reasonably consider the consequences of being identified with the campaign, particularly where SkyWest's response included communications to employees and a participant's subsequent employer, while Naqvi also described receiving an FAA complaint shortly after reporting harassment to SkyWest.

**B. SkyWest's Written Agreements and Organizing History Corroborate Present Concerns.**

As detailed in the Motion, the language in SkyWest's SAPA representative agreement supplies objective context for why employees might regard their organizing relationships as vulnerable. SkyWest's Opposition does not eliminate the significance of that documentary evidence merely by asserting that no identified ALPA supporter was terminated solely for supporting ALPA.

---

[39] Dkt. 132-8 ¶¶ 3–10 & Exs. A–B.

Likewise, Defendants do not rely on the 2007 SkyWest litigation as conclusive proof of present-day retaliation. The earlier proceedings provide historical context. The current declarations and SkyWest's more recent statements supply the contemporaneous evidence.[40]

**C. SkyWest's objections to the declarations.**

SkyWest independently dismisses each of the declarations of Moussaron, Krithivas, Rindfleisch, Naqvi, and Doe as speculative or insufficiently particularized.[41] The declarations must instead be considered collectively and in the context of SkyWest's documented conduct. These declarations do more than assert that disclosure might theoretically discourage association. They go beyond and describe actual reluctance to participate openly, requests for confidentiality, and the importance of protecting nonpublic identities to continuing organizing efforts.

With regard to SkyWest's argument of hearsay – the pilots' statements are offered to prove their reluctance and fear – their then-existing state of mind – not the truth of what they believed happened to earlier organizers,[42] and the First National Bank formulation describes exactly this testimony – the proponent does "not need affidavits from" the affected members themselves.[43] In Bonta, the evidence the Court found sufficient was testimony from the organizations' officers about threats to the organizations and their supporters, not declarations from the donors themselves.[44]

With regard to Doe – courts accept anonymous declarations in this setting, and a single member's declaration of dependence on the requesting party made the prima facie case in *Apple*

[40] See *SkyWest Pilots ALPA Organizing Committee v. SkyWest Airlines, Inc.*, No. C-07-2688 CRB, 2007 U.S. Dist. LEXIS 48316, at *4–6, *34–35 (N.D. Cal. June 27, 2007).
[41] Dkt. 174, pgs. 17–19.
[42] *See* Fed. R. Evid. 803(3).
[43] *AFT Mich. v. Project Veritas*, 2020 U.S. Dist. LEXIS 259422, at *29 (E.D. Mich. July 2, 2020); AFL-CIO v. FEC, 333 F.3d 168, 176 (D.C. Cir. 2003).
[44] 594 U.S. at 604, 617; id. at 636–37 (Sotomayor dissenting).

*v. Match*.[45] Importantly, the reluctance to disclose an identity associated with organizing is consistent with the concern the Motion seeks to address.

For the Naqvi Declaration – the RLA provides that representatives of employees "need not be persons in the employ of the carrier,"[46] and his evidence that SAPA's officers pursued a former SkyWest pilot at his new employer demonstrates the breadth and reach of the retaliation that identified pilots have reason to fear, even after leaving SkyWest.[47]

In the AFA case SkyWest relies on, this Court entered its redaction order at the request of plaintiffs who were themselves accused of manipulating a URL to obtain other members' credentials.[48]

The other cases SkyWest relies on to diminish the declarations confirm that the burden is "light" and those cases are distinguishable: a plaintiff that had already disclosed its donors, a defendant who "did not even submit an affidavit," a trade association whose evidence was a "winky-face emoji."[49] None involved an employer seeking the identities of its own employees who organized against it.

**D. The Emerson declaration confirms the showing.**

Emerson attests that since ALPA gave SkyWest its 2007 committee list no pilot has been disciplined for supporting ALPA or filed a retaliation claim, and that the 2007 case "concerned

---

[45] Dkt. 132-9 ¶ 3; *Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 2018 U.S. Dist. LEXIS 91336, at *32–33 (N.D. Cal. May 31, 2018); *Apple v. Match*, 2021 U.S. Dist. LEXIS 161373, at *24–25.
[46] 45 U.S.C. § 152, Third.
[47] Dkt. 132-8 ¶¶ 2, 5–7; 2007 U.S. Dist. LEXIS 48316, at *8–10.
[48] *Ass'n of Flight Attendants-CWA v. SkyWest Airlines, Inc.*, No. 2:23-cv-00723-DBB-DBP, Dkt. 157, pgs. 1–3 (D. Utah Dec. 18, 2025); see also Ass'n of Flight Attendants-CWA v. SkyWest Airlines, Inc., 2025 U.S. Dist. LEXIS 256218, at *5–6 (D. Utah Dec. 9, 2025).
[49] *Hispanic Leadership Fund, Inc. v. Walsh*, 2014 U.S. Dist. LEXIS 192506, at *9–13 (N.D.N.Y. June 9, 2014); *Amaya v. Bregman*, 2016 U.S. Dist. LEXIS 63588, at *36 (D.N.M. May 13, 2016); *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 576–78 (S.D.N.Y. 2024); *United States v. Town of Colo. City*, 2014 U.S. Dist. LEXIS 153308, at *5–6 (D. Ariz. Oct. 28, 2014).

pilots' ability to wear ALPA insignia."[50] The 2007 court found threats of discipline, a captain pulled from a flight, discriminatory enforcement, and a "purge" instruction issued after Emerson learned of the complaints.[51] SkyWest has refused all discovery into its treatment of organizers and its relationship with SAPA,[52] and asks the Court to treat the absence of evidence as proof. The significance of that proceeding is not that SkyWest necessarily terminated identified supporters, but that its restrictions on organizing activity prompted judicial intervention. The present evidence includes substantially more recent events and declarations addressing employees' actual reluctance to participate openly. The absence of a formal retaliation claim does not disprove the sworn evidence that some pilots feared disclosure of their associational activities; the inquiry remains the reasonable probability of chill.

## III. THE GRANDBOUCHE FACTORS SUPPORT THE PROPOSED ORDER

### A. SkyWest's own authorities ordered the relief Defendants request.

SkyWest argues that identities are "inseparable from the conduct" and that the privilege does not reach communications "conveyed outwardly for 'persuasion, recruitment or motivation.'"[53] However, *Perry*—the source of the phrases SkyWest quotes—continues in the same footnote: "The district court may require the parties to redact the names of individuals with respect to these sorts of communications."[54] *La Union* permitted the party "to redact the names of any individual Committee members or volunteers from all discovery";[55] *NetJets* ordered production "with all identifying information redacted"; *Petteway* ordered redacted production;

[50] Dkt. 174-16 ¶¶ 3–7.
[51] 2007 U.S. Dist. LEXIS 48316, at *4–6, *34–35.
[52] SkyWest Objections to Rule 30(b)(6) Notice (Oct. 9, 2026), pgs. 36–39 (Ex. F); Dkt. 160, pg. 2; Dkt. 160-1, pg. 13 (Topics 14–15).
[53] Dkt. 174, pgs. 3, 26, 29–30.
[54] *Perry v. Schwarzenegger*, 591 F.3d 1147, 1165 n.12 (9th Cir. 2010); *Id*. at 1162, 1164.
[55] *La Union del Pueblo Entero v. Abbott*, 2022 U.S. Dist. LEXIS 222064, at *31–34, *39 (W.D. Tex. Dec. 9, 2022).

*Planned Parenthood* disclosed donor identities only under AEO "to minimize the potential for First Amendment infringement"; *Farmland Partners* unmasked "the actual Defendants in the case, not nonparties."[56] The Tenth Circuit's own instruction in *First National Bank* was to consider "whether the Government can acquire the material it ostensibly seeks by obtaining the records with the members' names deleted."[57] Not one of SkyWest's cases ordered the identities of an organization's rank-and-file supporters produced to the adversary they had organized against.

**B. Relevance and necessity: the order produces the conduct and withholds the census.**

SkyWest states it needs to know "who took its data, who received it, and what was done with it."[58] The proposed order gives it all three: it "prohibits Defendants from using associational protection to conceal independently discoverable technical or transactional evidence concerning the acquisition, storage, possession, transmission, use, or disposition of SkyWest information," forbids withholding any document, and permits challenge to redaction where "evidence shows that the individual personally possessed the underlying SkyWest-derived dataset or participated in its acquisition, alteration, transfer, or use."[59]

SkyWest's "Catch-22" hypothetical[60] – describes a document the order requires to be produced and a redaction the order lets SkyWest challenge on its face. Moussaron states that he controlled exports of the underlying data; any dispute concerning the scope of other users' access is a technical discovery issue, not a basis for disclosure of every pilot's organizing preferences.[61]

---

[56] *NetJets*, 2017 U.S. Dist. LEXIS 129354, at 13-14; *Petteway v. Galveston Cnty.*, 2023 U.S. Dist. LEXIS 84369, at *43–46 (S.D. Tex. May 15, 2023); *Planned Parenthood*, 2018 U.S. Dist. LEXIS 91336, at *40, *62, *64; *Farmland Partners Inc. v. Fortunae*, 2020 U.S. Dist. LEXIS 260126, at *21 (D. Colo. May 18, 2020).
[57] 701 F.2d at 119.
[58] Dkt. 174, pg. 29.
[59] Dkt. 132-11.
[60] Dkt. 174, pg. 26.
[61] Dkt. 174-1, Interrog. No. 7 answer, pgs. 5–6; Suppl. Moussaron Decl. ¶¶ 2–4 (Ex. C).

Indeed, the DMS functioned as a phone-banking tool operates: organizer logs into the encrypted DMS using second factor authentication, and is assigned one pilot at a time to contact and upload notes of the conversation to the DMS. When phone-banking, OC members had hourly view and time limits, and the DMS did not allow OC members to view the list of pilots in the system, could not search by name or telephone number, could not review notes about other pilots or see poll responses, could not export any data from the system – they received one pilot at a time to call and then document it. Unlike the DMS, SkyWest's SWOL returned the contact information of all 5,300 pilots to any authenticated pilot who searched it. Moussaron only shared the information from the DMS with Rindfleisch, ALPA's organizing consultant, via an encrypted export.[62]

Moreover, in its response to SkyWest's subpoena, ALPA identified and produced the only six emails in its possession that involve the transmission of alleged SkyWest confidential information, and confirmed that ALPA did not transmit the data outside its organization or otherwise use the data.[63] In fact, ALPA has actually locked the data down out of an abundance of caution and pursuant to this litigation. [64]

---

[62] Suppl. Moussaron Decl. ¶¶ 2–4 (Ex. C); Dkt. 174-1, pgs. 5–6.

[63] Dkt. 174-12, pgs. 7–8 ("Other than January 8 and 9, 2026 emails identified above, ALPA has no other records of any transmission of the January 8 Spreadsheet to any other person. Furthermore, ALPA did not import or upload the January 8 Spreadsheet, or any of its data, into any ALPA databases or data management systems. … March 11, 2026 ALPA confirmed to SkyWest that the January 8 Spreadsheet "has not been and will not be shared outside of ALPA."), pgs. 11–13 ("… ALPA further states that has identified no records of information received from Defendants that may have been derived from SkyWest Online other than that contained in the October 13 Spreadsheet, the December 15 SMS Tab, and the January 8 Spreadsheet… no records of transmission … other than documents identified above ... ALPA further states that it did not import or upload [any of the documents/information] into any ALPA database or data management system …")

[64] *Id*., at 9 ("Mr. Rindfleisch, two senior employees in ALPA's IT Department, and five attorneys and one paralegal in ALPA's Legal Department [have access, and are]… subject to the same password and other security procedures with which ALPA protects its own confidential data."), and 13 ("ALPA further states that … [the documents/information and] any data they contain… are currently stored by ALPA only in the locations, and subject to the access restrictions, identified in response to Request No. 2.").

What the order withholds is the census. SkyWest says it "is not asking who supports unionization,"[65] yet its motions seek the row-level tables pairing each pilot with an "alpa_poll_response," the EZ Texting fields recording "poll responses" and "group assignments," the vendor's records of "any inbound replies or poll responses," the identity of every Committee member and caller, and the names and comments of everyone who donated to the legal-defense fund.[66] The one place the Opposition addresses relevance, it says the claims "require proof of who accessed its data, how it was used, who received it, and how it was distributed."[67] Union sympathies, expressions of interest, and evidence of other associational activity are none of those things.

**C. The counterclaims do not waive the privilege of pilots who are not parties.**

Grandbouche "refuse[d] to adopt a per se rule that a plaintiff waives his First Amendment privileges simply by bringing suit," treating the point as "a factor,"[68] and the California decision it adopted holds that nonparty members "have clearly not waived their constitutional right of associational anonymity."[69] Grandbouche could not refuse to identify the persons he claimed were harassed, whereas here Defendants' counterclaims allege retaliation against themselves, whose identities and injuries are fully disclosed, and the pilots the order protects have asserted no claim.[70] To hold that a party suing over interference with association must surrender the association "would make any judicial protection meaningless."[71]

---

[65] Dkt. 174, pg. 29.
[66] Dkt. 70; Dkt. 71; Dkt. 174-8, RFP No. 12, pg. 25; RFP No. 18, pg. 30; Dkt. 174-1, Interrog. No. 16, pg. 16; Dkt. 151, pg. 4.
[67] Dkt. 174, pg. 23.
[68] *Grandbouche v. Clancy*, 825 F.2d 1463, 1466-67 (10th Cir. 1987).
[69] *Britt v. Superior Court*, 574 P.2d 766, 775 (Cal. 1978).
[70] 825 F.2d at 1467; Dkt. 47, Countercl. ¶¶ 69–80.
[71] *Black Panther Party v. Smith*, 661 F.2d 1243, 1265–66 (D.C. Cir. 1981), vacated as moot sub nom. *Moore v. Black Panther Party,* 458 U.S. 1118 (1982); *Adolph Coors Co. v. Wallace*, 570 F. Supp. 202, 209 (N.D. Cal. 1983).

### D. The information is available from other sources.

SkyWest has the server logs recording every request to the directory endpoint, the complete list of pilots contacted on December 9, Defendants' sworn account, and ALPA's production of the transmittal emails.[72] The "six separate transmissions" it counts are two transmittals of pilot data by Moussaron (October 13, 2025 and January 8, 2026), one Committee roster, and three internal ALPA forwards; Moussaron's produced text messages show both transmittals to ALPA, and the discovery answer SkyWest claims Moussaron said he only sent it "one time" says nothing about how many times.[73] The other items SkyWest seeks, such as email communication between organizers, are no longer in Defendants' possession as it lapsed or was overwritten before any preservation duty attached, as SkyWest has known since July – and falls under the protection anyway.[74]

ALPA's own subpoena response, draws the Motion's line exactly: it identified every transmission, produced the documents free of SkyWest data, identified where every copy sits and who can reach it, confirmed the spreadsheet was never imported or shared outside ALPA, and redacted "Email," "Assessment," "AssessmentDate," "DMSComments," "PilotComments," "Source" and "RegisteredDate" – the associational core, field by field.[75]

Furthermore, on October 23, 2026, SkyWest stated that "as reflected in SkyWest's logs and Defendants' own discovery responses," the access at issue "involved directly invoking the employee-detail endpoint rather than navigating from the visible Directory page; installing the third-party Tampermonkey program; and running a userscript, written by Moussaron and

---

[72] SkyWest_000038; SkyWest_0000545–590; Dkt. 174, pg. 11; Dkt. 174-13.
[73] Dkt. 174-13 (ALPA00001–00005, 00017); Moussaron_000260–000261; Dkt. 174-1, Interrog. No. 7 answer, pgs. 5–6; Dkt. 174, pg. 11.
[74] Dkts. 120, 121, 151, 155; Dkt. 151-2, pg. 2; Dkt. 78-1, pg. 4; Moussaron_000239–000244.
[75] Dkt. 174-12, General Objections 1–2, pgs. 2–3; Responses to Subpoena Requests Nos. 1–2 & n.2, pgs. 6–9.

delivered to Krithivas through Microsoft Teams, that automatically requested pilot records in seniority order at intervals of a few seconds and transmitted the returned data to a remote server controlled by Moussaron."[76] That account – what was accessed, how, by whom, with what tool, and where it went – comes from SkyWest's logs and Defendants' responses. None of it required the identity of a pilot who answered the December 9 poll, how any pilot responded, or the OCs internal assessments. The technical and transactional facts have been discovered.

## IV. THE INFORMATION SKYWEST CALLS "CONFIDENTIAL" IS INFORMATION IT GIVES TO ITS OWN IN-HOUSE ASSOCIATION

The Opposition treats pilot names, numbers and addresses as "sensitive employee data,"[77] yet SkyWest routinely made that information available to all of its pilots,[78] granted designated SAPA leaders access to pilot telephone numbers through Sked+;[79] and sent pilot mailing addresses to SAPA's outside vendor for election mailings that SkyWest reimbursed,[80] including four mailings of roughly 5,000 postcards between December 2024 and July 2026.[81] Thus, SkyWest supplied the same category of data from the same source to a third party for the same purpose – communicating with pilots about representation – while labeling its use by a competing organization as theft. That position also conflicts with labor law: Gray Flooring held that an employee who copied co-workers' names and numbers for organizing had not taken confidential information;[82] employers must provide eligible voters' names and addresses after an

---

[76] SkyWest Resp. to Krithivas Fourth Set (Oct. 23, 2026), Interrog. No. 25 answer, pg. 11; see also pg. 13 (same) (Ex. D).
[77] Dkt. 174, pgs. 4–5.
[78] SkyWest Resp. to Krithivas Third Set (Sept. 30, 2026), RFA No. 24 response, pgs. 6–7 (Ex. G).
[79] Dkt. 111-1 (SkyWest First Supp. Resp. to Krithivas Second Set, Aug. 18, 2026), RFA No. 10 response, pgs. 10–11.
[80] SkyWest First Supp. Resp. to Moussaron Third Set (Oct. 14, 2026), Interrog. No. 8 answer, pgs. 41–42 (Ex. H).
[81] SkyWest_0001782–0001791; SkyWest_0000863; SkyWest FY2025 Form LM-10, Part B, Item 5 (Ex. E).
[82] Dkt. 34, pgs. 8–9 (discussing Gray Flooring, 212 NLRB 668 (1974)).

election is directed;[83] and employers may not use litigation to identify employees engaged in union activity. [84]

By giving one labor organization access to pilot contact information and paying for its mailings while demanding to know which pilots a competing organization contacted and what they said, SkyWest is not protecting a trade secret; it is using this litigation to discover who stands on the other side of a representation contest.

## V. AEO DOES NOT ANSWER THE THRESHOLD QUESTION, AND SKYWEST'S IN-HOUSE LAWYERS ARE THE REASON

AEO governs who may see information once the Court has decided it must be disclosed; it does not decide whether a nonparty pilot's identity must be disclosed at all.[85] A protective order "will ameliorate but cannot eliminate" the harm, and "assurances of confidentiality may reduce the burden of disclosure … [but] do not eliminate it"; "[t]he First Amendment problem is not so much that public disclosure would chill participation … but that disclosure to Apple would do so."[86]

With regard to Emerson, SkyWest's own authority holds that access turns on "each individual counsel's activities, association, and relationship with a party," and that counsel "involved in competitive decisionmaking" may properly be denied access.[87] As detailed in the Motion and Emerson's declaration, he has been a SkyWest labor and employment attorney for the past 20 years, was involved in the ALPA 2007 injunction, and he was directly involved in the

---

[83] *NLRB v. Wyman-Gordon Co*., 394 U.S. 759, 763, 767 (1969).
[84] *Dilling Mech. Contractors, Inc.*, 357 NLRB 544, 546 (2011); *United Nurses*, 871 F.3d at 785–88; *Wright Elec., Inc.*, 327 NLRB 1194, 1194–95 (1999), enfd. 200 F.3d 1162 (8th Cir. 2000).
[85] Dkt. 132, pg. 20.
[86] *Perry*, 591 F.3d at 1164; *Bonta*, 594 U.S. at 616; *Apple v. Match*, 2021 U.S. Dist. LEXIS 161373, at *24 n.7.
[87] *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468–69 (Fed. Cir. 1984); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470–71 (9th Cir. 1992).

investigation into Defendants and Moussaron's termination. ALPA has also raised the same objection in August: production "pursuant to a protective order limiting access to Plaintiff's outside attorneys only," because SkyWest's in-house counsel had "been directly involved in anti-union activity, including decisions to fire OC members."[88] The Standard Protective Order does not list a party's in-house counsel among those who may receive AEO material in any event.[89] If identities must be disclosed on a particularized showing, they should go to outside counsel of record only.

Lastly, SkyWest attempts to distinguish and escape the consequences of *Blissenbach*—which refused to compel the production of certain confidential union information where its disclosure would unduly burden ALPA's rights – based on the fact that the discovery was sought from a non-party (ALPA), rather than from Defendants.[90] But here, as discussed above, production of the associational information SkyWest seeks will burden not just Defendants' rights, but the rights of non-parties – including ALPA and thousands of non-Defendant pilots. Moreover, the protective order Defendants seek that will also apply to third party discovery, including SkyWest's pending subpoena to ALPA, EZTexting, and GoFundMe. As such, the Blissenbach court's holding is entirely relevant and instructive.

## VI. THE GOFUNDME SUBPOENA SHOWS WHAT SKYWEST ACTUALLY SEEKS

SkyWest put its GoFundMe subpoena before the Court as an effort "to obtain records of how its data was used in the outreach campaign."[91] It demands the names, email addresses, donation amounts, dates and "comments and/or messages" of every person who contributed to

---

[88] Dkt. 174-12, General Objection 5, pg. 4.
[89] Standard Protective Order (DUCivR 26-2), §§ B(1)(a)–(h), B(2).
[90] Dkt. 174, pg. 33
[91] *Id*., pgs. 12, 27.

the pilots' legal-defense fund.[92] A donor list is not a record of how data was used, and the Opposition offers no other theory.[93] Contributors who pool resources to support a cause are themselves a protected association, and "[t]he risk of a chilling effect on association is enough."[94]

## CONCLUSION

The Court should grant the Motion, enter the proposed order (Dkt. 132-11), and deny SkyWest's request for wholesale production under the denied motions.

DATED this 27th day of October, 2026.

**SCHOLNICK THORNE HOLLAND**
/s/ Jonathan K. Thorne
Jonathan K. Thorne
Lauren I. Scholnick
Jack Holland
*Attorneys for Defendant and Counterclaim Plaintiff Daniel Moussaron*

**LAW OFFICES OF TIMOTHY D. DUCAR, PLC**
/s/ Scott C. Uthe
Timothy D. Ducar
Scott C. Uthe
*Attorneys for Defendant and Counterclaim Plaintiff Vikaas Krithivas*

## CERTIFICATE OF COMPLIANCE

I, Jonathan K. Thorne, certify that this reply contains 6,198 words, including headings, footnotes and quotations and excluding the caption, signature blocks and certificates, and complies with the Court's Order granting leave to file an overlength reply (Dkt. 191), which permits a reply of up to 6,200 words.

[92] Dkt. 151, pgs. 4, 8.
[93] Dkt. 174, pg. 27.
[94] Bonta, 594 U.S. at 618–19.